Hon. Barbara J. Rothstein

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARLI BROWN and LACEY SMITH, | CASE NO. 2:22-CV-00668-BJR |
| Plaintiffs, | **DEFENDANT ASSOCIATION OF FLIGHT ATTENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| ALASKA AIRLINES, INC., and ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

**TEL** 800.238.4231 | **FAX** 206.378.4132   **LAVITT LLP**

## INTRODUCTION

AFA—the Association of Flight Attendants—respectfully moves for summary judgment on the sole remaining claim Plaintiffs Marli Brown and Lacey Smith assert against it: a claim that AFA discriminated against them by treating them disparately based on their religion. As shown below, AFA is entitled to judgment as a matter of law on the undisputed record because (1) Plaintiffs cannot establish their prima facie case as there is no similarly situated flight attendant whom AFA treated more favorably; (2) AFA decided not to arbitrate Plaintiffs' grievances based on the merits of their claims, not Plaintiffs' religion; (3) AFA has no policy of not advocating for religious flight attendants and, to the contrary, has successfully done so when their claims have merit; and (4) Plaintiffs remain free to this day to arbitrate their claims on their own, precluding them from recovering damages against AFA for its decision not to arbitrate their claims.

## STATEMENT OF UNDISPUTED FACTS

### I.   AFA represents flight attendants at Alaska and several other airlines.

AFA is a labor union that represents nearly 50,000 flight attendants at 19 airlines nationwide, including Alaska. Peterson Dec. ¶ 4. AFA has one Master Executive Council (MEC) per airline and several Local Executive Councils (LECs). Peterson Dec. ¶¶ 9–10. The MEC serves as the union's chief governing body for AFA's membership at that airline, and the LEC serves as the flight attendants' representative at each airline base or domicile. *Id.* Alaska has bases at Anchorage, Los Angeles, Portland, San Diego, Seattle, and San Francisco. Peterson Dec. ¶ 11.

AFA's Constitution and Bylaws commit the union to uniting all flight attendants across various backgrounds, including religion, sexual orientation, and gender identity. Peterson Dec. ¶¶ 12–15; Barnard Dec. Ex. A, Tr. 37:10–42:8; Barnard Dec. Ex. B, Tr. 259:23–260:23. AFA trains its officers and union representatives on these commitments. Peterson Dec. ¶ 16; Barnard Dec. Ex. A, Tr. 118:4–19. AFA also enters into collective bargaining agreements (CBAs or contracts) with

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 1
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
**TEL** 800.238.4231 | **FAX** 206.378.4132   **LAVITT LLP**

airlines, including Alaska, and those contracts have non-discrimination provisions, including commitments not to discriminate on the basis of religion or sexual orientation. Peterson Dec. ¶ 17.

**II.    AFA ably and fairly represented Smith throughout her career at Alaska.**

**A.    In 2017 and 2018, Alaska disciplined Smith for minor issues, prompting AFA to educate her about Alaska's system of progressive discipline.**

In 2017 and 2018, Smith—a Portland-based flight attendant—twice failed to complete her required training in time. Berry Dec. ¶¶ 9–11. During that process, AFA explained the Company's system of progressive discipline to her: repeated incidents of discipline within 18 months of each other build off each other and increase in severity. *Id.*; Peterson Dec. ¶ 32.

**B.    In 2020, Alaska suspended Smith for misrepresenting the Company's position on BLM in a public petition attacking the Company, prompting AFA to warn her to stay out of trouble for 18 months.**

In the summer of 2020, the country witnessed several people of color killed at the hands of police, which prompted many Americans to reflect on the appropriate use of force, accountability for police-involved killings, and the need for Black lives to matter. Berry Dec. ¶ 12; Maller Dec. ¶ 16; Peterson Dec. ¶ 52. Alaska reflected on those issues as well, prompting the Company to announce a series of racial justice commitments as well as a zero-tolerance policy for discrimination and harassment. Berry Dec. ¶¶ 13–14; Barnard Dec. Ex. I; Barnard Dec. Ex. H, Tr. 371:14–372:5, 380:13–384:18.

Smith responded to these developments on August 9, 2020, by emailing Alaska's then-CEO Brad Tilden to oppose what she perceived to be the Company's support for the BLM organization, which she described as a Marxist organization "that has hijacked equality for political reasons." Barnard Dec. Ex. I. That day, Smith also asked her supervisor why Alaska had gotten political and where she could buy "back the blue" shirts. Barnard Dec. Ex. J; Barnard Dec.

DEFENDANT    AFA-CWA'S    MOTION    FOR    SUMMARY
JUDGMENT- 2
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400    **BARNARD**
SEATTLE, WASHINGTON 98119    **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

1  Ex. H, Tr. 384:12–392:8. Smith considered BLM inherently and thoroughgoingly political. *Id.*, Tr.

2  405:4–406:12.

3      Smith then posted her email to her supervisor to a Facebook group called "Conservative

4  Flight Attendants with Wings." *Id.*, Tr. 398:20–403:3. She did so to encourage other conservative

5  flight attendants with concerns about Alaska's support for BLM to reach out to their supervisors.

6  *Id.*

7      Tilden replied to Smith on August 11 that Alaska was staying out of "the political aspect"

8  and focusing on the human rights aspect of these issues. *Id.*, Tr. 404:15–406:12. Smith's supervisor

9  gave her a handout the next day with a detailed explanation of Alaska's support for the BLM

10  movement (not the organization). Barnard Dec. Ex. K; Barnard Dec. Ex. H, Tr. 406:13–412:22.

11      A few days later, Smith wrote a petition titled "Depoliticize Alaska Airlines" and launched

12  it on the internet. Barnard Dec. Ex. L; Barnard Dec. Ex. H, Tr. 413:12–415:7. Notwithstanding the

13  information Smith had received from Tilden and her supervisor, the petition criticized Alaska for

14  supporting the BLM organization and asked the Company to "remove political bias" that, in her

15  view, degraded police officers and threatened to destroy the country. Barnard Dec. Ex. L; Barnard

16  Dec. Ex. H, Tr. 416:19–417:16. Nothing in the petition itself mentions religion or religious belief.

17  Barnard Dec. Ex. L; Barnard Dec. Ex. G, Tr. 139:2–140:5, 141:1–142:12.

18      At least 1,322 people signed this petition and 406 people commented on it. *Id.*; Barnard

19  Dec. Ex. H, Tr. 419:13–420:10. Smith actively monitored the comments and was aware that

20  several passengers, including MVP and MVP Gold passengers, threatened to take their business

21  elsewhere. *Id.*, Tr. 417:17–422:7. Smith's husband, Bradley Granger, commented on her petition

22  that "Choosing to be political alienates HALF (if not more) of their customer base and is

23

24

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 3
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

irresponsible from their upper management," and Smith fully agreed with this comment. Barnard Dec. Ex. M at AFA_0020669; Barnard Dec. Ex. H, Tr. 422:8–427:11.[1]

Alaska investigated Smith for violating its policies by launching this petition, and AFA represented her in that investigation. Maller Dec. ¶¶ 7–19; Berry Dec. ¶¶ 15–58.[2] After the investigation, Alaska found Smith had violated its policies, suspended her for 30 days, and required her to remove the petition within 24 hours or be considered insubordinate. Berry Dec. Ex. 9; Barnard Dec. Ex. H, Tr. 450:8–457:18. The 30-day suspension was the longest AFA had seen at Alaska. Barnard Dec. Ex. N, Tr. 167:17–23; Berry Dec. ¶ 57; Peterson Dec. ¶ 47. AFA grieved the suspension but Alaska denied the grievance. Maller Dec. ¶¶ 21–28; Berry Dec. ¶ 59. Smith withdrew from the grievance process before AFA had occasion to decide whether to arbitrate that grievance. Maller Dec. ¶¶ 30–33; Berry Dec. ¶ 62; Barnard Dec. Ex. H, Tr. 482:6–483:7. Smith appreciated AFA's advocacy on her behalf through Maller, her LEC President. *Id.*, Tr. 472:12–473:17.

During this process, multiple AFA representatives warned Smith that she needed to keep her head down for the next 18 months because, under the CBA, that's how long discipline remains active on an employee's record and, given the severity of the suspension, any further infraction during that period—however minor—would likely result in her termination, which would be difficult to overturn. Maller Dec. ¶ 20; Maller Dec. Ex. 3, Tr. 46:21–48:14; Berry Dec. ¶ 56; Barnard Dec. Ex. H, Tr. 473:18–474:15. At no point in the BLM-petition investigation or grievance process did Smith say anything about her religion or religious beliefs as motivations for

---

[1] About a week after Smith's petition, in response to a question from another employee, Alaska reiterated on an internal company-wide website its position that it supports the BLM movement not the organization. Barnard Dec. Ex. O; Barnard Dec. Ex. H, Tr. 430:1–431:17.

[2] AFA was also concerned about the number of flight attendants who signed or commented on the petition and also faced potential investigation and discipline. Barnard Dec. Ex. P, Tr. 55:24–57:1.

DEFENDANT AFA-CWA'S MOTION FOR SUMMARY JUDGMENT- 4
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

her petition. Maller Dec. ¶¶ 24–27, 34; Berry Dec. ¶¶ 24, 46, 48–50; Barnard Dec. Ex. H, Tr. 481:4–13; Barnard Dec. Ex. G, Tr. 145:9–146:2, 157:11–159:13. Rather, Smith explained her motivations for her petition as her opposition to Alaska taking political positions. Maller Dec. ¶ 34.

**C. Less than six months later, on February 25, 2021, Smith posted a discriminatory comment on Alaska's World, which led to Alaska firing her and AFA grieving the termination but ultimately deciding not to arbitrate it.**

**1. Alaska's article and Smith's post.**

On February 4, 2021, Alaska's leadership for the Inflight Division—its flight attendant division—sent an email updating the flight attendants about its efforts at diversity and inclusion. Berry Dec. ¶¶ 63–66. This email reiterated Alaska's zero-tolerance policy for harassment and discrimination and summarized the Company's recent listening sessions, from which it learned that the "Depoliticize Alaska Airlines" petition had been hurtful to many flight attendants. *Id.*

Two weeks later, on February 25 around 8:30 a.m., Alaska posted an article on Alaska's World titled "Alaska Supports the Equality Act." Peterson Dec. Ex. 9, at p. AA00011207 (showing the article was "up" by 8:31 a.m.); Berry Dec. ¶ 67; Berry Dec. Ex. 14. In the article, Alaska explained the Equality Act was proposed legislation that would amend existing civil rights laws to prohibit discrimination on the basis of sexual orientation and gender identity in a number of spheres. *Id.* Alaska supported this, the article explained, because it believed having a clear federal standard on equality was the right thing to do and good for business and for employees. *Id.*

After reading the article, at 8:36 a.m., Smith posted a comment: "As a company, do you think it's possible to regulate morality." *Id.*; Barnard Dec. Ex. H, Tr. 493:12–16. At the time she posted, she had not read the Equality Act. *Id.*, Tr. 495:3–5. Before Smith posted, a dialogue box appeared on Alaska's World, showing her Alaska's commenting rules and requiring her to agree with them before posting. Barnard Dec. Ex. G, Tr. 100:2–104:1.

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
**BARNARD
IGLITZIN &
LAVITT LLP**

The minute Smith posted her comment, at 8:36 a.m. she also took a screenshot of it. Barnard Dec. Ex. H, Tr. 505:19–510:11, 515:5–517:3; Barnard Dec. Ex. Q; Barnard Dec. Ex. R, at RFA Resp. 1–3. At 8:37 a.m., she took a screenshot of Alaska's commenting rules. Barnard Dec. Ex. H, Tr. 511:2–17; Barnard Dec. Ex. S; Barnard Dec. Ex. R at RFA Resp. 4–6. At 8:39 a.m., Smith, who was on reserve duty that day, took a screenshot of the list of the day's flight attendant reserves. Barnard Dec. Ex. H, Tr. 522:13–524:15; Barnard Dec. Ex. T; Barnard Dec. Ex. R at RFA Resp. 7–9. At 10:05 a.m., she took a screenshot of Alaska's Equality Act article. Barnard Dec. Ex. H, Tr. 524:20–525:13; Barnard Dec. Ex. U; Barnard Dec. Ex. R at RFA Resp. 10–12.

Smith has no explanation—other than that she was gathering evidence to defend herself for an investigation she anticipated from the moment she posted—for why she took these screenshots throughout that morning. Barnard Dec. Ex. H, Tr. 526:12–530:17.

Sometime between 10:30 a.m. and 12:30 p.m., Andy Schneider—Alaska's Senior Vice President of People—posted a response to Smith's comment. Peterson Dec. ¶ 69; Barnard Dec. Ex. V (12:31 p.m. Smith's screenshot of response). In relevant part, Schneider's response read:

> Supporting the Equality Act is not about regulating morality. It's about supporting laws that allow our LGBTQ+ employees and guests, no matter what state they live in or fly to, to be protected against discrimination. Our values are our guide, and we strongly believe that doing the right thing and being-kindhearted require us to support this act. As we said above, we aren't the kind of company that stands by and watches—we're going to use our voice and be a leader on these issues.
> We also expect our employees to live by these same values. Our differences are to be respected. As stated in our People Policies, harassment and discrimination will not be tolerated.

Berry Dep. Ex. 14. *See also* Barnard Dec. Ex. H, Tr. 525:14–526:11; Barnard Dec. Ex. V; Barnard Dec. Ex. R at RFA Resp. 13–15 (Smith's 12:31 p.m. screenshot of Schneider's response). Also following Smith's posts, Alaska and AFA began receiving complaints from employees that they were offended by Smith's post, which they felt was discriminatory and understood in context to say or imply that LGBTQ people are immoral and undeserving of legal protections. Peterson Dec.

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY JUDGMENT- 6
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

¶¶ 60–94; Berry Dec. ¶¶ 70–74; Barnard Dec. Ex. W, Tr. 40:6–25, 46:1–7, 186:7–187:5; Barnard Dec. Ex. X; Barnard Dec. Ex. Y, Tr. 31:24–32:21, 36:20–37:1; Barnard Dec. Ex. Z, Tr. 141:19–143:2, 151:8–153:21.

At 12:07 p.m., an Inflight performance supervisor emailed Smith and her AFA representative, Steve Maller, to schedule an investigatory meeting with them. Maller Dec. ¶ 35.

### 2. Although AFA zealously advocated for Smith in the ensuing investigation, Alaska fired her and AFA grieved her termination.

Maller—Smith's AFA LEC President—prepared Smith for her investigatory meeting, which took place on March 11. Maller Dec. ¶¶ 35–38; Barnard Dec. Ex. H, Tr. 551:11–560:15. During those preparations, when asked why she posted her comment, Smith said nothing about her religion. *Id.* Instead, she explained she was simply throwing out a "general question" about "regulations and morality" because she thought "laws are supposed to regulate morality." Maller Dec. ¶ 36. She admitted to hesitating before posting because, in her words, she was "on 18-month probation … ." Maller Dec. ¶ 37. But she posted anyway because she said she was simply asking a question. *Id.* Smith expressed appreciation for Maller's advocacy. Maller Dec. ¶ 38.

Maller and Krystle Berry—Smith's LEC Vice President—represented Smith at Alaska's March 11 investigatory meeting. Maller Dec. ¶ 40; Berry Dec. ¶¶ 81–114. During the meeting, Maller argued that Alaska should not discipline Smith for her comment because its own commenting rules invited dialogue and Smith was simply asking a question. Berry Dec. ¶ 111; Barnard Dec. Ex. H, Tr. 561:11–570:15. If Alaska deemed Smith's comment inappropriate, he said, they should have removed it instead of leaving it up and responding to it, which appeared to legitimize it by engaging in the dialogue Smith started. *Id.* He also put his own credibility on the line for Smith, noting that he—an openly gay man—was not offended by her comment and 17 employees "liked" it, which, he argued, showed the comment was open to interpretation. *Id.* Smith

DEFENDANT AFA-CWA'S MOTION FOR SUMMARY JUDGMENT- 7
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

said nothing in that meeting about her religion or religious beliefs. Maller Dec. ¶ 41; Berry Dec. ¶ 113. Instead, she explained that she meant nothing by her question other than to start a dialogue. Berry Dec. ¶ 113. Smith expressed her true beliefs at that meeting and thanked Maller for his representation at the meeting. Barnard Dec. Ex. H, Tr. 550:5–15, 571:2–8; Maller Dec. ¶ 42, Ex. 12.

On March 16, Maller and Berry spoke with Smith to prepare for the meeting closing the investigation. Maller Dec. ¶¶ 43–44; Berry Dec. ¶¶ 115–118. Smith said nothing about her religion in that call. *Id.* After the call, Smith prepared a statement in her own words about her Alaska's World comment. Maller Dec. ¶¶ 45–49; Berry Dec. ¶¶ 119–121; Barnard Dec. Ex. H, Tr. 573:6–578:12. In that statement, Smith explained she commented simply out of curiosity and to ask a question, and she felt targeted because of her petition and because of her response to Alaska, once again, "promoting a national, political bill." *Id.* Her statement said nothing about her religion or religious beliefs. *Id.*

On March 19, Alaska closed its investigation into Smith and fired her for making a discriminatory statement on a Company website that discredited the Company. Maller Dec. ¶¶ 50–53; Berry Dec. ¶¶ 122–134; Berry Dec. Ex. 19. During the close out meeting, Smith asked her supervisor a series of prepared questions. *Id.*; Barnard Dec. Ex. H, Tr. 578:16–581:3. She again made no mention of religion. *Id.*

AFA filed a grievance on Smith's behalf on April 1, protesting her termination. Maller Dec. ¶ 54. The hearing on that grievance was set for April 27. Maller Dec. ¶ 56.

**3. After hiring First Liberty, Smith offered a new, religious explanation for her post at her grievance hearing, and AFA, which had no prior notice of this new line of defense, immediately amplified that explanation.**

On April 16, Smith first spoke with First Liberty Institute, a religious-liberty legal organization she engaged on April 19 and 23. Barnard Dec. Ex. H, Tr. 517:20–518:7; Barnard

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 8
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

Dec. Exs. AA–BB. Maller and Berry spoke with Smith on April 26 to prepare for the grievance hearing. Maller Dec. ¶ 57; Berry Dec. ¶ 137. Smith said nothing to them in that call about her religion or religious beliefs or her engagement of lawyers. *Id.*

Smith brought three documents to the April 27 grievance hearing, including a "Statement for Grievance Hearing," which she had not previously shared with her AFA representatives. Maller Dec. ¶¶ 58–59; Berry Dec. ¶¶ 141–142. Smith read her written statement, which—for the first time—asserted that Smith's religious beliefs motivated her Alaska's World post. *Id.* After Smith's remarks, Maller made arguments on Smith's behalf based on information she had previously shared with him; these tracked the arguments he made at the investigatory meeting. Maller Dec. ¶ 61; Berry Dec. ¶ 156. Berry added how well-liked Smith was by her colleagues and, upon hearing Smith's newly asserted religious motivations, improvised additional arguments that Alaska should not discriminate against her based on her religion. Maller Dec. ¶¶ 62–63; Berry Dec. ¶¶ 157–160.

On May 10, Alaska denied Smith's grievance. Maller Dec. ¶ 64. AFA promptly moved the grievance to the next step, the system board of adjustment. Maller Dec. ¶ 64; Maller Dec. Ex. 19–20.

### 4.  AFA decided not to arbitrate Smith's grievance based on its merits, but she remains free to do so on her own even today.

Because AFA, by contract, has only 13 dates per year for arbitration and must be a good steward of its members' resources, AFA must be selective in which cases to arbitrate on behalf of its members. Chaput Dec. ¶ 8; Peterson Dec. ¶ 28. AFA does so by evaluating the merits of a case and selecting for arbitration only those cases it believes have a reasonable chance of winning at arbitration. Chaput Dec. ¶¶ 9–11; Peterson Dec. ¶¶ 29–33. To ensure the Screening Committee—which makes these selection decisions—has the information it needs, AFA attorney Kimberley Chaput and MEC Grievance Chair Stephanie Adams hold a "pre-screening meeting" with

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY JUDGMENT- 9
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

grievants to probe their story and ask tough questions they might get at arbitration. Chaput Dec. ¶¶ 12–14. While usually not comfortable for grievants, this is an important step in the selection process. *Id.* Smith's pre-screening meeting took place on June 29. Chaput Dec. ¶¶ 87–125; Adams Dec. ¶ 15.

AFA screened her case for arbitration later that day. Chaput Dec. ¶¶ 126–133; Adams Dec. ¶¶ 16–27; Peterson Dec. ¶¶ 116–119; Maller Dec. ¶¶ 65–70. The panel voted 3-1 against AFA arbitrating Smith's case. *Id.* Maller voted to take her case to arbitration, much for the reasons he had argued at the investigatory meeting and grievance hearing. Maller Dec. ¶¶ 65–66. He recognized, though, that Smith's changing explanation for her post would invite questions regarding her credibility as a witness at arbitration. Maller Dec. ¶¶ 69–70. Chaput, Adams, and Peterson voted not to arbitrate her case because, by making a discriminatory statement on a Company website (even if it was a microaggression) within 18 months of her 30-day suspension (which stood as Smith had withdrawn from the grievance process), they believed no arbitrator would overturn her termination. Chaput Dec. ¶¶ 127–133; Adams Dec. ¶¶ 16–27; Peterson Dec. ¶¶ 116–119. Adams also noted some potential comparators for consideration but concluded that none counseled in favor of arbitrating Smith's case, either because they were not true comparators or because the underlying conduct was similar and AFA previously decided not to arbitrate those cases as well. Adams Dec. ¶¶ 16–27; Barnard Dec. Ex. A, Tr. 84:7–11; Barnard Dec. Ex. C, Tr. 37:12–38:19. AFA's decision not to arbitrate her case was not premised in any way on Smith's religion. Maller Dec. ¶ 68; Chaput Dec. ¶ 133. The factors considered by Smith's screening panel are the key factors arbitrators look to in evaluating grievances. Lankford Dec. ¶ 4, Ex. 3.

After AFA decided not to arbitrate Smith's case, it tried unsuccessfully to negotiate a last-chance agreement with Alaska on her behalf. Adams Dec. ¶ 28. On July 1, AFA then notified

DEFENDANT AFA-CWA'S MOTION FOR SUMMARY JUDGMENT- 10
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

Smith of its decision not to arbitrate her case, while also informing her that she could arbitrate the case on her own at her own expense if she wished. Adams Dec. ¶ 29. Smith has the ability to do so to this day. Adams Dec. ¶ 30.

**III.    AFA ably and fairly represented Brown throughout her career at Alaska.**

Before 2021, AFA represented Brown in at least two pay disputes, which resulted in restoration of her pay. Peterson Dec. ¶¶ 42–44.

**A.    When AFA helped Brown avoid discipline in January 2021, she learned her words could have unintended impact on her co-workers and Alaska's passengers.**

On January 28, 2021, Alaska investigated Brown for an allegation that on a December 14, 2020, trip she grabbed a first-class passenger's arm and told him not to get the COVID vaccine because it would give him HIV. Taylor Dec. ¶¶ 20–21. Brown's LEC President, Terry Taylor, represented her in that meeting. *Id.* At the meeting, Brown denied the allegations and asked what she could do to avoid future investigations and make passengers and her colleagues more comfortable. Taylor Dec. ¶¶ 22–24. Her performance supervisor, Tiffany Lewis, answered that, she should keep in mind that in-flight conversations are easily overheard, and Taylor suggested Brown avoid discussing hot topics on the plane. Taylor Dec. ¶ 25. Lewis agreed. *Id.* Brown then asked what hot topics are and Lewis answered religion, money, and politics can be examples of hot topics when in the company of those who may not share Brown's views. Taylor Dec. ¶ 27. Brown asked how to avoid these topics when passengers ask about Alaska's stance on COVID vaccinations; Lewis suggested she keep it vague and Taylor suggested she deflect and move on. Taylor Dec. ¶ 28.[3]

---

[3] Brown does not recall how the topic of religion came up in this meeting. Barnard Dec. Ex. D, Tr. 125:7–126:10; 128:4–10; 129:5–131:11; 139:1–5; 139:14–21.

DEFENDANT AFA-CWA'S MOTION FOR SUMMARY JUDGMENT- 11
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

After the meeting, Brown prepared a statement thanking Lewis and Taylor for the meeting and, specifically, for showing her how to better herself by dealing with situations concerning hot topics and conversations on the plane. Taylor Dec. ¶¶ 31–33; Barnard Dec. Ex. CC.[4]

Shortly after the meeting with Lewis and Taylor, on February 4, Brown received Alaska's email reiterating its zero-tolerance policy and explaining that it would not tolerate harassment and discrimination against coworkers, including microaggressions. Barnard Dec. Ex. D, Tr. 143:15–144:14.

**B. Less than a month later, on February 25, 2021, Brown posted a discriminatory comment on Alaska's Equality Act article.**

Brown saw Alaska's February 25 Equality Act article sometime that morning. Barnard Dec. Ex. E, Tr. 24:19–25:1. After reading the article, she prayed by talking out loud to God and asking God whether she should post a comment and seek clarification. *Id.*, Tr. 26:7–27:15. She believes she received an answer from God that directed her to ask for clarification and oppose Alaska's stance because of the Equality Act's impact on women and girls. *Id.*, Tr. 27:20–28:14. Meanwhile, Brown researched the Equality Act on the internet. *Id.*, Tr. 28:15–29:17. She read several articles that day, including a Heritage Foundation article ("11 Myths about H.R. 5, the Equality Act of 2021"), a Child and Parental Rights Campaign article ("HR 5: The (In)Equality Act"), an article from the American Family Association (which describes itself as on the front lines of America's culture war), and perhaps other information from Liberty Counsel. Barnard Dec. Ex. DD at Rog. Resp. 16; Barnard Dec. Ex. D, Tr. 179:16–180:7; Barnard Dec. Ex. E, Tr. 37:9–38:4, 39:7–44:1. She also watched FlashPoint, an hour-long TV show on a Christian network. Barnard

---

[4] Alaska did not discipline Brown for this incident because, based on its investigation, although Brown did discuss COVID with the passenger, he was not offended. Taylor Dec. ¶¶ 34–35. Therefore, Alaska issued only a record of discussion (ROD), which is not disciplinary. *Id*

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY JUDGMENT- 12
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD IGLITZIN & LAVITT LLP**

Dec. Ex. E, Tr. 29:20–31:8. Brown saw First Liberty lawyers appear on FlashPoint and believed God told her to take down their contact information, which she did. *Id.*, Tr. 33:19–37:8.

At 7:56 p.m. that evening, after reviewing the commenting rules, Brown posted the following comment in response to Alaska's Equality Act article:

> Does Alaska support: endangering the Church, encouraging suppression of religious freedom, obliterating women['s] rights and parental rights?
>
> This act will Force every American to agree with controversial government-imposed ideology on or be treated as an outlaw. The Equality Act demolishes existing civil rights and constitutional freedoms which threatens constitutional freedoms by eliminating conscience protections from the Civil Rights Act. The Equality act would affect everything from girls' and women's showers and locker rooms to women's shelters and women's prisons, endangering safety and diminishing privacy. Giving people blanket permission to enter private spaces for the opposite sex enables sexual predators to exploit the rules and gain easy access to victims. This is Equality Act[.]

Barnard Dec. Ex. EE; Barnard Dec. Ex. D, Tr. 107:06–109:13; 110:11–111:11. Other than "Does Alaska support," none of the words in this post were her own. She copied the words of the first paragraph from a FlashPoint screenshot. Barnard Dec. Exs. F; D, Tr. 184:1–185:11. She copied the words of the second paragraph from a Heritage Foundation article. Barnard Dec. Exs. GG; HH; D, Tr. 180:17–182:22, 185:5–7, 191:15–21. The Heritage Foundation is a political, not religious, organization. Barnard Dec. Exs. II; D, Tr. 185:14–187:9.

Brown felt compelled by her religious beliefs to oppose Alaska for supporting discrimination against women, girls, and religious people. Barnard Dec. Ex. D, Tr. 155:14–20. She believed the Equality Act would "remove safe spaces for women and girls" and felt directed by the Bible to stand up for the vulnerable, which, in her view, included women and girls (which she sees as fixed categories because, in her view, there are only two genders, "biological men" and "biological women"). *Id.*, Tr. 155:21–160:5. Brown believed that, by allowing transgender people to use bathrooms in accordance with their gender identity, women would be unsafe because some

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 13
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD
IGLITZIN &
LAVITT LLP**

1    people might exploit the law to harm women and girls in bathrooms. *Id.*, Tr. 161:16–164:14,

2    188:19–191:14.

3           Although Brown read portions of the Equality Act quoted in the articles she read on

4    February 25, she was unfamiliar with its findings regarding discrimination women face and with

5    its provisions that give women additional protections against discrimination. Barnard Dec. Ex. E,

6    Tr. 64:12–67:10; Barnard Dec. Ex. JJ. Notwithstanding her claimed concern to stand up for

7    women, she had no concern about additional forms of discrimination, combatted by the Equality

8    Act, that women face outside bathrooms. Barnard Dec. Ex. D, Tr. 188:20–191:14; Barnard Dec.

9    Ex. E, Tr. 66:8–73:11.

10          Brown also believed the Equality Act would "endanger the church" by eliminating its tax-

11   exempt status. Barnard Dec. Ex. E, Tr. 31:9–32:18, 50:2–19, 52:2–54:9. She believed it would

12   "suppress religious freedom" by prohibiting people from reading their Bible on the plane or talking

13   about Jesus. *Id.*, Tr. 54:10–57:18. She had no idea, though, what effect, if any, passage of the

14   Equality Act would have on Alaska or its workforce. *Id.*, Tr. 48:6–49:4.[5] She also did not know

15   whether churches are covered by Title VII, whether they are considered public accommodations,

16   or about the ministerial exception. Barnard Dec. Ex. E, Tr. 62:6–64:20.

17          Nothing about Brown's religious beliefs, however, required her to raise her concerns about

18   women or religious freedom on Alaska's World itself, which reached 26,000 employees. *Id.*, Tr.

19   188:21–194:13; Barnard Dec. Ex. W, Tr. 108:4–7. Raising those concerns directly to Brown's

20   supervisor or Alaska's human resources department would fully satisfy, and be fully consistent

21   with, Brown's religious beliefs. *Id.* Although Southwest Airlines currently employs Brown and

22

23   _____

     [5] Brown's concern about the Equality Act's bathroom-access provisions would have no effect on Alaska because it
     had allowed its employees to use whichever bathroom was consistent with their gender identity since at least 2018.
     Barnard Dec. Ex. A, Tr. 207:2–18; Barnard Dec. Ex. KK, p.8. And no one at Alaska ever told Brown she cannot read

24   her Bible on a plane. Barnard Dec. Ex. E, Tr. 204:2–14.

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY            18 WEST MERCER ST., STE. 400   **BARNARD**
JUDGMENT- 14
Case No. 2:22-CV-00668-BJR                               SEATTLE, WASHINGTON 98119   **IGLITZIN &**

                                                         TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

supports the Equality Act, Brown has not asked Southwest to withdraw its support for that legislation or for a religious accommodation allowing her to express her views about it, notwithstanding its non-discrimination policies. Barnard Dec. Ex. E, Tr. 136:16–138:19.

Shortly after Brown posted, AFA representatives started receiving complaints from employees who felt offended by Brown's post, which they understood as trading on tropes that LGBTQ people—especially transgender people—are sexual predators. Taylor Dec. ¶¶ 40–41; Peterson Dec. ¶ 95; Barnard Dec. Ex. B, Tr. 245:20–246:7. Alaska also received complaints about Brown's post. Barnard Dec. Ex. W, Tr. 123:12–124:19: Barnard Dec. Ex. Z, Tr. 69:19–70:6, 141:19–143:2, 151:8–154:6.

The next day, February 26, Alaska notified Brown that it had removed her comment, was investigating her for violating its policies, and removed her from flying duties until the investigation completed. Taylor Dec. ¶ 48. Alaska scheduled the investigative meeting with Brown for March 4. Taylor Dec. ¶ 49.

**C.  Although AFA advised Brown to accept responsibility for her posting and commit to avoid discriminatory comments, on the advice of her undisclosed First Liberty lawyers she insisted on asking for permission to continue making similar comments.**

On March 3, Brown engaged First Liberty to represent her, after first contacting them on February 26. Barnard Dec. Ex. D, Tr. 148:2–18, 202:5–7; Barnard Dec. Ex. LL. Brown, however, did not let AFA know at any time before the filing of the EEOC charges and this lawsuit that she was represented by First Liberty. Taylor Dec. ¶ 51.

Taylor spoke with Brown on March 3 to prepare for the investigative meeting. Taylor Dec. ¶¶ 50–59. During the call, Taylor asked Brown why she posted her comment and Brown explained the post did not contain her own words, which she copied from websites she had been researching. Taylor Dec. ¶ 53. Brown added that she wanted to ask a question to understand Alaska's support for the Equality Act, but Brown never explained what question she wanted to ask. *Id.* Taylor

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

explained that when there's undisputed evidence of an incident the Company is investigating, the best defense is to admit the incident and argue it was not a violation or admit it, accept responsibility for violating Company policy, show contrition, and commit not to repeat it. Taylor Dec. ¶ 54. Because several employees found Brown's comment discriminatory, Taylor advised Brown that responsibility, contrition, and amends was the way to go. Taylor Dec. ¶¶ 41, 56–57. Brown, however, wanted to seek a religious accommodation to continue making similar statements. Taylor Dec. ¶¶ 56–59. Taylor explained her concerns that (1) accommodations cannot usually be used after-the-fact to excuse prior behavior; they are, instead, to seek permission to engage in future conduct; (2) an investigatory meeting conducted by Inflight performance supervisors is not the right place to seek an accommodation, which the People Department (Alaska's human resources department) usually handles; and (3) an accommodation request was inconsistent with Brown's best defense, which was accepting responsibility for offending her co-workers and committing not to repeat the behavior. *Id.* Despite Taylor's advice, Brown insisted on making the religious accommodation request, and Taylor assisted her in doing so. Taylor Dec. ¶¶ 60–64, 93–95; Barnard Dec. Ex. E, Tr. 150:20–152:12. AFA was not aware that Brown's First Liberty lawyers drafted her religious accommodation request. Barnard Dec. Ex. D, Tr. 218:21–220:7; Barnard Dec. Ex. E, Tr. 119:14–126:13; Barnard Dec. Exs. MM, NN, OO.

Brown's performance supervisor, Tiffany Lewis, conducted the March 4 investigative meeting. Taylor Dec. ¶¶ 67–69. After describing her reasons for posting her comment, Brown admitted that she had read and understood Alaska's commenting rules, did not use her own words in her comment, recognized that she offended her LGBTQ co-workers, and represented that, if she had the chance to do it again, she would take her concerns directly to her supervisor or other Alaska management rather than post them on a company-wide website. Taylor Dec. ¶¶ 73–89. Taylor

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 16
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

advocated for Brown during the meeting, explaining that she had talked at length with Brown and, based on those conversations, understood Brown's perspective, which was that she had genuine concerns about Alaska's support for the Equality Act and expressed them on Alaska's World because that is where Alaska posted its support for the Act. Taylor Dec. ¶ 90. Moreover, because senior leadership had responded to Smith's earlier post, Brown reasonably expected a response from management on Alaska's World as well. *Id.* Brown argued at that meeting that she felt discriminated against for expressing her religious views—a point Taylor did not thwart. Taylor Dec. ¶ 91; Barnard Dec. Ex. A, Tr. 213:10–214:10. The day after the meeting, Taylor sent Alaska Brown's religious accommodation request. Taylor Dec. ¶¶ 93–94.

Alaska then completed its investigation and, on March 19, met with Brown and Taylor to deliver its decision, which was to terminate Brown. Taylor Dec. ¶¶ 95–100. Alaska explained it was terminating Brown for posting a comment on Alaska's World that was offensive, discriminatory, and did not align with Alaska's values. Taylor Dec. Ex. 16, p.2. These actions, it concluded, violated its harassment and discrimination policy, its requirement not to discredit the Company, and its requirements to reflect favorably on the Company, contribute to a harmonious working environment, and exercise good judgment. *Id.*, pp. 2–3. Alaska also explained that Brown's religious accommodation request did not excuse her conduct. *Id.*, p.2. It offered two reasons: first, misconduct cannot be excused by an accommodation request "after the fact," and second, Alaska is "not required to provide an accommodation that permits actions that demean and degrade, or are designed to demean or degrade, other employees." *Id.*

Brown thanked Taylor for everything she was doing to represent her. Barnard Dec. Exs. PP; E, Tr. 152:13–153:18; 155:2–156:3.

**D.  AFA vigorously represented Ms. Brown at her March 30 grievance hearing.**

AFA grieved Brown's termination the next day, March 20. Taylor Dec. ¶¶ 105–106; Taylor

DEFENDANT AFA-CWA'S MOTION FOR SUMMARY JUDGMENT- 17
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD
IGLITZIN &
LAVITT LLP**

Dec. Ex. 22. Alaska heard the grievance on March 30. Taylor Dec. ¶ 117. Before the hearing, Brown sent Taylor another statement, which reiterated her religious accommodation request. Taylor Dec. ¶¶ 116–118; Taylor Dec. Ex. 28. Taylor again warned Brown that her accommodation request was counterproductive to her best defense—accepting responsibility and committing not to make offensive posts again. *Id.*

At the hearing, Taylor advocated strongly on Brown's behalf. Taylor Dec. Exs. 29 and 30. Brown invited Taylor to start the presentation. Taylor Dec. ¶¶ 120–121. Taylor argued throughout the hearing that Brown posted to get clarity about Alaska's position and believed it was appropriate for her to do so, especially because upper management had responded to Smith's comment earlier that day; Brown did not intend to make a discriminatory comment and, in fact, had used other people's words, which she thought reputable based on her research; but, still, based on what Brown told Taylor throughout their preparations for the hearing, Taylor was convinced Brown would not again post anything other than benign, positive comments; Brown specifically had no intent to correlate the Company's support for LGBTQ protections with equating LGBTQ people with sexual predators; and, in light of Brown's extensive clean record with Alaska, the Company had no reason to think Brown would ever post anything discriminatory again. Taylor Dec. ¶¶ 122–133. During Taylor's presentation on Brown's behalf, Brown expressly agreed that she would not post anything again other than benign comments; she recognized she hurt her co-workers; and she said she understood that her words can cause unintended harm to others if not carefully chosen. Taylor Dec. ¶¶ 126, 130. After the hearing, Brown thanked Taylor for representing her well. Barnard Dec. Ex. E, Tr. 152:13–153:18, 155:3–19.

Alaska nonetheless denied the grievance on April 13. Taylor Dec. ¶ 134. AFA moved the grievance to the next step, the system board of adjustment, later that day. Taylor Dec. ¶ 135.

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 18
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

**E. AFA decided not to arbitrate Brown's case based on its merits, but she is free to do so on her own even today.**

AFA's attorney, Chaput, and MEC Grievance Chair Adams had a pre-screening meeting with Brown on May 13. Chaput Dec. ¶ 15; Adams Dec. ¶ 8. Again, the purpose of this meeting was to ask Brown questions she might get at arbitration to see how she would handle them. Chaput Dec. ¶¶ 12–14. At the meeting, Chaput asked Brown questions designed to elicit her reasons for posting her comment, which Brown provided. Chaput Dec. ¶¶ 15–78. During that meeting, Brown again acknowledged that she would be willing in the future to take her concerns to management directly, rather than post them on a company-wide website, and she reiterated that she had no intent to post anymore. Chaput Dec. ¶¶ 67, 72.

Brown's screening meeting took place on May 17. Chaput Dec. ¶ 79. AFA voted, 3-1, not to arbitrate Brown's case. Chaput Dec. ¶ 80. Chaput voted reluctantly for AFA to arbitrate. *Id.* Chaput agreed that Brown posted a comment Alaska determined to be discriminatory and that it would be hard to overturn that determination at arbitration. Chaput Dec. ¶ 81. But she thought AFA could argue disparate treatment based on Alaska's decision to give Smith only a 30-day suspension, rather than fire her, for her BLM petition, which was posted publicly instead of on a company website. *Id.* Chaput had concerns about that argument, however, because she recognized that Alaska had a legal obligation to avoid creating a hostile work environment and was likely within its rights to discipline employees who use a Company forum to create a hostile work environment for others. *Id.* She also had concerns about Brown's performance as a witness because, based on the pre-screening, Brown struck her as hostile or indifferent to her co-workers' concerns, not humble or apologetic. Chaput Dec. ¶ 83. Finally, Chaput recognized that Brown's accommodation request complicated the case because Brown was fired for violating Alaska's harassment and discrimination policies and, by asking to be able to continue to make similar

comments on a company forum, Brown was effectively asking to be exempt from those policies—she was seeking the right to harass and discriminate. Chaput Dec. ¶ 84. In Chaput's experience, arbitrators do not condone discriminatory or harassing conduct. *Id.*

The other three—Taylor, Adams, and Peterson—voted against arbitration because they thought AFA could not win Brown's case. Taylor Dec. ¶¶ 139–141; Adams Dec. ¶¶ 10–11; Peterson Dec. ¶¶ 106–113. They reasoned that Brown posted a comment, experienced by many employees as discriminatory against the LGBTQ community, on a company-wide website; Brown's accommodation request undercut the credibility of her showing of contrition and commitment to avoid similar comments in the future in that it effectively asked for the right to discriminate; and, while a less important factor, Brown had prior notice of the Company's position on the importance of avoiding words causing even unintended negative impacts or offense and had proceeded with her comment nonetheless. *Id.*; Barnard Dec. Ex. A, Tr. 218:8–219:17. The factors considered by Smith's screening panel are the key factors arbitrators use in evaluating grievances. Lankford Dec. ¶ 4, Ex. 3.

After making this decision, Adams attempted to negotiate a last-chance agreement with Alaska to reinstate Brown. Adams Dec. ¶¶ 12–13. Alaska did not agree to AFA's proposal. *Id.* Adams then notified Brown that AFA decided not to arbitrate her case but she had the right to do so at her own expense. Adams Dec. ¶ 14. Brown may do so even today. Adams Dec. ¶ 30.

## IV. AFA has successfully advocated for other religious employees with meritorious grievances.

AFA has successfully advocated for religious flight attendants. Barnard Dec. Ex. B, Tr. 239:20–240:22. Specifically, AFA's advocacy saved the jobs of two flight attendants who were accused of sleeping, or appearing to sleep, on duty—ordinarily a terminable offense—when they

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 20
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

1   were, in fact, praying. Adams Dec. ¶¶ 43–54; Barnard Dec. Ex. A, Tr. 128:4–129:10, 129:16–

2   131:13. AFA saved their jobs by advocating for their right to pray on duty. *Id.*

3   **V.   Plaintiffs' claim against AFA.**

4       Following the Court's dismissal of their state-law claims against AFA (Dkt. 57), Plaintiffs

5   assert only one live claim against AFA: religious-based disparate treatment under Section

6   703(c)(1) of Title VII, 42 U.S.C. § 2000e-2(c)(1). Dkt. 39, Am. Compl. ¶¶ 347–370.

7                                **ARGUMENT**

8   **I.   Legal standard on summary judgment.**

9       Summary judgment shall issue if the moving party "shows that there is no genuine dispute

10  as to any material fact and … is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). A

11  fact is "material" where it "might affect the outcome of the case." *Anderson v. Liberty Lobby, Inc.*,

12  477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "a reasonable jury could return a verdict

13  for the nonmoving party." *Id.* Courts evaluate evidence on summary judgment with all justifiable

14  inferences favoring the nonmovant. *Id.* at 255. And cross-motions for summary judgment are

15  evaluated independently, giving each respective non-movant the benefit of inferences on the

16  motion it opposes. *ACLU of Nevada v. Law Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006).

17      The movant bears the responsibility of showing the court the basis for its motion. *Celotex

18  Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But where, as here, the non-movants bear the burden

19  of proof at trial on an essential element of their case, summary judgment shall be entered against

20  them unless they produce sufficient evidence to establish that element. *Id.* at 322–23.

21  **II.   AFA did not discriminate against Plaintiffs based on their religion.**

22      **A.   The elements of religiously based disparate-treatment discrimination by a union.**

23      Section 703(c)(1) makes it unlawful for a union "to exclude or to expel from its

24  membership, or otherwise to discriminate against, any individual because of" her "religion … ."

---

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 21
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
**TEL** 800.238.4231 | **FAX** 206.378.4132   **LAVITT LLP**

42 U.S.C. § 2000e-2(c)(1). Plaintiffs do not allege that AFA excluded or expelled them from membership. *Cf.*, Dkt. 39, Am. Compl. ¶¶ 347–370. They must therefore prove AFA otherwise discriminated against them because of their religion, which the statute defines to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).[6]

To "discriminate against" someone is to treat "that individual worse than others who are similarly situated." *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *Accord Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Such treatment is "because of" religion "whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock*, 140 S. Ct. at 1739. Plaintiffs may nonetheless establish a 703(c) violation by showing that religion was a "motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

Taking these together, courts generally analyze disparate treatment claims under the burden-allocating framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, plaintiffs always retain "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff … ." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

For claims of disparate treatment by a union, plaintiffs first bear a burden of production to show a prima facie case of discrimination. *See, e.g., Beck v. UFCW, Local 99*, 506 F.3d 874, 882

---

[6] The plain terms of the statute impose no accommodation requirement on unions regarding their members' employment conditions, and Plaintiffs do not allege that AFA itself was somehow obligated to accommodate them. *Cf.*, Dkt. 39, Am. Compl. ¶¶ 347–370.

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 22
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD
IGLITZIN &
LAVITT LLP**

1    (9th Cir. 2007); *Gay v. Waiters' & Dairy Lunchmen's Union*, 695 F.2d 531, 537–39 (9th Cir.

2    1982); *Wesley v. General Drivers*, 660 F.3d 211, 214 (5th Cir. 2011). To do so, a plaintiff must

3    show (1) she has a trait, such as religion, protected by Section 703(c)(1); (2) the union subjected

4    her to an adverse union action;[7] and (3) the union treated other members—similarly situated except

5    for the protected trait—more favorably than the plaintiff. *Beck*, 506 F.3d at 882; *Gay*, 695 F.2d at

6    537–39; *Wesley*, 660 F.3d at 214.

7    　　If the plaintiff produces evidence sufficient to support a prima facie case, an inference of

8    discrimination arises and the burden shifts to the union to articulate a legitimate, non-

9    discriminatory reason for its action. *Beck*, 506 F.3d at 883; *Pejic v. Hughes Helicopters, Inc.*, 840

10   F.2d 667, 674 (9th Cir. 1988). That burden requires the union to "provide reasons for its actions

11   which, if believed by the trier of fact, would support a finding that unlawful discrimination was

12   not the cause of the … action." *Beck*, 506 F.3d at 883. Doing so rebuts the inference of

13   discrimination raised by the prima facie case and leaves the Plaintiffs the ultimate burden of

14   coming forward with evidence sufficient to persuade the fact finder that they have been the victims

15   of intentional discrimination. *Id.*

16   **B. Plaintiffs have failed to make out a prima facie case of disparate treatment because
       they cannot identify any similarly situated non-Christian flight attendant AFA
17     treated more favorably.**

18   　　Plaintiffs' prima facie case founders on the third requirement: identification of a non-

19   Christian comparator AFA treated more favorably.[8] To be "similar situated," employees must be

20   ───────────────────────────

21   [7] Because Section 703(c)(1) speaks of "otherwise discriminat[ing] against" a member, after listing excluding or
     expelling them from membership, to be actionable, the union's adverse action must be tantamount to exclusion or
22   expulsion from membership. *See, e.g.*, *Yates v. U.S.*, 574 U.S. 528, 545 (2015) (discussing *ejusdem generis* canon
     when interpreting statutory lists followed by an "otherwise" catch-all concluding term); *Circuit City Stores v. Adams*,
     532 U.S. 105, 114–15 (2001) (similar).

23   [8] The record also raises serious questions about the first element of Plaintiffs' prima facie case: whether they posted
24   out of religious beliefs. Smith's contemporaneous explanations all reference her political, not religious, beliefs. *Supra*

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 23
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

"similarly situated … in all material respects," and, particularly, must have "similar jobs and display similar conduct." *Weil v. Citizens Telecom Services Co., LLC*, 922 F.3d 993, 1004 (9th Cir. 2019) (plaintiff failed to meet prima facie case by failing to produce evidence of a "similarly situated employee who displayed similar conduct.") (cleaned up). *See also Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) ("Individuals are similarly situated when they have similar jobs and display similar conduct"); *Collins v. Potter*, 431 Fed. Appx. 599, 600 (9th Cir. 2011) (employee dissimilar where not subject to last-chance agreement, as plaintiff was); Dkt. 117, p.3. As this Court has observed, employees "who were disciplined for reasons dissimilar and unrelated to the reasons for which Plaintiffs were terminated" are "not comparators" and "not relevant" to the Title VII analysis. *Id.*

Simply put, there is no evidence of any Alaska flight attendant who engaged in conduct similar to Smith or Brown—and, certainly, none whom AFA treated more favorably than Plaintiffs.

For Smith, there is no other flight attendant who Alaska fired for posting a discriminatory, or even unkind, comment on Alaska's World or any other company-wide website reaching 26,000 employees within 18 months of receiving a 30-day suspension—the practical equivalent to a last-chance agreement. *Supra* at 10; *Collins*, 431 Fed. Appx. at 600 (where plaintiff was on a last-chance agreement but putative comparator was not, employees dissimilar).

For Brown, other than Smith, there is no other flight attendant who Alaska fired for posting a discriminatory, or even unkind, comment on Alaska's World. *Supra* at 19–20. And Plaintiffs cannot make their prima facie case for Brown or Smith because AFA chose not to arbitrate either

---

at 2–9. And, while Brown held sincere religious opposition to the Equality Act, she admits that nothing in her religion required her to post that opposition in offensive terms on a company-wide forum rather than taking her concerns directly to management. *Supra* at 14–15, 19. AFA nonetheless does not seek summary judgment on this ground as it anticipates Plaintiffs may raise factual disputes about these questions.

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

BARNARD
IGLITZIN &
LAVITT LLP

case, so did not treat Smith more favorably than Brown in regard to union representation. *Supra* at 9–11, 19–20.

### C. In any case, AFA had a legitimate non-discriminatory reason not to arbitrate Plaintiffs' claims: it thought they would lose on the merits at arbitration.

Even if the Court somehow found Plaintiffs established their prima facie case, AFA would still be entitled to summary judgment because undisputed record evidence shows AFA decided not to arbitrate based on the merits of the grievances, not Plaintiffs' religion. *Supra* at 9–11, 19–20.

AFA has a well-established framework for evaluating the merits of grievances. Chaput Dec. ¶¶ 9–11; Peterson Dec. ¶¶ 31–32 (discussing Article VII, §F(5)(h) of the MEC Policy and Procedure Manual). That framework is fully consistent with the factors arbitrators use to evaluate cases. Lankford Dec. ¶ 4; Lankford Dec. Ex. 3. [9] AFA followed that framework here in Smith's and Brown's cases. *Supra* at 9–11, 19–20. Applying that framework, AFA concluded that it was unlikely to win Smith's case at arbitration because after the Company gave clear notice of its zero-tolerance policies, Smith made a discriminatory statement on a company-wide website within 18-months of her 30-day suspension; it could identify no comparator case it decided to arbitrate; and Smiths' changing explanation for her post raised credibility concerns. *Supra* at 9–11. AFA concluded that it was unlikely to win Brown's case at arbitration because she posted a discriminatory comment on a company-wide website; the way she framed her accommodation request undercut her best defense, which was to accept responsibility, show contrition, and commit

---

[9] *See also EMD Millipore Corporation*, 2023 BNA LA 16 (Szuter, 2023) (denying grievance and sustaining termination of employee fired for commenting on a company-sponsored Facebook page that the company constantly pushed the LGBTQ agenda, to its shame); *Brown-Forman Cooperage*, 138 BNA LA 255 (Goldberg, 2017) (sustaining termination of employee who posted a racist rant on Facebook regarding Black Lives Matter); *Labor Arbitration Decision, 4645372-AAA*, 2018 BNA LA Supp. 4645372 (Raisfeld, 2018) (similar); *City of Duluth*, 113 BNA LA 1153 (2000) (sustaining termination of employee who continued prohibited conduct after prior warning); *Lockheed Aircraft Corp.*, 28 BNA LA 829, 831 (1957) (explaining just cause); *Wards Bldg. Maintenance*, 111 BNA LA 1088 (1998) (similar). *See* Barnard Dec. Exs. BBB-GGG.

DEFENDANT AFA-CWA'S MOTION FOR SUMMARY JUDGMENT- 25
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

not to repeat the behavior; and she had prior notice of the Company's position. *Supra* at 19–20. Even the panelist who supported taking Brown's case to arbitration questioned her performance as a witness and recognized the validity of the reasons the other panelists voted against arbitration. *Id.*

Because AFA decided not to arbitrate Plaintiffs' cases for legitimate, non-discriminatory, merits-based reasons, it is entitled to summary judgment. *Pejic*, 840 F.2d at 674; *Golden v. Local 55 of the International Association of Firefighters*, 633 F.2d 817, 822 (9th Cir. 1980) (affirming bench judgment); *Faragalla v. Douglas County*, 2009 WL 2902737, at *9 (D. Col. Aug. 10, 2009) (rendering summary judgment for union that did not arbitrate claims based on its assessment of success at arbitration).

### III.   AFA has successfully advocated for religious members.

Plaintiffs allege AFA intentionally failed to file grievances concerning religious discrimination and intentionally failed to raise religious discrimination during the grievance process. Dkt. 39, Am. Compl. ¶ 356. Although not entirely clear, Plaintiffs may be pursuing a theory of liability under *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), which held it unlawful for a union to have a policy of categorically refusing to pursue grievances predicated on discrimination claims on behalf of members of a protected class, regardless of their merits, while pursuing grievances on other theories for members outside that class. *Id.* at 668–69. *See also Woods v. Graphic Communications*, 925 F.2d 1195 (9th Cir. 1991) (affirming judgment against union that was aware of, but ignored, racial harassment grievances); *EEOC v. Pipefitters Ass'n Loc. Union 597*, 334 F.3d 656, 661 (7th Cir. 2003) (Explaining *Goodman*: "It is not a defense for a shopkeeper who refuses to hire blacks that the only reason he does so is that his customers don't like blacks.").

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 26
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD**
**IGLITZIN &**
**LAVITT LLP**

To the extent Plaintiffs pursue that theory, it, too, must fail. First, AFA does not have a policy of not pursuing grievances challenging religious discrimination. On the contrary, it has vindicated the rights of Christians to pray while on duty. *Supra* at 21. Second, AFA did file grievances on behalf of both Plaintiffs and it advocated for their religious rights during the grievance process: Berry amplified Smith's religious discrimination claim during the grievance hearing, when she first heard it, *supra* at 9, and Taylor sent Alaska Brown's religious accommodation request, notwithstanding Taylor's concerns about the efficacy of that strategy. *Supra* at 16. Third, unlike in *Goodman* and *Woods*, AFA did not ignore the merits of Plaintiffs' grievances when deciding not to arbitrate them. *Supra* at 9–11, 19–20. Quite the contrary, AFA's particularized analysis of the merits of each Plaintiff's grievance was the principal reason AFA decided not to arbitrate their cases. *Id*.

## IV. AFA cannot be liable for damages based on its decision not to arbitrate Plaintiffs' claims because they can still arbitrate those claims on their own.

As shown above, AFA is entitled to summary-judgment dismissal of Plaintiffs' remaining Section 703(c)(1) claim. But even if the Court were to find triable issues on liability, it should still render partial summary judgment (as authorized by Fed. R. Civ. P. 56(a)) holding AFA not liable for damages based on its decision not to arbitrate Plaintiffs' claims.

A union is liable for damages under Title VII only to the extent it proximately caused those damages. *Dowd v. United Steelworkers of America*, *Local 286*, 253 F.3d 1093, 1103–04 (8th Cir. 2001). Title VII imposes a duty on Plaintiffs to mitigate their damages. 42 U.S.C. § 2000e-5(g)(1); *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982) (recognizing the statutory duty is rooted in common law). Where employers and unions both face claims arising from unlawful terminations, courts are familiar with segregating damages among the responsible defendants and limiting

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
**BARNARD
IGLITZIN &
LAVITT LLP**

unions' liability to only those "damages that flow[] from their own conduct." *Czosek v. O'Mara*, 397 U.S. 25, 28–29 (1970) (analyzing this question in the context of duty of fair representation claims). As the Supreme Court has explained:

> Assuming a wrongful discharge by the employer independent of any discriminatory conduct by the union and a subsequent discriminatory refusal by the union to process grievances based on the discharge, damages against the union for loss of employment are unrecoverable except to the extent that its refusal to handle the grievances added to the difficulty and expense of collecting from the employer.

*Id.* at 29. *See also Bowen v. U.S. Postal Service*, 459 U.S. 212, 229–30 (1983) (where union does not deprive employees of access to a remedy, such as arbitration, it is responsible only for any additional expenses—beyond loss of termination—its own conduct imposed on employees); *id.* at 236 (White, J., concurring) (ordinarily, the union's liability will be de minimis when it has not denied employees a remedy).

Here, AFA indisputably has not denied Plaintiffs a remedy: they may still arbitrate their claims on their own, provided they pay the costs of their own legal representation, arbitrator fees, and court reporter costs. *Supra* at 11, 20. It is also undisputed that First Liberty is representing them for free and is covering the costs associated with that representation. *Supra* at Barnard Dec. Ex. AA–BB, LL. Plaintiffs may therefore, to this day, arbitrate their claims at no expense to themselves.

In those circumstances, AFA has not proximately caused them any damages by choosing not to arbitrate their claims. It has instead given them the opportunity to arbitrate their claims with the legal representatives of their choice. AFA cannot be held liable in damages for Plaintiffs' decision not to pursue the remedy AFA afforded them.[10]

---

[10] Finally, Plaintiffs allege that AFA acquiesced in Alaska's hostile work environment and its retaliation against Brown for opposing discrimination. Dkt. 39, Am. Compl. ¶¶ 357–358. Those claims are derivative of Plaintiffs' claims against Alaska and they fail as a matter of law for the reasons demonstrated by Alaska in its own summary-judgment motion.

DEFENDANT   AFA-CWA'S   MOTION   FOR   SUMMARY
JUDGMENT- 28
Case No. 2:22-CV-00668-BJR

18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132

**BARNARD
IGLITZIN &
LAVITT LLP**

1

## CONCLUSION

2
AFA respectfully asks the Court to enter summary judgment in favor of AFA on the sole

3
remaining claim against it.

4
RESPECTFULLY SUBMITTED this 16th day of January, 2024.

5
                                        *s/Darin M. Dalmat*
                                        Kathleen Phair Barnard, WSBA No. 17896
6
                                        Darin M. Dalmat, WSBA No. 51384
                                        Alyssa Garcia, WSBA No. 55731
7
                                        Thomas C. Kaplan, WSBA No. 60351
                                        **BARNARD IGLITZIN & LAVITT LLP**
8
                                        18 W Mercer St, Suite 400
                                        Seattle, WA 98119
9
                                        Tel: (206) 257-6028
                                        Fax: (206) 378-4132
10
                                        barnard@workerlaw.com
                                        dalmat@workerlaw.com
11
                                        garcia@workerlaw.com
                                        kaplan@workerlaw.com
12

13
                                        *s/John H. Morse III*
                                        John H. Morse III *(pro hac vice)*
                                        Association of Flight Attendants-CWA
14
                                        501 3rd Street NW – 10th Floor
                                        Washington, DC 2001
15
                                        Tel: (202) 989-9393
                                        jmorse@afanet.org
16

17
                                        *s/Alidz Oshagan*
                                        Alidz Oshagan *(pro hac vice)*
                                        Association of Flight Attendants-CWA
18
                                        230 S. Broad Street, 19th Floor
                                        Philadelphia, PA 19102
19
                                        Tel: (202) 251-8536
                                        aoshagan@cwa-union.org
20

21
                                        *Attorneys for Association of Flight Attendants-CWA,
                                        AFL-CIO*

22

23

24

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
**TEL** 800.238.4231 | **FAX** 206.378.4132   **LAVITT LLP**