The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARLI BROWN and LACEY SMITH, Plaintiffs, <br><br> v. <br><br> ALASKA AIRLINES, INC., and ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO, Defendants. | NO. 2:22-cv-668 <br><br> **ORDER (1) GRANTING DEFENDANT ALASKA AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT; (2) GRANTING DEFENDANT ASSOCIATION OF FLIGHT ATTENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (3) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................ 1

II.  BACKGROUND .............................................................................................................. 1

  A.  Alaska's Support for the Equality Act and Smith's and Brown's Posts in Response ........ 1

  B.  Smith's and Brown's Disciplinary Proceedings and Termination ..................................... 4

III.  DISCUSSION ................................................................................................................... 7

  A.  Summary Judgment Standard ............................................................................................ 7

  B.  Summary of Plaintiffs' State and Federal Claims ............................................................. 8

  C.  Religious Discrimination: State and Federal Disparate Treatment Claims Against Alaska (First, Fifth, Ninth Causes of Action) .................................................................. 9

    1.  Whether Plaintiffs Have Produced Direct Evidence of Discrimination ........................ 10

    2.  Whether Plaintiffs Have Produced Indirect Evidence of Discrimination ..................... 18

    3.  Whether Plaintiffs' Claims Succeed Under *McDonnell Douglas* ................................ 27

    4.  Whether Plaintiffs Can Prove Their Disparate Treatment Claims Based on a Failure-to-Accommodate Theory ................................................................................... 30

  D.  Religious Discrimination: Disparate Impact Claims Against Alaska (Twelfth Cause of Action) .......................................................................................................... 36

1.    Whether Plaintiffs Can Make Out Prima Facie Case ..................................... 36

2.    Whether Alaska Has Established Business Necessity Defense ...................... 39

E.   Retaliation: State and Federal Claims by Brown Against Alaska (Fourth and Seventh Causes of Action) ........................................................................................ 40

F.   Hostile Work Environment/Harassment: State and Federal Claims Against Alaska (Third, Sixth, and Tenth Causes of Action) ................................................................ 44

G.   Religious Discrimination: Disparate Treatment Claims Against AFA (Second Cause of Action) ................................................................................................................ 49

1.    Additional Background Related to Plaintiffs' Claims Against AFA ............................ 49

2.    Disparate Impact (Religious Discrimination) Claims Against AFA ............................ 50

IV.    CONCLUSION ................................................................................................ 61

## I.     INTRODUCTION

This matter comes before the Court on three cross Motions for Summary Judgment, filed respectively by (1) Plaintiffs Marli Brown and Lacey Smith; (2) Defendant Alaska Airlines, Inc. ("Alaska" or the "Company"); and (3) Association of Flight Attendants-CWA, AFL-CIO ("AFA" or the "Union"). Dkt. Nos. 144, 146, and 129. Plaintiffs Smith and Brown are former Alaska Airlines flight attendants who were terminated for comments they posted on Alaska's internal website, after the Company determined those comments violated its antidiscrimination and antiharassment policies. Plaintiffs brought this lawsuit based on claims of religious discrimination, asserting twelve causes of action. Am. Compl., Dkt. No. 39. By their Motion for Summary Judgment, Plaintiffs seek judgment on Defendants' liability as to all counts, reserving for trial the question of damages. Each Defendant seeks dismissal of all claims against it. Having reviewed the briefs filed in support of and in opposition to all three motions, the declarations and exhibits filed in support thereof, and the relevant authority, the Court denies Plaintiffs' Motion, and grants Defendants' Motions, for the reasons that follow.

## II.     BACKGROUND

### A.     Alaska's Support for the Equality Act and Smith's and Brown's Posts in Response

Defendant Alaska Airlines is an air carrier based in SeaTac, Washington. Together with its regional partner Horizon, Alaska employs approximately 26,000 people. *See* Wonderly Decl., Ex. A at 108:4-7. Plaintiffs Marli Brown and Lacey Smith are former Alaska flight attendants, based out of Seattle and Portland, respectively. Prior to the events giving rise to this lawsuit, Brown had been an Alaska flight attendant for eight years, with no documented performance concerns. Smith

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
1

had been employed as an Alaska flight attendant for six years. For reasons discussed in more detail below, in August 2020 Smith received a 30-day suspension for violating Alaska's antidiscrimination and antiharassment policies for circulating a petition that criticized and mischaracterized Alaska's support for the Black Lives Matter movement. *See* Wonderly Decl., Dkt. No. 147, Ex. W, 8/28/2020 Notice of Discipline or Discharge. At the time, she was told that any further discipline in the next 18 months would result in termination. Wonderly Decl., Ex. X at 169:15-170:3. During their employment with Alaska, both flight attendants were covered by a collective bargaining agreement and were represented by their union, Defendant AFA.

Around 8:30 a.m. on February 25, 2021, Alaska posted an article on the "Alaska's World" website, expressing the company's support for the Equality Act, federal legislation under consideration in Congress. Wonderly Decl., Ex. Y. Alaska's World is an intra-company "communication network," accessible by over 25,000 Alaska and Horizon employees and retirees. Am. Compl., ¶¶ 73-76, 86. Alaska uses the website to communicate with its employees, posting both required and optional reading, and allows employees to comment in response, subject to certain commenting rules. Those include "[n]ever post a comment that is disrespectful toward another employee" and a "three strikes and you're out" policy, providing "[i]f a comment doesn't follow the rules, it will be removed," with three such deletions resulting in being blocked from future commenting. Wonderly Decl., Ex. AA at 2; Ex. C, Smith Dep., at 101:3-16.

According to Alaska's February 25 post, the Equality Act "would amend existing civil rights laws protecting individuals from discrimination based on race, color, national origin, sex, disability and religion and add clear, consistent protections to prohibit discrimination on the basis of sexual orientation and gender identity." *Id*., Ex. Y. Under the heading "Why it matters," the

article stated a "clear federal standard on equality across the country is not only the right thing to do, it is also good for our business and for our employees. . . . To continue to make progress and ensure full equality for LGBTQ+ individuals and families, Congress should swiftly move to pass the Equality Act." *Id*.

At 8:36 a.m. that morning, only minutes after the article was posted, Smith posted, in response, "As a company, do you think it's possible to regulate morality?" *Id*. Approximately two hours later, Andy Schneider, Senior Vice President of People (Alaska's HR division), responded to Smith's comment:

> Supporting the Equality Act is not about regulating morality. It's about supporting laws that allow our LGBTQ+ employees and guests, no matter what state they live in or fly to, to be protected against discrimination. Our values are our guide, and we strongly believe that doing the right thing and being kind-hearted require us to support this act. …
>
> We also expect our employees to live by these same values. Our differences are to be respected. As stated in our People Policies, harassment and discrimination will not be tolerated.

*Id*.

Throughout the day, several Alaska employees expressed offense at Smith's post, in comments on Alaska's World and one in an email to then-CEO Brad Tilden. *See, e.g.*, Wonderly Decl., Ex. Y, 10:37 a.m. post on Alaska's World, ("I question the wisdom of allowing such a forum to exist when it is being used as a soapbox (intentionally or not) to further marginalize already marginalized employees."); *id*., Ex. BB, 10:11 a.m. email to Tilden ("I am happy to see Alaska supporting the Equality Act publicly. I am a little dismayed to see the posted comments from various coworkers. The leading one is from PDX flight attendant Lacey Smith... I consider … Alaska's World an extension of the workplace. If she said this to my face, it would be highly

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
3

offensive and worth pursuing. Hiding behind digital platforms should be no different."). Jeffrey Peterson, president of AFA's Master Executive Council ("MEC"), the governing body for AFA's Alaska membership, also received reports "that multiple flight attendants found Ms. Smith's post divisive and questioned how they could safely fly with her." Peterson Decl., Dkt. No. 137, ¶ 79.

In the evening of that same day, Brown also posted a comment in response to the Equality Act article. She wrote:

> Does Alaska support: endangering the Church, encouraging suppression of religious freedom, obliterating women [*sic*] rights and parental rights?
>
> This act will Force every American to agree with controversial government-imposed ideology on [*sic*] or be treated as an outlaw. The Equality Act demolishes existing civil rights and constitutional freedoms which threatens constitutional freedoms by eliminating conscience protections from the Civil Rights Act. The Equality act would affect everything from girls' and women's showers and locker rooms to women's shelters and women's prisons, endangering safety and diminishing privacy. Giving people blanket permission to enter private spaces for the opposite sex enables sexual predators to exploit the rules and gain easy access to victims. This is Equality Act[.]

Wonderly Decl., Ex. GG. Soon afterward Alaska deleted both Smith's and Brown's comments. Alaska disabled the commenting function on the website for the article, and Plaintiffs were advised that Alaska would "follow up with a separate email with more information." *Id.*, Ex. CC.

**B.      Smith's and Brown's Disciplinary Proceedings and Termination**

Alaska subsequently met with Smith and her AFA representatives, conducted an investigation, and consulted with management in its Inflight (flight attendant) division, legal department, and HR representatives. Alaska terminated Smith's employment on March 19, 2021. *See* Wonderly Decl., Ex. EE, Smith NOD; Ex. B, Williams Dep. at 19:9-16, 74:2-18; Ex. Z, Link Dep. at 86:12- 87:19. According to the Notice of Discharge ("NOD"), the Company had "received

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
4

concerns" that Smith's comment "was undermining Alaska's attempt to support legislation that protects individuals from discrimination and carried the message that being LGBTQ was immoral or wrong." Wonderly Decl., Ex. EE. The NOD expressed Alaska's rejection of the defense Smith gave at the investigation meeting, at which she characterized her post as "a philosophical question," and stated that "[d]efining gender identity or sexual orientation as a moral issue, or questioning the Company's support for the rights of all people regardless of their gender identity or sexual orientation, is not a philosophical question, but a discriminatory statement." *Id*.

The NOD also stated "[t]his was not the first time you engaged in conduct that was contrary to our Company values and had a significant negative impact on other employees." *Id*. This was a reference, as noted above, to Smith's 30-day suspension in August 2020. The discipline was imposed by the Company in response to Smith creating and publicly posting a petition, titled "Depoliticize Alaska Airlines," which expressed opposition to Alaska's public support of the Black Lives Matter movement. Peterson Decl., ¶ 45. After investigation, Alaska found that Smith had "published information [she] knew to be false" in a petition the Company determined "is misleading, damaging to Alaska brand and image, promulgates divisiveness, and undermines the Company's efforts to create an inclusive work environment." Wonderly Decl., Ex. W ("The petition is inconsistent with our company values and the impact it has had on other employees is significant. Employees have reported being concerned about working safely with those involved in the petition."). According to AFA official Peterson, the petition "created huge disruptions both for the flight attendants who supported it and for those who felt attacked by it," and the 30-day suspension was the longest he could recall an employee receiving since he began serving as MEC President in 2011. Peterson Decl., ¶¶ 53, 46.  When Smith posted her comment in response to the

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
5

Equality Act, she was only six months into the 18-month "probationary" period related to the August 2020 infraction, and according to Peterson, was already "a high-profile flight attendant based on her prior discipline for her BLM petition." Peterson Decl., ¶ 65.

Smith grieved (appealed) her termination, the next step in the discipline process provided by the CBA. At the grievance hearing, Smith raised, for the first time as far as anyone at Alaska or AFA was aware, a claim that her comment was rooted in her religious convictions, and asked that she be given accommodation "to be able to politely express beliefs motivated by [her] religion in the same way that others are able to express beliefs encompassed by other protected characteristics, such as sexual orientation." Taub Decl., Ex. 61. On May 10, 2021, Smith's grievance was denied and her termination was upheld. Maller Decl., ¶ 64.

On March 19, Alaska also terminated Brown's employment. Wonderly Decl., Ex. II, Brown NOD. Like Smith, Brown had attended an investigatory meeting, and was given an opportunity to explain her comment. In connection with the investigation, Brown submitted a written request for "a religious accommodation," also asking that she be allowed to "politely express beliefs motivated by [her] religion in the same way that others are able to express beliefs encompassed by other protected characteristics, such as sexual orientation." Brown Decl., Ex. 7. Brown's Notice of Discharge asserted that Brown's comment was "offensive" and "hateful and discriminatory," and "undermined Alaska's support of legislation that protects individuals from discrimination, contributed to a hostile work environment, and was discriminatory toward LBGTQ individuals by equating them to predators and stating that providing LGBTQ individuals with equal rights threatened the rights and safety of others." Wonderly Decl., Ex. II. Alaska also denied her accommodation request, stating "[y]our misconduct cannot be excused by requesting a

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
6

religious accommodation after the fact. Additionally, your request for accommodation would present an undue hardship to Alaska because posts like the one you made are discriminatory and create a hostile work environment for your coworkers. . . . There was nothing polite about your comment and there is no reason to believe future comments would be any different." *Id.*

Brown also grieved her termination, and that grievance was denied. After consideration, AFA's screening panel determined it would not represent either Plaintiff in arbitration. Plaintiffs filed charges with the Equal Employment Opportunity Commission, received Notices of Right to Sue dated March 11, 2022, and timely filed their Complaint on May 17, 2022.

## III.    DISCUSSION

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If ... [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000). "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.*

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
7

When, as here, "simultaneous cross-motions for summary judgment on the same claim[s] are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir.2001). The Court is not obligated, however, to "organize its discussion of the cross-motions into separate sections," provided it considers the evidence, authority, and arguments submitted by both sides, and rules "on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citations omitted).

**B.      Summary of Plaintiffs' State and Federal Claims**

Plaintiffs bring several claims under Title VII of the Civil Rights Act of 1964: (1) against both Defendants, for religious discrimination/disparate treatment, including (against Alaska) under a failure-to-accommodate theory; (2) for religious discrimination/disparate impact; (3) for hostile work environment; and, by Plaintiff Brown, (4) for retaliation.

Under Title VII, it is unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015) ("These two proscriptions, often referred to as the 'disparate treatment' (or 'intentional

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
8

discrimination') provision and the 'disparate impact' provision, are the only causes of action under Title VII.").

Plaintiffs have also asserted state-law religious discrimination claims against Alaska; Brown under the Washington Law Against Discrimination ("WLAD") and Smith under Oregon's Unlawful Discrimination in Employment provisions. The WLAD guarantees "[t]he right to obtain and hold employment without discrimination," and outlaws employment practices that "discriminate against any person in … terms or conditions of employment because of … creed." RCW §§ 49.60.030; 49.60.180. The Oregon law provides "[i]t is an unlawful employment practice [f]or an employer, because of an individual's … religion … to … discharge the individual from employment … [or] to discriminate against the individual … in terms, conditions or privileges of employment." ORC § 659A.030(a) and (b). Plaintiffs have also asserted retaliation and hostile work environment claims against Alaska under their respective state laws. Except as stated otherwise below, the parties and the Court agree that Plaintiffs' claims brought under the state antidiscrimination laws are adjudicated under the same standards as those brought under the federal law, and need not be analyzed separately.

## C. Religious Discrimination: State and Federal Disparate Treatment Claims Against Alaska (First, Fifth, Ninth Causes of Action)

Plaintiffs and Alaska both seek summary judgment in their respective favor on Plaintiffs' federal and state-law disparate treatment claims, set out as Plaintiffs' First, Fifth, and Ninth Causes of Action. Am. Compl. ¶¶ 317-346; 403-412; 452-460. A disparate treatment claim may be established by direct evidence or by circumstantial evidence, with or without the traditional *McDonnell Douglas* burden-shifting framework. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103,

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
9

1122 (9th Cir. 2004) ("[W]hen responding to a summary judgment motion, the plaintiff is presented with a choice regarding how to establish his or her case[, and] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]."). Discrimination may also be shown by proving an employer failed to accommodate an employee's religious observance or practice. 4 U.S.C. § 2000e(j).

To be unlawful under Title VII, Alaska's actions must be "because of" Plaintiffs' religion. "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation. That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020) (citations omitted).

### 1.  Whether Plaintiffs Have Produced Direct Evidence of Discrimination

Plaintiffs first argue that the undisputed direct evidence of Alaska's discriminatory intent entitles them to judgment on their disparate treatment claims. "On summary judgment, direct evidence of discrimination is that which, 'if believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Hittle v. City of Stockton, California*, 76 F.4th 877, 888 (9th Cir. 2023) (citing *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005)). Direct evidence comprises "conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude." *Enlow v. Salem–Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004). Such evidence is usually composed of "clearly sexist, racist, or similarly discriminatory statements or actions by the employer."

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
10

1    *Coghlan*, 413 F.3d at 1095. For the following reasons, the Court concludes that Plaintiffs have not

2    produced "direct evidence" supporting their claims of religious discrimination.

3    **a.   Plaintiffs' Termination Is Not Direct Evidence of Discrimination**

4    Plaintiffs' proffered "direct" evidence of Alaska's discriminatory intent against Brown is

5    that Brown is a Christian who was fired for the sole reason that she posted a comment that

6    discussed "the Church" and "religious freedom." Pls.' Opp. to Alaska's MSJ at 8. Plaintiffs argue

7    that "this alone is sufficient evidence for a jury to find that the Airline fired Marli Brown because

8    of her religious expression." *Id*. Similarly, Plaintiffs argue that "[i]f Lacey held different religious

9    beliefs about sexual morality, then the Company would not have fired her," and that "this is all

10   that is needed to show religious discrimination." Pls.' MSJ at 17. Plaintiffs argue that the

11   "undisputed evidence shows that Alaska Airlines fired Plaintiffs because of their religious beliefs

12   and would not have fired Plaintiffs if their religious beliefs were different." Pls.' MSJ at 8

13   (referencing *Bostock*'s "but-for" causation test).

14   Plaintiffs are incorrect. As an initial matter, Plaintiffs' proposed syllogism—Plaintiffs

15   made religious comments, Alaska fired Plaintiffs for those comments, therefore Alaska fired

16   Plaintiffs because of their religion—does not hold up under scrutiny. It is the last step here that

17   fails. Given the evidence in the record, the only reasonable inference that one can draw is that

18   Alaska did not terminate Plaintiffs because of their religion, but because of the comments they

19   posted. It is undisputed that Alaska would have fired Plaintiffs for posting those comments even

20   if Plaintiffs were not Christian or religious (and indeed, Alaska was unaware of Smith's religious

21   faith until well after she was terminated). Under the *Bostock* test, which "directs us to change one

22

23   ORDER RE: CROSS MOTIONS
     FOR SUMMARY JUDGMENT
24   11

25

thing at a time and see if the outcome changes," Plaintiffs' religion is not a but-for cause of Alaska's actions.

Put differently, Alaska's decision to fire Brown and Smith based on their comments is not direct evidence of religious discrimination, because additional inferences are in fact required to reach the conclusion that Alaska's actions were motivated by discriminatory intent. "In the context of a religious discrimination claim, the 'most obvious and compelling example' of direct evidence would 'be a remark to the effect that ... "I'm firing you because you're ... a Christian."' *Perdue v. C. Hager & Sons Hinge Mfg., Co.*, 412 F. Supp. 2d 1227, 1233 (M.D. Ala. 2005) (citing, inter alia, *Venters v. City of Delphi*, 123 F.3d 956, 972–73 (7th Cir.1997)); *see also Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 854 (11th Cir. 2010) (holding comment "You're fired, too. You're too religious," was direct evidence of religious discrimination requiring jury determination as to actual motive, reversing district court, which had dismissed claim because comment was not "You're fired too *because* you're too religious.").

The evidence Plaintiffs proffer here as "direct" is categorically different from this and other kinds of evidence that courts have found to be "direct" in other cases. In *Godwin v. Hunt Wesson, Inc.*, for example, the Ninth Circuit found direct evidence of sex discrimination where defendant said he "did not want to deal with another female." 150 F.3d 1217, 1221 (9th Cir. 1998) ("This comment directly suggests the existence of bias and no inference is necessary to find discriminatory animus."); *see also Cordova*, 124 F.3d at 1150 (direct evidence of race discrimination where employer referred to a Mexican–American employee as a "dumb Mexican."); *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1128-29 (9th Cir.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
12

2000) (direct evidence included an executive committee member stating that "two Chinks" in the pharmacology department were "more than enough.").

Statements such as these require no additional inference to find an impermissible motive was afoot; they are, on their face, discriminatory. In contrast, one must in fact make an additional "inference or presumption" here to reach the conclusion that Alaska fired Plaintiffs "because of" their religious beliefs. As to Smith, her comment makes reference to morality but otherwise does not on its face state a religious—or even necessarily moral—proposition; as she herself told Alaska, she was simply asking a "philosophical" question.[1] Wonderly Decl., Ex. EE. To conclude that Smith's termination was motivated by an anti-Christian or anti-religious animus, one must presume that Alaska made the connection between Smith's statement and her religion, because questioning the morality of equal rights for LGBTQ individuals is simply not synonymous with religiosity; it is beyond question that many who identify as Christian support LGBTQ equal rights, while many who oppose such rights purport to hold no faith at all.

---

[1] Smith later testified she was calling the comment "philosophical" because she was afraid to admit it was coming from her religious beliefs; but there is simply no evidence in the record that Alaska knew that Smith's comment was based in her religion when it decided to terminate her, and Alaska's understanding that the comment was "merely" philosophical, and not religious, was certainly reasonable at that time. Plaintiffs have also argued that regardless of whether Alaska knew that Smith or her comment were religious when it terminated her, the Company was later made aware that the comment was grounded in Smith's religious beliefs before it made that termination final, when it denied her grievance. But what Alaska learned later in the disciplinary process is not relevant to what its motive was at the time it decided to terminate her, the adverse employment action at issue here. Again, it is undisputed that, at *that* time, Alaska had no actual or constructive knowledge that Smith was a Christian. Furthermore, Plaintiffs' reliance on *Abercrombie* for the proposition that an employer "can be liable for religious discrimination even if the employee never explained her religious beliefs," Pls.' Opp. at 12, is misplaced in the context of determining whether an employer is acting with discriminatory intent. The *Abercrombie* court was observing that the employer cannot escape liability by denying it was aware that a plaintiff's *accommodation request* was based in her religion. *Abercrombie*, 575 U.S. at 773. Even at that, the Court conceded "it is arguable that the motive requirement itself is not met unless the employer at least suspects that the practice in question is a religious practice." *Id*. at 774. Plaintiffs have not presented evidence that Alaska's decision-makers in this case suspected Smith's religious beliefs.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
13

As to both Plaintiffs, one must make the additional "inference or presumption" that the Plaintiffs were fired not because their comments violated Alaska's antidiscrimination and antiharassment policies—as indeed Alaska said at the time and, with ample evidence, argues now—but because Plaintiffs are religious. Therefore this evidence is not, by definition, "direct evidence" that religion was the but-for cause of Plaintiffs' termination.

### b. Alaska's Characterization of Brown's Comment as "Discriminatory" and "Offensive" Is Not Direct Evidence of Discrimination

Plaintiffs also argue that Alaska's characterization of Brown's comment as "hateful," "offensive," and "discriminatory" is additional direct evidence of discrimination against Brown's religious beliefs. *See* Wonderly Decl., Brown NOD, Ex. II. ("Your comment stating that providing equal rights to LGBTQ individuals threatens others and equating LGBTQ individuals to sexual predators is hateful and discriminatory. . . . Your posting was offensive, discriminatory, and did not align with Alaska Airline's [*sic*] values."). More specifically, Plaintiffs claim that Alaska intentionally misinterpreted Brown's comment as equating LGBTQ individuals with "sexual predators," relying on a stereotype that Christians discriminate against LGBTQ individuals (and more specifically, transgender people), when in fact, Plaintiffs claim, Brown was merely expressing a concern about men (regardless of gender identity) exploiting Equality Act provisions to gain access to women's restrooms and other "safe spaces." Plaintiffs also argue that it was discriminatory for Alaska to disparage Brown's use of the term "opposite sex." *See* Taub Decl., Ex. 26, Williams Dep. at 34-35 (labeling the comment "discriminatory towards gender identity" "[b]ecause she's talking about it in terms of one sex or another," thus failing "to recognize there

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
14

are gender nonconforming and nonbinary individuals."). According to Plaintiffs, Brown's "belief in two sexes is a widely-shared Christian belief based in Genesis." Pls.' MSJ at 10.

The Court concludes that Alaska's labeling as "offensive, discriminatory" and "hateful" Brown's statement that "[g]iving people blanket permission to enter private spaces for the opposite sex enables sexual predators to exploit the rules and gain easy access to victims" is not direct evidence of religious discrimination. Plaintiffs argue this characterization is discriminatory for two reasons, both of which the Court rejects.

First, Plaintiffs claim as direct evidence of discrimination the fact that Alaska interpreted this statement as equating LGBTQ individuals with "sexual predators." Without deciding whether Brown intended the statement in that way, the Court notes that Alaska's interpretation of the comment as equating LGBTQ individuals with sexual predators was a reasonable one, particularly given the clear intent of the comment—to oppose Alaska's support for federal expansion of LGBTQ rights—and the inartful and histrionic tone of the statement as a whole. *See* Wonderly Decl., Ex GG (characterizing Equality Act as "[f]orcing every American to agree with controversial government-imposed ideology on [*sic*] or be treated as an outlaw," "obliterating women [*sic*] rights," and "demolish[ing] existing civil rights"). In other words, even if Alaska's interpretation was an "intentional misreading," it is not possible to ascribe to it an anti-religious motive without additional "inference or presumption," meaning it cannot be considered "direct evidence."

Furthermore, it is not evident from the record that Brown's concern for sexual predators gaining access to women-only spaces is grounded in religious belief at all, let alone Brown's Christian beliefs specifically. Brown testified that her Christian faith taught her to speak up for the

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
15

vulnerable—in her scenario, women and girls who might be victimized by "sexual predators." *See* Taub Decl., Ex. 2, Brown Dep. at 156 ("Q. When you say it would remove safe spaces for women and girls, tell me what tenet of your religion you were relying on in making that argument. A. I was basing it off of me as a female and my safety and the safety of my female coworkers. . . . Q. Is there a particular Biblical reference you have for me where it talks about women and children in dressing rooms that you're relying on and what sort of behavior and conduct should go on there? A. The Bible says to stand up for those who are vulnerable, and women and children -- women and girls, and my female flight attendants, are vulnerable when they're in a position to where they can be seen by the opposite sex while changing."). Courts are frequently cautioned not to scrutinize the contours of a plaintiff's purported religious belief. However, courts are also not obligated to "take plaintiffs' conclusory assertions of violations of their religious beliefs at face value." *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023). It simply defies credulity to claim that concern for the vulnerable is anything other than a universal human precept. Brown was unable to point to any specific passage in the Bible, teaching of her religious leaders, or other religion-specific source for this principle, saying little more than "[a]ll I know is the conviction that I had in my heart to stand up for vulnerable people as I -- it was just so strong in my heart to do." Taub Decl., Ex. 2 at 157-58. Absent some specific religious grounding, a generic moral code expressing concern for the vulnerable is simply too vague to be considered "religious" for purposes of Title VII protections.

Second, Plaintiffs also argue that Alaska's characterization of Brown's use of the phrase "opposite sex" as discriminatory was, itself, discrimination. Brown's perceived assertion that human sexuality is binary, however, is not uniquely or even particularly a Christian viewpoint.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
16

Plaintiffs' own expert opines that "[t]he view that sex is binary and that there is a difference between men and women is a foundational belief *of all three Abrahamic religions-Judaism, Christianity, and Islam*," casting doubt on Plaintiffs' claim that Brown's comment was disparaged for its Christian character. Mauser Decl., ¶¶2-5 (emphasis added). Moreover, despite some recent shifts in linguistic usage, "opposite sex" remains a fairly commonplace and distinctly secular phrase, often used well outside the context or influence of Christian or other religious teaching. The Court need not dispute Plaintiffs' expert's view that belief in only two sexes is a fundamental Christian teaching to conclude that it is one that is neither unique to, nor a particular tenet of, Christianity specifically or religion more broadly.

More importantly, Alaska's claimed disparagement of the phrase "opposite sex" is not in itself evidence that Alaska's actions were motivated by religious animus. Regardless of Williams' post-hoc testimony regarding the discriminatory character of Brown's use of the phrase "opposite sex," (which she was objecting to not generally, but specifically "in the context of [Brown's] comment  related to the Equality Act," Taub Decl., Ex. 26 at 35), the Notice of Discharge itself does not refer specifically to Brown's use of the phrase "opposite sex," or express a view that it was use of this phrase that was "hateful" or "offensive," let alone state that it was grounds for Brown's termination. This is true despite the NOD repeatedly calling out, several times, both Brown's opposition to Alaska's support for LGBTQ rights in general and, more specifically, the perceived suggestion that the Equality Act would enable LGBTQ individuals to commit acts of sexual violence in women-only spaces. Again, therefore, one must "presume" or "infer" additional information before reaching the conclusion, based on this evidence, that Alaska's motive was in fact discriminatory.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
17

Accordingly, the Court concludes that Plaintiffs have failed to provide direct evidence of religious discrimination based on either the fact of Plaintiffs' termination, or on Alaska's reference to Plaintiffs' comments as "offensive" and "discriminatory."

### 2. Whether Plaintiffs Have Produced Indirect Evidence of Discrimination

### a. When Indirect Evidence Supports an Inference of Religious Discrimination

Having found no direct evidence of religious animus, the Court next turns to Plaintiffs' claimed indirect evidence. "[T]he plaintiff in a disparate treatment case must show the employer's intent to discriminate, but intent may be inferred from circumstantial evidence." *McGinest*, 360 F.3d at 1122 (citations omitted); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004) ("Where direct evidence is unavailable, the plaintiff may come forward with circumstantial evidence to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable.") (cleaned  up, citations omitted). "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation omitted). However, "[o]n summary judgment, circumstantial evidence of discrimination must be 'specific' and 'substantial,'" not "conclusory and unsupported." *Hittle*, 76 F.4th at 891 (citation omitted).

To survive summary judgment, a plaintiff must provide circumstantial evidence either that "similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (citation omitted). Plaintiffs' proffered indirect evidence of discrimination can be roughly grouped into

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
18

these two categories, "comparator evidence" and "other circumstances." The Court examines each in turn.

### b. Putative Comparators

In support of their attempt to provide indirect evidence of Alaska's claimed discriminatory motive, Plaintiffs proffer a number of examples of what they claim are "similarly situated" employees who were treated differently than Plaintiffs. None of the examples they have provided, however, can be construed as true comparators. First, and critically, Plaintiffs have failed to allege that *any* of the examples they offer as comparators were *outside* the claimed protected class (to wit, non-Christian or non-religious), a necessary element for relying on comparators as evidence of discriminatory intent. *See Chuang*, 225 F.3d at 1126 (finding plaintiffs had demonstrated discriminatory intent with evidence of "the more favorable treatment of similarly situated individuals *outside their protected classes*") (emphasis added); *see also, e.g., Varkonyi v. United Launch All., LLC*, No. 2:23-CV-00359-SB-MRW, 2023 WL 4291649, at *3 (C.D. Cal. May 12, 2023) (dismissing plaintiff's religious discrimination claim where plaintiff failed to allege "that similarly situated non-Christian or nonreligious individuals were treated more favorably than he was"); *Jaffe v. Birmingham Gastroenterology Assocs., P.C.*, No. 2:20-CV-01821-KOB, 2021 WL 4220356, at *3 (N.D. Ala. Sept. 16, 2021) ("As Jaffe states a religious discrimination claim, it is imperative that her comparators be non-Jewish."); *Lindsey v. Bridge Rehab, Inc.*, 369 F. Supp. 3d 1204, 1211 (N.D. Ala. 2019) ("[F]atal to Ms. Lindsey's claim, Ms. Wallace is also a Christian. Thus, Ms. Wallace is not 'a similarly-situated individual outside of [Ms. Lindsey's] protected class' as required under the fourth element of her prima facie case.") (citation omitted). This is

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
19

true, of course, because Plaintiffs' burden is to prove not just that they were treated differently, but that they were treated differently *because of their religion.*

Even were the Court to ignore this flaw in Plaintiffs' evidence, the Court concludes that none of the putative comparators are similarly situated enough to create an inference of disparate treatment based on religious discrimination. To be relevant as circumstantial evidence of discrimination, a comparator must "be similarly situated in all material respects." *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). Most saliently here, none of the putative comparators made offensive statements that were reasonably perceived as questioning the wisdom and/or morality of supporting LGBTQ rights, which Alaska cited as the sole reason for termination in its Notice of Discharge of both Plaintiffs. *See, e.g.*, Smith NOD, Wonderly Decl. Ex. EE ("[Y]our comment . . . carried the message that being LGBTQ was immoral or wrong."). As discussed more fully below, and as Plaintiffs themselves have alleged, support for LGBTQ rights plays a key role in Alaska's corporate culture and public messaging, for both ethical and business reasons. *See infra*, § III.C.1.c.; Wonderly Decl., Ex. Y (Alaska article stating that supporting Equality Act "is not only the right thing to do, it is also good for our business and for our employees.").

Moreover, most of Plaintiffs' proffered comparators did not broadcast offensive comments, on any subject matter, on the official company-sponsored, company-wide website, Alaska's World. Several examples that Plaintiffs provide are of employees who said something objectionable to only a single other employee or to just a few others; some posted comments on their personal, private social media pages. Posts on Facebook or other personal social media are different from posts on Alaska's World. They do not broadcast to all Alaska employees and do not appear to carry the Company's imprimatur, and therefore do not implicate the same liability risks

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
20

or public relations concerns. This aspect of the comparison is "material" because it is the reason Alaska cited in terminating both Plaintiffs. As the Company stated in its termination of Smith, "Your comment here created a negative impact on other employees, was made in a public forum, promulgated divisiveness, and undermined the Company's efforts to create an inclusive work environment free of harassment and discrimination." Wonderly Decl., Ex. EE.

In addition, Alaska notes, all but one of the putative comparators who did post a comment on Alaska's World were in a different work group, and thus subject to different rules and decision-makers than Plaintiffs, further attenuating any probative value those comparators could serve. *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), as amended (Jan. 2, 2004) ("[T]o be similarly situated, an employee must have the same supervisor, be subject to the same standards, and have engaged in the same conduct.") (citing *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 659 (6th Cir.1999) (abrog'd on other grounds); *see also Floyd v. GEICO Ins. Co.*, No. C17-1154-JCC, 2018 WL 6249844, at *4 (W.D. Wash. Nov. 29, 2018)) ("To be relevant, comparators must be similarly situated in all material respects—the comparator employee must have (1) engaged in similar misconduct and (2) been disciplined by the same decision-maker."). In this case, being a flight attendant is one of the "material respects" of Plaintiffs' case, as both Plaintiffs were terminated for violating provisions in the Flight Attendant Manual prohibiting conduct that "could discredit or harm the reputation of the Company," and because being a flight attendant is a singularly customer-facing role with the Company. *See* Wonderly Decl., Ex. II.

The single Alaska's World comment by a flight attendant that Plaintiffs have produced, made by "G.N.," is too dissimilar to Plaintiffs' comments, in multiple respects, to support an inference that G.N. was treated differently from Plaintiffs because Plaintiffs are Christian. In

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
21

apparent disagreement with an article titled "Alaska Air Group commits to a more inclusive workforce by 2025," G.N. posted "Racial equity was taught to me years ago from my parents, Like Hellen Keller, a famous blind woman, I see no color, Only whats [*sic*] inside every single person. We are all created equal." Taub Decl., Ex. 125. On its face, this comment does not question the morality either of Alaska's inclusivity initiative, or of any particular protected class, let alone do so in an arguably offensive manner. There is no allegation or evidence in the record that any other employee was offended by or complained about this comment. It is far from the kind of "substantial" evidence necessary to raise an inference that Plaintiffs were treated differently because of their religion.

Finally, although a single material dissimilarity will render a comparator inapposite for purposes of a discrimination claim, many of Plaintiffs' proffered comparators are dissimilar from Plaintiffs in multiple ways. In one example, the employee "D.T." was given a second chance because Alaska performed a "risk calculus" and determined it had an evidentiary problem: "in this particular case, because it was a verbal comment and there was a he said/she said about what was actually said . . . we thought there was enough risk that we wouldn't be necessarily successful in arbitration." Watts Decl., Ex. E, Williams Dep. at 74. Plaintiffs' cases did not present such evidentiary risks, as their offending comments were written, recorded, and not in dispute. Other employees were allowed to return to work because Alaska determined "that, if the person came back to work, the behavior wouldn't continue." Watts Decl., Ex. E at 29. Here, Plaintiffs actually used their grievance hearings to request permission to continue expressing beliefs in a way that the Company had reason to believe might be discriminatory, clearly signaling a refusal to

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
22

acknowledge the offensiveness of the comments they had made.[2] Ultimately, Plaintiffs have failed to provide evidence of a substantially similar employee, outside of their protected class, who was treated more favorably than they.

### c. Whether "Other Circumstances" Give Rise to an Inference of Religious Discrimination

In addition to the comparator evidence, which the Court has rejected as insufficient, Plaintiffs also argue "other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson*, 358 F.3d at 603. They claim that Alaska's disproportionate and "extreme reaction" to Plaintiffs' posts, and its deviation from its own policies in how it chose to discipline them, are circumstantial evidence supporting a conclusion that their termination was motivated by the Company's discriminatory animus against Christian beliefs. Pls.' MSJ at 12-15. First, Plaintiffs claim, Alaska did not follow its "three strikes" policy regarding objectionable posts on Alaska's World when it fired Plaintiffs after just their first such posts on the site. Second, at least as to Brown, Alaska did not follow its "normal rules" of progressive discipline, but went directly to termination. Third, Plaintiffs argue that how Alaska disciplined Plaintiffs was "vastly out of step" with how it disciplined employees engaged in purportedly anti-Christian behavior. Fourth, Plaintiffs argue that revoking Plaintiffs' security badges and prohibiting them from working during the investigation into their posts "showed discriminatory animus by treating Plaintiffs as a safety risk." Pls.' Opp. to Alaska's MSJ at 17. Fifth, Alaska denied Plaintiffs a "Last Chance Agreement," ("LCA") which involves reinstatement of a

---

[2] As explained elsewhere, given the context in which they were made these were not requests for "religious accommodations" in the legally protected sense.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
23

terminated employee under certain conditions. And sixth, Plaintiffs argue as evidence that Alaska fired Plaintiffs because of their religion, that Alaska "knew that many people of faith have real concerns about the Equality Act," but fired Plaintiffs anyway. *Id*. at 18.

The Court concludes that Plaintiffs' proffered "other circumstances" evidence is not substantial enough to support an inference that Plaintiffs were fired for impermissibly discriminatory reasons. Even if one were to accept that Alaska's discipline was an "extreme reaction" to Plaintiffs' comments, there is still no evidence that would suggest it was motivated by intolerance of or hostility towards Plaintiffs' religion. Instead, the only explanation that is supported by the prodigious amount of evidence in the record is that Alaska fired Plaintiffs, under its "zero-tolerance" antidiscrimination policy, based upon the seriousness of the infractions Alaska perceived they had committed. *See* Wonderly Decl., Ex. A, Schneider Dep. at 166 (in conversation with Williams, "we looked at our zero tolerance policy and felt that [Brown's] statement was so egregious that it warranted termination," and "with respect to [Smith, Williams] was recommending termination based on our progressive discipline policy and the fact that her statement was—was, in fact, insulting, discriminatory and hurtful to other employees."). Alaska's policies allowed it to bypass intermediate steps and to take other disciplinary measures for infractions that were "egregious enough" and, importantly, for precisely the circumstances presented here. *See* Taub Decl., Ex. 46, November 2020 AFA "Grievance Committee Update" (describing "[s]teps of discipline" but noting "[m]anagement doesn't always progressively travel up the steps of discipline. . . . There is no middle ground for certain violations"); Taub Decl., Ex. 21, Lewis Dep. Vol. I at 50 ("Q. And how does progressive discipline work for these nonattendance performance bucket infractions? A. It really depends on the case. I mean, there's some cases where,

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
24

if it's egregious enough, then it could skip all of the other levels and go straight to termination."); Taub Decl., Ex. 25, Dep. of Terry Taylor, at 106 (flight attendant removed from service pending investigation only "when they feel that the behavior is particularly egregious, whatever it may be"). When asked in deposition about what infractions might cause Alaska to go "straight to termination," Brown's Performance Supervisor Tiffany Lewis responded, "[t]heft, a positive drug or alcohol test, violence, *discrimination, harassment*, lying in an investigation is grounds for termination." Watts Decl., Lewis Dep., Ex. C, 51:12-14 (emphasis added).

The seriousness with which Alaska treated Plaintiffs' infractions is reasonable (and does not suggest discriminatory animus) in particular given the unique nature of Alaska's business, which requires employees to work in extremely close quarters, under stressful circumstances that can implicate the very lives and safety of both employees and customers. *See* Peterson Decl., ¶ 52 ("Flight attendants, after all, work in a metal tub[e] flying over 30,000 feet above ground, usually half an hour away from help during the best of conditions. That working environment requires flight attendants to be able to trust one another and feel that they will have each other's back when needed."); Wonderly Decl., Ex. H, Alaska's "People Policies," at pp. 10-11 ("Workplace harassment affects *all* workers and can result in a safety risk, decreased productivity, increased turnover, and reputational harm for individuals and the company."). Setting aside the unique nature of Alaska's industry, even in a generic office environment, preventing a hostile workplace is absolutely a legitimate justification for Alaska's efforts to contain the effects of Plaintiffs' perceived harassment. And contrary to Plaintiffs' suggestion, there is nothing in the case law obligating an employer to wait until an employee's behavior rises to a "severe or pervasive" level of harassment before the employer may take action to avoid liability for tolerating a hostile work

environment. *Cf. McGinest*, 360 F.3d at 1120 (Employer can "avoid liability for such harassment by undertaking remedial measures reasonably calculated to end the harassment.").

It is also evident that Alaska was concerned not just that Plaintiffs' comments might create workplace safety issues or expose it to hostile work environment liability, but could also have offended those outside the company that support LGBTQ rights. That this is an important external Alaska constituency can be discerned from allegations in the Complaint itself. As Plaintiffs allege, "[o]ver the past few years, Alaska Airlines dramatically increased its social advocacy for LGBTQ+ causes. . . . Alaska Airlines brands itself as a supporter of the LGBTQ+ community. The Airline engages in public policy advocacy, corporate giving, and public messaging supporting the LGBTQ+ community. On or about June 15, 2021, Alaska Airlines unveiled the "Pride in the Sky" livery in support of the LGBTQ+ community," which "features vibrant airplane decals with iconic rainbow stripes and inclusive colors, winglets, and the words 'Fly with Pride' adorned on the side." Am. Compl., ¶¶ 42-46. Put simply, Alaska's discipline of Plaintiffs, whose remarks were reasonably perceived at the very least to have been made in opposition to the company's support for LBGTQ rights, can be explained as a rational business decision, devoid of any anti-religious bias. As the Ninth Circuit recently observed, courts "cannot infer [religious] discrimination based on factual allegations that are 'just as much in line with' the non-discriminatory explanation we have identified." *Hittle*, 76 F.4th at 889 (quoting *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 276 (1st Cir. 2022)); *see also Peterson*, 358 F.3d at 603 (9th Cir. 2004) (company's "special attention to combating prejudice against homosexuality . . . is in no manner unlawful," but, to the contrary, "efforts to eradicate discrimination against homosexuals in its workplace were entirely consistent with the goals and objectives of our civil rights statutes generally.").

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
26

In short, Plaintiffs' indirect "other circumstances" evidence demonstrates only that Alaska took Plaintiffs' infractions extremely seriously and disciplined them accordingly, for legitimate non-discriminatory reasons which are amply supported in the record, and do not include any animus towards Plaintiffs' religion.

### 3. Whether Plaintiffs' Claims Succeed Under *McDonnell Douglas*

Plaintiffs argue in the alternative that they can prove their disparate treatment claims under the well-known burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under this analysis, Plaintiffs must first establish a prima facie case of employment discrimination by showing: (1) that they are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that "similarly situated individuals outside [their] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson,* 358 F.3d at 603 (citations omitted).

If plaintiffs establish a prima facie case, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang,* 225 F.3d at 1123–24. If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons for their terminations are mere pretext for unlawful discrimination. *See Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1282 (9th Cir.2000) (to avoid summary judgment plaintiffs must "introduce evidence sufficient to raise a genuine issue of material fact" as to pretext).

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
27

Plaintiffs fail to demonstrate that they are entitled to a jury trial (let alone to summary judgment) under this analysis as well. The Court agrees that Plaintiffs may be able to establish the first three elements of their prima facie case.[3] For many of the reasons already discussed at length above, however, Plaintiffs are unable to raise a triable issue regarding the fourth prong—that "similarly situated individuals outside [their] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *See supra* § III.C.2. For this reason alone, Plaintiffs cannot prevail under the *McDonnell Douglas* framework.

Even if Plaintiffs were able to establish their prima facie case under *McDonnell Douglas*, however, Alaska has also met its burden of establishing "legitimate, nondiscriminatory reasons" for Plaintiffs' termination. As already discussed, the record is replete with evidence that Alaska was enforcing its zero-tolerance antiharassment and antidiscrimination policies, focused particularly on preventing a hostile work environment and supporting LBGTQ rights. *See supra* § III.C.2. Courts have repeatedly acknowledged this is a legitimate, nondiscriminatory justification for an employer's actions. *See, e.g., Peterson*, 358 F.3d at 603 ("Hewlett–Packard's efforts to eradicate discrimination against homosexuals in its workplace were entirely consistent with the goals and objectives of our civil rights statutes generally.").

---

[3] There is no dispute that Plaintiffs are members of a protected class. There is also no dispute that Brown was performing her job satisfactorily, and the Court assumes, without deciding, that Smith may also be able to meet the second element; she had "the requisite training, experience, and knowledge to perform the job satisfactorily." Pls.' Opp. to Alaska's MSJ at 18 (quoting *Decker v. Barrick Goldstrike Mines, Inc.*, 645 F. App'x 565, 567 (9th Cir. 2016)). Contrary to Alaska's argument, her previous infraction, and the fact that she was on "probation," did not necessarily render her unqualified. As to the third element, Plaintiffs' termination is indisputably an adverse employment action.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
28

Plaintiffs protest that "it is not legitimate or non-discriminatory to fire Plaintiffs for expressing their religious beliefs because other employees find those beliefs offensive," and cite *Groff v. DeJoy* to argue that "coworker 'bias or hostility to a religious practice' is no defense." Pls.' Opp. to Alaska MSJ at 19; Pls.' MSJ at 19 (citing *Groff*, 600 U.S. at 472-73). Plaintiffs' reliance on *Groff* for this premise is inapt and unpersuasive. The example used in *Groff* of the "bias or hostility" that an employer may not prioritize over an employee's religious practice is an "[a]dverse customer reaction" from "a simple aversion to, or discomfort in dealing with, bearded people." *Groff*, 600 U.S. at 473. As discussed further below, Plaintiffs have not demonstrated that their posts were in fact a religious "observance or practice" entitled to Title VII protection, *see infra* § III.C.4.b; and a customer's "discomfort" with an employee's beard is patently frivolous compared to Alaska's employees' right to be free from anti-LGBTQ hostility in the workplace. As *Groff* itself acknowledges, "coworker impacts" that "affec[t] the conduct of the business" may indeed be a defense to liability. 600 U.S. at 472.

Plaintiffs also argue that Alaska had no legitimate reason to fire Plaintiffs because "[t]o claim that Plaintiffs' isolated comments constitute severe or pervasive harassment is absurd." Pls.' Opp. to Alaska's MSJ at 19. This argument fails on several fronts. First, comments that were broadcast to over 25,000 Alaska employees cannot accurately be characterized as "isolated." Second, the record demonstrates that far from being remorseful, Plaintiffs intended to continue expressing their discriminatory comments, meaning the danger of being perceived as tolerating a hostile work environment arose not just from Plaintiffs' first comments, but from what Alaska

reasonably believed would be ongoing behavior. *See, e.g.*, Taub Decl., Ex. 51.[4] Third, Alaska is not arguing that Plaintiffs' single posts on Alaska's World, standing alone, were "severe or pervasive harassment," nor need Alaska prove as much. Alaska's argument, supported by authority, is that the comments violated the Company's antidiscrimination and antiharassment policies, thus providing the Company a right (and an obligation) to take action to avoid creating a hostile work environment. *See Bodett*, 366 F.3d at 746 (rejecting religious discrimination claim by employee who was terminated after engaging in harassment of LGBTQ subordinate).

Plaintiffs also fail to meet their final burden of production under *McDonnell Douglas*: demonstrating that Alaska's legitimate, nondiscriminatory reason is merely pretextual. As discussed above, Plaintiffs' proffered comparators are not "similarly situated in all material respects" to a sufficient degree to support a finding that Alaska's nondiscriminatory explanation is pretextual. *See supra*, §III.C.2.b. For the foregoing reasons, Plaintiffs' disparate treatment claims fail under a *McDonnell Douglas* analysis as well.

### 4. Whether Plaintiffs Can Prove Their Disparate Treatment Claims Based on a Failure-to-Accommodate Theory

#### a. Failure-to-Accommodate Theory

Both sides also seek judgment on Plaintiffs' theory that Alaska violated Title VII by failing to meet its obligation to accommodate Plaintiffs' religious views.[5] "A plaintiff who fails to raise a reasonable inference of disparate treatment on account of religion may nonetheless show that his

---

[4] This observation applies with particular force to Smith, who had already been disciplined under Alaska's antidiscrimination and antiharassment policies, with the NOD for that incident noting she "did not express remorse for creating the petition or acknowledge the negative impact it has had." Wonderly Decl., Ex. W.

[5] It is clear that "failure-to-accommodate" is not a separate cause of action under Title VII, but a theory on which a plaintiff may bring its disparate treatment claim. *Abercrombie*, 575 U.S. at 771-72. To the extent such specific pleading was even necessary, both Plaintiffs adequately pled this theory in their Amended Complaint.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
30

employer violated its affirmative duty under Title VII to reasonably accommodate employees' religious beliefs." *Peterson,* 358 F.3d at 606 (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977)). The failure-to-accommodate theory is grounded in Title VII's definition of "religion," which "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Because this definition includes an implicit requirement that an employer "accommodate" an employee's religious "observance or practice," an employee can bring suit based on the theory that the employer discriminated against her by failing to accommodate her religious conduct. *Abercrombie*, 575 U.S. at 775.

To establish a claim of religious discrimination on the basis of a failure-to-accommodate theory, a plaintiff "must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson*, 358 F.3d at 606. If the plaintiff establishes his prima facie case, the burden shifts to the defendant "to show that it 'initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship.'" *Id.* (quoting *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir.1998)).

### b.  Plaintiffs Have Failed to Establish the First Element of Their Prima Facie Case

Under this test, Plaintiffs have failed to establish the first element of a prima facie case in support of their failure-to-accommodate theory, because they have not provided evidence of any

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
31

"observance or practice" that conflicts with their employment duties. Plaintiffs have not alleged that their religion compelled them to respond to Alaska's article about the Equality Act, or that doing so—let alone on the company-wide intranet site—was an "observance or practice" required by their faith. Indeed, Brown conceded that her religion did not require her to post her comments. Wonderly Decl., Brown Dep., 191 ("Q. And you had no religious compulsion to bring future concerns about company policy to 24,000 coworkers? [objection] A. I didn't need to."). "Title VII comes into play only when an employee's religious beliefs proactively require or encourage the employee to *do something* that the employer forbids or *refrain from doing something* that the employer requires." *Snyder v. Arconic Corp.*, No. 3:22-CV-0027-SHL-SBJ, 2023 WL 6370785, at *6 (S.D. Iowa Aug. 31, 2023). This is not a case in which a plaintiff's religion "compels them to do one thing (like wear a headscarf or rest on the Sabbath) but their employer requires them to do something else (like working without headwear or on Sundays)." *Id*. at *5 (citing *Groff*, 600 U.S. at 453; *Abercrombie & Fitch*, 575 U.S. at 770). There is no evidence in the record indicating that Plaintiffs' religion obligated them to post their comments, leading the Court to echo the skepticism expressed by the Ninth Circuit in *Peterson*; "we seriously doubt that the doctrines to which Peterson professes allegiance compel any employee to engage in either expressive or physical activity designed to hurt or harass one's fellow employees" 358 F.3d at 606.[6]

Indeed, even assuming that Plaintiffs' religious beliefs required them to express their opposition to Alaska's support for the Equality Act—and Plaintiffs have neither argued nor provided evidence supporting such conclusion—Plaintiffs would have to demonstrate that their

---

[6] The Ninth Circuit made this observation despite the plaintiff's claim that his "religious beliefs imposed upon him 'a duty to expose evil when confronted with sin.'" *Peterson*, 358 F.3d at 606. Plaintiffs here have made no such claim.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
32

religion compelled them to express that opposition *in the specific manner they chose to do so*, and not in some other way that might have avoided a conflict with Alaska's anti-harassment and anti-discrimination policies, *e.g.,* in the privacy of their own homes, or directly to a supervisor. *See Tiano v. Dillard Department Stores, Inc.*, 139 F.3d 679 (9th Cir. 1998). In *Tiano*, the Ninth Circuit rejected the plaintiff's religious discrimination claim based on a failure-to-accommodate theory, which she had predicated on her employer's denial of her request to embark on a pilgrimage on a specific date. The Ninth Circuit held that "[t]he evidence shows only a bona fide religious belief that she needed to go to Medjugorje at some time; she failed to prove the temporal mandate." *Id.* at 682. The timing of the pilgrimage—which was what had caused the employer to deny her request—was "personal preference," not an inherent element of her religious observance. *Id.*; *see also Rose v. Midwest Express Airlines, Inc.*, No. 8:01-CV-473, 2002 WL 31095361, at *3 (D. Neb. Sept. 19, 2002) (granting summary judgment to employer who terminated an employee because it believed she was sleeping on the job, although she claimed she was praying, because employee "offered no evidence that her religion required her to pray in a specific manner, at specific times, at specific places, or in specific circumstances."). Likewise here, even if Plaintiffs were able to demonstrate that verbalizing their opposition to Alaska's support for the Equality Act was compelled by their religion, choosing to do so—based on "personal preference"—in a manner that violated Alaska's policies removed their actions from the scope of Title VII's protections.

Having failed to demonstrate the existence of a religious "observance or practice" in conflict with Alaska's policies, Plaintiffs appear to argue instead that Alaska had—and breached— a duty under Title VII to accommodate their religious *beliefs*. Pls.' Opp. to MSJ at 22 ("Alaska Airlines failed to consider whether Plaintiffs' religious beliefs could be accommodated in other

ways."). In doing so, however, they misrepresent the statute's definition of "religion," where the failure-to-accommodate theory is grounded. In an interpretive sleight-of-hand, Plaintiffs submit to the Court that the "statute defines 'religion' broadly to include 'all aspects of religious observance and practice, as well as belief' unless accommodating the religious ***beliefs*** would cause 'undue hardship' to the business." Pls.' Opp. to Alaska's MSJ at 25 (emphasis added) (purporting to cite 42 U.S.C. 2000e(j)). But Title VII, by its terms, does not require accommodation of religious "beliefs," as Plaintiffs claim; it requires accommodation of a religious "observance or practice." 42 U.S.C. § 2000e(j); *see Equal Emp. Opportunity Comm'n v. Kroger Ltd. P'ship I*, 608 F. Supp. 3d 757, 776 (E.D. Ark. 2022) ("Speaking metaphysically, a belief cannot conflict with a workplace rule. Instead, it is the religious observance or practice—i.e., doing something or refraining from doing something based on a religious belief—that can conflict with a workplace rule."). To meet the burden of demonstrating the first element of a prima facie failure-to-accommodate claim, therefore, it is not enough for Plaintiffs to allege their *beliefs* conflict with Alaska's policies; they must demonstrate that the actual "observance or practice" of those beliefs created that conflict. *See Snyder*, 2023 WL 6370785, at *5 ("[Plaintiff] has not cited—and the Court is not independently able to locate—a case holding that Title VII requires "favored treatment" in the absence of a conflict between a religious practice and an employment requirement."). They have not done so here.[7]

---

[7] Alaska argues that Plaintiffs have also failed to establish the second element of their prima facie failure-to-accommodate theory, since it is undisputed that Plaintiffs did not explicitly request an accommodation until after they had committed the infractions for which they were terminated. Because Plaintiffs have failed to show the existence of a religious practice that conflicted with an employment duty, the Court need not reach the second element of their prima facie case.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
34

1

**c.  Defendant Is Entitled to "Undue Hardship" Defense**

2     The Court also concludes that Alaska has demonstrated it is entitled to an "undue hardship"

3   defense on Plaintiffs' failure-to-accommodate theory. Alaska argues that because both federal law

4   and various state laws (including those of Washington and Oregon) prohibit discrimination based

5   on sexual orientation and gender identity, it cannot legally allow Plaintiffs to engage in

6   discriminatory behavior that might contribute to a hostile environment in the workplace, regardless

7   of that behavior's claimed religious underpinning. *See* Or. Rev. Stat. §659A.030; RCW §

8   49.60.180.

9     Defendant is correct. "In cases involving private employers," the Ninth Circuit has "held

10   that an employer is not liable under Title VII for failure to accommodate when accommodating an

11   employee's religious beliefs would require the employer to violate federal or state law because the

12   existence of such a law establishes 'undue hardship.'" *Bolden-Hardge*, 63 F.4th 1215, 1225 (9th

13   Cir. 2023) (cleaned up, citing *Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 830 (9th

14   Cir. 1999)). This rule includes laws prohibiting discrimination and harassment in the workplace.

15   *See* EEOC Compliance Manual, § 12-III.D ("[A]n employer never has to accommodate expression

16   of a religious belief in the workplace where such an accommodation could potentially constitute

17   harassment of coworkers, because that would pose an undue hardship for the employer.") (citing

18   *Peterson*, 358 F.3d at 607 ("[A]n employer need not accommodate an employee's religious beliefs

19   if doing so would result in discrimination against his co-workers or deprive them of contractual or

20   other statutory rights.")); *see also Matthews v. Wal-Mart Stores, Inc.*, 417 F.App'x 552, 554 (7th

21   Cir. 2011) (employer not required to accommodate plaintiff by allowing her to "admonish gays at

22   work to accommodate her religion" where doing so would "place Wal–Mart on the 'razor's edge'

23   ORDER RE: CROSS MOTIONS
    FOR SUMMARY JUDGMENT
24   35

25

of liability by exposing it to claims of permitting workplace harassment"). Contrary to Plaintiffs' suggestion, Alaska has no obligation to wait until religiously motivated discriminatory behavior rises to an actionable level to take action to curb that behavior. In the absence of discriminatory intent, Alaska, as a private employer, must be allowed to determine when and how to apply its antiharassment and antidiscrimination policies, in order to provide for its employees a productive and harassment-free workplace.

Plaintiffs fail to acknowledge or dispute that requiring Alaska to allow Plaintiffs to continue posting comments on Alaska's World could expose it to legal liability under state and federal anti-discrimination laws, and Alaska is entitled to judgment in its favor on Plaintiffs' failure-to-accommodate theory for this reason as well.

### D.  Religious Discrimination: Disparate Impact Claims Against Alaska (Twelfth Cause of Action)

### 1.  Whether Plaintiffs Can Make Out Prima Facie Case

The parties seek summary judgment in their favor, respectively, on Plaintiffs' Twelfth Cause of Action against Alaska, for "Religious Discrimination, Disparate Impact."  Am. Compl. ¶¶ 486-495. "A disparate impact claim challenges employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir.1990) (citations omitted). This claim is based on Title VII, which provides that an employer cannot "use[] a particular employment practice that causes a disparate impact on the basis of . . . religion" unless it can "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

To plead a prima facie case of disparate impact discrimination, a plaintiff must (1) identify the specific employment practice or selection criteria being challenged; (2) show a disparate impact on a protected group; and (3) prove causation. *Rose*, 902 F.2d at 1424. Plaintiffs have alleged that "Alaska Airlines had a policy or practice of disciplining employees for expressing, mentioning, or suggesting that they hold traditional beliefs on issues related to sexual morality, sexual orientation, or gender identity," and claim that this alleged policy or practice "has a disparate impact on Christians like Marli and Lacey." Am. Compl. ¶¶ 489, 493; Pls.' Opp. to Alaska's MSJ at 23.

The Court finds that Plaintiffs have failed to demonstrate that Alaska has or enforces policies or practices that create a "significant disparate impact" on a protected group. To the extent that Plaintiffs intend to claim a disparate impact on all Christians, or even on all religious employees—either of which might be a protected group—Plaintiffs have failed to meet their burden at the summary judgment stage of raising an issue of fact on this claim. While "statistics are not strictly necessary" to prove a disparate impact claim, in the absence of statistical evidence, a policy's impact on a protected group must be "obvious." *Bolden-Hardge*, 63 F.4th at 1227. Such "obviousness" may exist where, for example, a policy "on its face" has a disparate impact on a protected group, or where it has an impact on "all or substantially all" members of such group. *Id.* (citing *Garcia v. Woman's Hosp. of Tex.*, 97 F.3d 810, 813 (5th Cir. 1996)); *see also, e.g.*, *Muhammad v. New York City Transit Auth.*, 52 F. Supp. 3d 468, 486 (E.D.N.Y. 2014) (finding prima facie case of disparate impact claim where "100% of those with religious objections were transferred, while 0% of employees with secular objections were transferred"). Here, however, Plaintiffs have failed to provide evidence that "all or substantially all" Christian employees, or employees of religious faith, are impacted by Alaska's policies. As noted, many Christians do not

share Plaintiffs' views on gender and sexuality, and even among those who do, certainly not all feel compelled to broadcast those views publicly. In the absence of statistical evidence, something more than an impact on an indeterminate number of individuals must be shown.

Furthermore, to the extent that Plaintiffs intend their claim to relate to a custom-tailored subgroup of Christians based upon beliefs—as they state in their Motion for Summary Judgment, "Christians like Marli and Lacey and other employees who hold traditional religious beliefs"— they have failed to define the kind of group that a Title VII disparate impact claim is designed to protect. Pls.' MSJ at 21. "[C]ourts generally treat disparate impact claims as those affecting particular groups or faiths, including articulable subgroups, *but not all those who share a single common belief.*" *Cox v. Nw. Reg'l Educ. Serv. Dist.*, No. 3:22-CV-01073-HZ, 2024 WL 777598, at *13 (D. Or. Feb. 23, 2024) (emphasis added) (citing *Dunbar v. Walt Disney Co.*, No. CV 22-1075-DMG (JCX), 2022 WL 18357775, at *3 (C.D. Cal. July 25, 2022)).

The Court finds instructive on this point a collection of recent district court cases analyzing disparate impact claims challenging employers' COVID-19 vaccine mandates. These courts have reasoned that "allowing disparate impact claims for groups holding a particular religious belief would give 'limitless relief' because 'any policy impacting a plaintiff's specific religious belief would generally impact 100% of the members of a class defined by that belief, which would virtually always amount to a disproportionate impact as compared to those falling outside the class.'" *Id*. (citing *Dunbar*, 2022 WL 18357775, at *3; *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc*., 406 F. Supp. 3d 1258, 1306 (M.D. Ala. 2019), aff'd, 6 F.4th 1247 (11th Cir. 2021)); *Akiyama v. U.S. Judo Inc*., 181 F. Supp. 2d 1179, 1186 (W.D. Wash. 2002).

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
38

Similarly here, Plaintiffs have attempted to define the group not by a protected status, but by the substantive content of individuals' subjective beliefs, which are undoubtedly held by some Christians, but not by other Christians. Pls.' Opp. to Alaska's MSJ at 24. This is not a proper disparate impact claim group. *Cox*, 2024 WL 777598, at *14 ("[P]arties cannot establish a prima facie disparate impact claim by defining the group as comprised of religious individuals holding a particular belief they attribute to their religion even if other members of that individual's faith or religious group believe otherwise.") (quoting *Dunbar*, 2022 WL 1857775, at *3).

### 2. Whether Alaska Has Established Business Necessity Defense

Even if Plaintiffs were able to establish the prima case facie elements of their disparate impact claim, Alaska has demonstrated that it is entitled to the "business necessity" defense. "The business necessity defense permits employment practices that have a disparate impact on a protected class if the practices have "a manifest relationship to the employment in question." *Bolden-Hardge*, 63 F.4th at 1228 (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)). As discussed above, Alaska has amply demonstrated that its job-related practice of preventing discrimination and harassment in the workplace by prohibiting offensive and discriminatory statements on its company-wide intranet site is consistent with a valid business necessity. *See supra* § III.C.2.c.; *Bey v. City of New York*, 999 F.3d 157, 171 (2d Cir. 2021) ("[C]omplying with [] legally binding federal regulation is, by definition, a business necessity and presents a complete defense to the Firefighters' disparate impact claim."); *Hamilton v. City of New York*, 563 F. Supp. 3d 42, 55 (E.D.N.Y. 2021) (applying *Bey* to Title VII religious discrimination claim). Plaintiffs' disparate impact claims are therefore dismissed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**E.    Retaliation: State and Federal Claims by Brown Against Alaska (Fourth and Seventh Causes of Action)**

Marli Brown brings claims against Alaska for retaliation under both state and federal laws, claiming she was fired for opposing unlawful religious and sex discrimination. Am. Compl., ¶¶ 390-402; 425-432. Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C.A. § 2000e-3.[8] Plaintiffs claim that Brown's termination was unlawful retaliation because it was based on Brown's expressed opposition to Alaska's support for the Equality Act, which Plaintiffs characterize as Brown's "[c]oncerns about safety or privacy risks from biological men in women's safe spaces" and concerns about the impact the Equality Act would have on religious people. Pls.' Opp. to Alaska's MSJ at 26. Plaintiffs also argue that it was unlawful retaliation for Alaska to fire Brown on account of her "religious accommodation" request, which she made at her termination hearing.

To make out a prima facie case of retaliation under Title VII, a plaintiff must show "(1) involvement in protected activity opposing an unlawful employment practice, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action." *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006). To satisfy the first element, the plaintiff's opposition must be grounded in "a *reasonable belief* that the employer has engaged in an unlawful employment practice." *Id.*; *see also Maner v. Dignity Health*, 9 F.4th 1114, 1127 (9th Cir. 2021)

---

[8] Similarly, under the WLAD, "[i]t is an unfair practice for any employer … discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter…." RCW § 49.60.210. "[T]he framework used to analyze Title VII retaliation claims applies equally to … the WLAD" and the Court need not analyze them independently. *Hotchkiss v. CSK Auto Inc.*, 918 F.Supp.2d 1108, 1125 (E.D.W.A. 2013).

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
40

1   (Title VII "protects an employee who opposes employer conduct in the mistaken but reasonable

2   belief that the conduct is unlawful.").

3           Plaintiffs' retaliation claims fail for the simple reason that Brown's post on Alaska's World

4   was not opposing conduct that could even arguably be perceived as the Company engaging in an

5   "unlawful employment practice." A Title VII retaliation claim does not protect an employee from

6   retaliation for opposing what she perceives as injustice or discrimination generally; as noted, the

7   "oppositional conduct" must be grounded in "a reasonable belief that *the employer* has engaged in

8   an unlawful employment practice." *Id.* (emphases modified from original); *see also Maner*, 9 F.4th

9   at 1127 (Title VII "protects an employee who opposes *employer conduct* in the mistaken but

10  reasonable belief that *the conduct* is unlawful.") (emphasis added); *Silver v. KCA, Inc.*, 586 F.2d

11  138, 141 (9th Cir. 1978) ("[N]ot every act by an employee in opposition to racial discrimination

12  is protected. The opposition must be directed at an unlawful employment practice of an employer,

13  not an act of discrimination by a private individual.").

14          Plaintiffs gloss over this element by arguing that Brown was articulating fears about men

15  using women's restrooms, and attempt to cast this as opposition to sex discrimination, but they fail

16  to address or explain how Alaska's support for pending federal legislation could reasonably be

17  considered an unlawful employment practice under Title VII. *See Stewart v. Wilkie*, No.

18  218CV01887ODWSKX, 2019 WL 1114866, at *4 (C.D. Cal. Mar. 11, 2019) (Plaintiff "opposing

19  President Obama's 'illegal Executive Orders that violated Plaintiffs [*sic*] Religious liberties in

20  advancing the LBGTQ [*sic*] agenda'" did "not articulate opposition to employment practices made

21  unlawful by Title VII . . .  and thus fail[s] to allege protected activity under Title VII."). Her post

22  on Alaska's World was therefore not protected oppositional conduct under Title VII.

23  ORDER RE: CROSS MOTIONS
    FOR SUMMARY JUDGMENT
24  41

25

Plaintiffs' retaliation claims based on Brown's request for a "religious accommodation" fair no better. As discussed above, after Brown posted the comment on Alaska's World, but before she was terminated, Brown made a request "to be able to politely express beliefs motivated by my religion." Taub Decl., Ex. 51. As an initial matter, it is not clear that requesting a religious accommodation, particularly after committing a fireable offense, is a "protected activity" for Title VII retaliation claim purposes.[9] *See Enriquez v. Gemini Motor Transp. LP*, No. CV-19-04759-PHX-GMS, 2021 WL 5908208, at *7 (D. Ariz. Dec. 14, 2021) ("Although the Ninth Circuit has not decided whether requesting a religious accommodation constitutes 'oppos[ing] ... an unlawful employment practice,' the Eighth Circuit has determined that it does not.") (citing *EEOC v. N. Memorial Health Care*, 908 F.3d 1098 (8th Cir. 2018)). In the absence of express statutory directive or authority on point, the Court is wary of expanding the scope of Title VII's protections to confer a retaliation claim on a potentially very broad class of employees who might express an "opposition" to being fired.

Even assuming Brown's accommodation request could be construed as protected activity, however, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Lewis v. Sunrise Hosp. & Med. Ctr., LLC,* No. 221CV00464CDSVCF, 2024 WL 1343962, at *7 (D. Nev. Feb. 28, 2024) (citing *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).[10] Plaintiffs have not presented any

---

[9] Indeed, in their Amended Complaint, Plaintiffs did not include Brown's request for religious accommodation as a basis for their retaliation claims.

[10] Plaintiffs correctly note that a retaliation claim under the WLAD imposes a lower standard for showing causation, requiring a plaintiff to prove only that retaliatory motive was a "substantial factor." *See Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 746 (2014). Under the facts of this case, Plaintiffs have not established causation under the WLAD, either.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
42

credible, admissible evidence supporting this third element of a retaliation claim: a causal link between the purportedly protected activity (the accommodation request) and the adverse employment action (termination). It is uncontested—indeed, Plaintiffs themselves have alleged— that Alaska terminated Brown for the sole reason that she posted a comment on Alaska's World that the Company perceived as discriminatory and offensive. *See* Am. Compl. ¶ 4 ("Alaska Airlines responded to Marli and Lacey's posts by immediately removing Marli and Lacey from their flight schedules [and] terminating their employment."); *id*. at ¶ 57 ("The Notice of Discharge did not give any reason for terminating Marli's employment other than Marli's post."). The only "evidence" Plaintiffs have submitted in support of a "causal link" between the request for religious accommodation and Brown's termination is a discovery response from Alaska's co-defendant AFA, indicating that Brown's union representative "advised Plaintiff that for her investigatory meeting with Alaska Airlines she should frame her request for a religious accommodation carefully so as not to cause the airline to take a more heavy-handed approach with her discipline." Taub Decl., Ex. 35, AFA First Supp. Ans., ER 584-91. This statement contains multiple layers of hearsay, lacks foundation, and is speculative and vague; and it fails to call into doubt that Brown was terminated (and that her grievance was subsequently denied) for the comment she posted on Alaska's World, not for a *post hoc* request she made that her religion be accommodated.

Furthermore, "[a]n employee is not protected by Title VII when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with the attainment of the employer's goals." *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985). Plaintiffs argue that cases so holding involve behavior that is more offensive than that committed here. *See* Pls.' Opp. to Alaska's MSJ at 28 (citing, *inter*

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
43

1  *alia, O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756 (9th Cir. 1996), where plaintiff's

2  oppositional conduct included "rummaging through his supervisor's office for confidential

3  documents" and "copying those documents and showing them to a co-worker."). This attempt to

4  distinguish the authority based on the flagrancy of the employee's conduct is unpersuasive. Alaska

5  considered Brown's comments "hateful" and "offensive" and a violation of its anti-discrimination

6  and anti-harassment policies. As the Court has already determined, Alaska had a legitimate, non-

7  discriminatory reason for terminating her. *See supra* § III.C.2.c. Brown's retaliation claims fail for

8  this reason as well.

9      **F.    Hostile Work Environment/Harassment: State and Federal Claims Against
             Alaska (Third, Sixth, and Tenth Causes of Action)**

10          Plaintiffs have included in their Amended Complaint three claims against Alaska for

11  hostile work environment/harassment: a federal claim under Title VII and two state-law claims,

12  by Brown under the Washington Law Against Discrimination and by Smith under Oregon's

13  Unlawful Discrimination in Employment Provisions.[11] *See* Am. Compl., ¶¶ 371-389; 413-424;

14  461-471. To establish a claim for hostile work environment based on religion, a plaintiff must

15  show "(1) that he was subjected to verbal or physical conduct of a harassing nature [based on his

16  religion], (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or

17  pervasive to alter the conditions of the victim's employment and create an abusive working

18  environment." *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir.

19  2000) (quoting *Pavon v. Swift Trans. Co., Inc.*, 192 F.3d 902, 908 (9th Cir. 1999)). In addition,

20

21

22  [11] All three claims are analyzed under the same standard. *See Mooers v. St. Charles Health Sys., Inc.*, No. 6:23-CV-01294-MC, 2024 WL 759632, at *2 (D. Or. Feb. 23, 2024); *Knight v. Brown*, 797 F. Supp. 2d 1107, 1132 (W.D. Wash. 2011), *aff'd*, 485 F. App'x 183 (9th Cir. 2012).

23  ORDER RE: CROSS MOTIONS
    FOR SUMMARY JUDGMENT
24  44

25

"[t]he working environment must both subjectively and objectively be perceived as abusive." *Vasquez*, 349 F.3d at 642.

Plaintiffs' allegations regarding their own first-hand experience are sparse. They include that Plaintiffs were fired for expressing their religious beliefs by opposing Alaska's support for the Equality Act, which the Court has already discussed at length, above. In addition, Smith alleges that she was disciplined for publicly opposing Alaska's support for the Black Lives Matter *movement*, which was, she believed, synonymous with the BLM *organization*, which Plaintiffs claim is "a Marxist, anti-family, and anti-Christian organization." Pls.' MSJ at 29. There is no evidence in the record that Smith told Alaska at the time that her opposition was grounded in her Christian faith, and there are no further allegations regarding this incident that tie it to Smith's religious beliefs or claimed religious discrimination.

For her part, Brown claims she was told by a supervisor not to discuss religion at work. A closer examination of this incident provides the context.[12] A complaint had been made against Brown, alleging she had "grabbed a passenger's arm, told them don't get the COVID vaccination because you could get AIDS." Watts Decl., Ex. I, Brown Dep., at 124. Brown denied the allegation and was not disciplined for it, but her supervisor, Tiffany Lewis, testified that Brown later came to her and AFA representative Terry Taylor, and

> inquir[ed] about something along the lines of, when is it appropriate to have these discussions . . . and I just said . . . in order to avoid kind of conflict and things like that, you know, COVID, religion, and I named off a couple . . . of things in addition to religion, so it wasn't just religion, of things that probably you shouldn't. These are sensitive topics. So it would probably be best just to not talk about them among

---

[12] "Context matters" in a hostile work environment claim. *Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 978 (9th Cir. 2023).

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
45

mixed company because you just never know how people feel about different topics.

Watts Decl., Lewis Dep., Ex. I, at 22-23; *see also* Taylor Decl., ¶¶ 26-27 ("Ms. Lewis followed my suggestion by agreeing that hot topics should be avoided to avoid being overheard and misunderstood. Ms. Brown then asked "what are hot topics?" Ms. Lewis answered that religion, money, and politics can be examples of hot topics to avoid on the plane in mixed-company where a flight attendant could be overheard by passengers or other co-workers."). Lewis added that in mixed company it would be best not to talk about race, either. *Id*. Other than this incident and her termination in response to her post on the Equality Act, Brown does not allege any other "verbal or physical conduct of a harassing nature" to which she was subjected that might have given rise to a hostile work environment.[13]

Under the governing standard, Plaintiffs have an obligation to demonstrate that their workplace "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sharp v. S&S Activewear, L.L.C.,* 69 F.4th 974, 978 (9th Cir. 2023). In determining whether conduct rises to the requisite level, courts focus on the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

---

[13] In her deposition, Brown made reference to certain Alaska training documents "on harassment and discrimination for other protected classes but never religion, which continually reminded me that it's not safe" to make a religion-based complaint in the workplace. Watts Decl., Ex. I, at 69. It is not clear what complaints she may have had, or what training documents she is referring to, although according to Alaska, "the evidence is undisputed that Alaska's trainings all mentioned religion—alongside sex, sexual orientation, gender identity, and other protected categories." Def.'s Opp. to MSJ at 29 (citing Watts Decl., Ex. J. at 5, 9, 13). In any event, Brown later testified she merely did not recall any training on protections against religious discrimination. Brown Dep., Taub Decl. ISO Pls.' Opp. to Alaska's MSJ, Ex. 48, at 611. Failing to recall training on religious discrimination cannot reasonably be considered conduct of a harassing nature, regardless of how it made Brown feel.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
46

offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88 (1998). The incidents Plaintiffs describe are neither severe nor pervasive enough to raise a triable issue on whether they experienced a hostile environment in the workplace.[14] "Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII." *McGinest*, 360 F.3d at 1113. Other than their termination—which the Court has already determined was based not on their religion, but on Alaska's determination that they had violated its antidiscrimination and antiharassment policies—each Plaintiff proffers only a single episode of having experienced purportedly harassing conduct in the workplace. Neither Plaintiff has alleged the conduct she experienced was "physically threatening or humiliating," interfered with her work performance, or otherwise altered the conditions of her employment. Because "[t]he required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct," Plaintiffs have a burden of demonstrating that the single episode of harassment that each alleges rises to an "extremely severe" level. *McGinest*, 360 F.3d at 1113; *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000) ("If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe."). They have not carried that burden in this case.

---

[14] Lewis and Taylor's advice that it would be wise to avoid "hot topics" including religion and race in "mixed company" does not give rise to a reasonable inference of hostile work environment, and furthermore is not on its own demonstrably improper. "Discussion of religion in the workplace is not illegal," *Smith v. City of Philadelphia*, 285 F. Supp. 3d 846, 854 (E.D. Pa. 2018), but this is not an instance of an employer "preemptively banning all religious communications in the workplace." EEOC Compliance Manual, § 12-III.D. Plaintiffs have not provided authority for their position that an employer may not advise employees to avoid discussing controversial subjects (including religion) in mixed company.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
47

Presumably recognizing this deficiency, Plaintiffs devote much of their argument to describing purportedly harassing conduct that other—in many cases anonymous—Alaska employees have allegedly experienced. In generalized and conclusory fashion, Plaintiffs claim that "Christian employees fear for their jobs, are afraid to mention their religious beliefs in the workplace, retire early, and talk with each other about the censorship and cancel culture." Pls.' MSJ at 28. They allege, for example, that the "Company 'systematically integrated' DEI [diversity, equity, and inclusion training] into its 'business processes and culture' . . . centered on 'racial equity' and 'gender equity,'" but that the "Managing Director in charge of DEI was not aware of anything the Company did to advance religious diversity, except for one holiday party in 2022." Pls.' MSJ at 28. Plaintiffs also claim that Alaska failed to respond to multiple complaints by Christian employees who stated, in an employee survey, that they felt unwelcome at the Company or discriminated against based on their religion. *See* Taub Decl., Ex. 126, Sept. 2020 Employee Feedback Survey.

Plaintiffs correctly note that "individual targeting is not required to establish a Title VII violation." *Sharp*, 69 F.4th at 978. Regardless of whether the harassing conduct is *targeted* at the plaintiff, however, the standard is clear; the plaintiff must still be the one "subjected to" that conduct. *Vasquez*, 349 F.3d at 642. For example, the "sexually graphic, violently misogynistic" music depicting "extreme violence against women" at issue in *Sharp* was "[b]lasted from commercial-strength speakers placed throughout the warehouse," and while perhaps not specifically targeted at the plaintiffs, "was nearly impossible to escape." 69 F.4th at 977 ("Sometimes employees placed the speakers on forklifts and drove around the warehouse, making it more difficult to predict—let alone evade—the music's reach."). Other than the incidents

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
48

described above, which the Court finds as a matter of law does not rise to the level of pervasiveness or severity required under Title VII, Plaintiffs have not claimed that they personally experienced any of the other purportedly harassing conduct alleged to have created a hostile workplace. Plaintiffs have therefore not satisfied the first or third prongs of the test: that *they* were "subjected to verbal or physical conduct of a harassing nature," or that the conduct "was sufficiently severe or pervasive to alter the conditions of their employment." Accordingly, Plaintiffs' hostile work environment claims must fail.

### G.     Religious Discrimination: Disparate Treatment Claims Against AFA (Second Cause of Action)

Plaintiffs and Defendant AFA have moved on the single remaining claim Plaintiffs assert against the Union, under Title VII, for religious discrimination, disparate treatment. *See* Am. Compl., ¶¶ 347-370.[15]

### 1.     Additional Background Related to Plaintiffs' Claims Against AFA

Defendant Association of Flight Attendants is a labor union that represents nearly 50,000 flight attendants at 19 airlines nationwide, including Alaska. Peterson Decl. ¶ 4. As noted, Jeffrey Peterson is an Alaska flight attendant and the president of AFA's Master Executive Council ("MEC"), which is the main governing body for AFA's membership at Alaska. *Id*., ¶¶ 2-5. A Local Executive Council ("LEC") represents flight attendants at each of Alaska's airline bases (e.g., in Anchorage, Seattle, Portland, etc.). Peterson Decl. ¶ 11.

After Smith posted her comment on Alaska's World and Alaska initiated disciplinary proceedings, Smith was represented by her AFA/LEC Portland president Steve Maller and vice-

---

[15] The Court dismissed Plaintiffs' state-law claims against AFA as preempted by federal law. Dkt. No. 57.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
49

president Krystle Berry, who helped her prepare for and attended the investigatory meeting with Alaska representatives. Maller Decl., ¶¶ 6, 35-43. After Alaska terminated Smith, AFA filed a grievance on her behalf. *Id.*, ¶ 54. Alaska denied Smith's grievance, and AFA sought conditional reinstatement under a "last chance agreement," or LCA, which Alaska denied. *Id.*, ¶ 64. AFA determined, after reviewing the merits of her case, that it would not represent her at the next step, arbitration. *Id.*, ¶ 65.

AFA also became involved in Brown's disciplinary proceedings after Brown posted her comment on Alaska's World. Brown's AFA/LEC Seattle president Terry Taylor represented her at the initial investigatory meeting. Taylor Decl. ¶ 20. After Alaska terminated Brown, AFA filed a grievance on Brown's behalf. *Id.*, ¶ 105. That grievance was denied, and AFA sought an LCA, which was also denied. Adams Decl., ¶ 13. After reviewing Brown's case, AFA declined to represent Brown in an arbitration as well. *Id.*, ¶ 14.

### 2.  Disparate Impact (Religious Discrimination) Claims Against AFA

Both sides move for judgment in their respective favor on the claim against AFA, for "religious discrimination, disparate treatment" under Title VII. As Plaintiffs aver in their Amended Complaint, under Title VII "it is an unlawful employment practice for a labor organization 'to exclude or expel from its membership, or otherwise to discriminate against, any individual because of his … religion.'" Am. Compl., ¶ 349; 42 U.S.C. § 2000e-2(c)(1). Labor organizations violate Title VII if they "discriminate against an individual," "adversely affect his status as an employee,"

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
50

or "cause or attempt to cause an employer to discriminate against an individual" "because of" religion, among other protected classes.[16] 42 U.S.C. § 2000e-2(c)(1)-(3).

Plaintiffs argue that AFA violated Title VII in all of these respects. They allege that AFA "caused or attempted to cause" discrimination by Alaska on the basis of religion by "reporting" Plaintiffs' comments to Alaska leadership and conveying that the Union supported Plaintiffs' discipline. They claim that AFA displayed discriminatory animus in both direct and circumstantial ways, including by failing to defend them on religious discrimination grounds and with respect to Brown, by actively attempting to dissuade her from raising religious discrimination as a defense in her disciplinary proceedings, and by representing other members whose cases did not involve religion more vigorously than it represented Plaintiffs. And finally, Plaintiffs claim that AFA representatives displayed hostility towards Plaintiffs and their religious beliefs through various disparaging comments and actions and through their refusal to represent Plaintiffs in arbitration. The Court reviews these allegations in turn.

### a. Whether Plaintiffs' Evidence Supports an Inference of Religious Discrimination by AFA

Plaintiffs have failed to provide sufficient evidence, direct or circumstantial, giving rise to a genuine issue of material fact as to whether AFA discriminated against them on the basis of religion. As an initial matter, none of the evidence Plaintiffs provide the Court can be considered "direct" evidence, which (as discussed at length above) "is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin*, 150 F.3d at 1221; *see*

---

[16] AFA is correct that the Amended Complaint *quotes* only 42 U.S.C. § 2000e-2(c)(1); the cause of action, however, *cites* the entire subsection, that is, "42 U.S.C. § 2000e-(2)(c)." Am. Compl., ¶ 349. Because the federal pleading standard is a liberal one (and because, as discussed below, Plaintiffs' claims fail in any event), the Court will read Plaintiffs as asserting all three claims enumerated under the subsection.

*also supra* § III.C.1. Here, there is simply no evidence of unlawful discrimination akin to that deemed "direct" in the caselaw. *See Hittle*, 76 F.4th at 891 ("[D]iscriminatory remarks made by a decisionmaker must be "clearly sexist, racist, or similarly discriminatory" to create an inference of discriminatory motive."); *Cordova*, 124 F.3d at 1150 (direct evidence of race discrimination where employer referred to a Mexican–American employee as a "dumb Mexican.").

In presenting their circumstantial evidence, Plaintiffs first argue that AFA "reported" Plaintiffs' conduct to the Company. Plaintiffs are referring to texts and phone calls from MEC president Peterson to Alaska SVP of People Andy Schneider. The evidence shows Peterson called Schneider one or two hours after Smith posted her comment, and exchanged several texts with Schneider. In those texts, Peterson reminded Schneider of Smith's probationary status and stated, among other things, "it seems like there are no great options. Her post is an obvious microaggression but it's not a smoking gun." Taub Decl., Ex. 57. Plaintiffs also cite Peterson's texts to Inflight division VP Carmen Williams, asking whether Williams had seen Brown's post on Alaska's World and requesting that Alaska shut down the comment function on the site. Peterson Decl., Ex. 16 ("Check out Marli Brown's post on [Alaska's World] re: Equality Act. Definitely lighting up social media tonight as if Lacey wasn't enough . . . Any possibility of shutting down comments…?").

The Court rejects the characterization of Peterson's texts to Alaska personnel as "reporting" Plaintiffs' conduct, which relies on an inference that but for Peterson's nefarious meddling, Alaska may not have found out about the comments otherwise.[17] That notion is

---

[17] It also appears to be untrue that Peterson was the source of Alaska's information about Smith's comment. Alaska posted its article, "Alaska Supports the Equality Act," around 8:30 a.m. on February 25, 2021. Dkt. 137-5, Ex. 9; Dkt.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
52

unsupportable; the comments were not anonymous, and they were posted on the *company-sponsored*, company-wide intranet site. No reasonable juror could believe Peterson was advising or intending to advise the Company of information it may otherwise not have learned. Nor is there anything substantive about this interaction that raises a reasonable inference of discrimination, let alone on the basis of religion.

Plaintiffs also argue that a newsletter AFA published around this time titled "How the First Amendment Applies in the Workplace" is additional evidence of discriminatory animus. In their briefing, Plaintiffs describe the newsletter as a "thinly veiled attack" against Plaintiffs, but the newsletter does not specifically refer to Plaintiffs at all. Instead, it appears to be a straightforward explanation of Alaska's antidiscrimination and antiharassment policies, reasonable and relevant given that two of AFA's members had just been disciplined for violating them. *See* Taub Decl., Ex. 47 ("The Alaska Airlines People Policy clarifies what constitutes harassment and discrimination. . . . [W]hile everyone is entitled to their private opinion or to share their opinion with the government, one can be disciplined for sharing an opinion deemed harassing, discriminatory or intolerant in the workplace. . . . We share this information in the attempt to educate our fellow members and prevent any further discipline or terminations."). The Court finds

---

145-3 (ER0997). Smith posted her comment at 8:36 a.m. Dkt. 134-1, Ex. 14 (MBLS0004036). Within minutes, by 8:39 a.m. PT, Alaska noticed Smith's comment. Dkt. 145-3 (ER0996) (email showing an Alaska manager circulating Smith's comment to colleagues at 8:39 a.m.). From 8:39 a.m. through 10:27 a.m., Alaska managers discussed how to respond to Smith's comment. Dkt. 145-3 (ER0994–97). Peterson did not learn of Smith's comment until 9:34 a.m. Dkt. 137, ¶ 62; dkt. 162, p. 4. At some point in the next hour, between 9:34 a.m. and 10:39 a.m., Peterson called Alaska's Senior Vice President of People Andy Schneider. Dkt. 137, ¶ 63. By 9:34 a.m., Alaska managers had exchanged at least four emails regarding Smith's comment and had drafted a proposed response to her comment. Dkt. 145-3 (ER0996–97).

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
53

it is a reasonable expression of what AFA viewed as its obligation to educate its members, and not fairly interpreted as evidence of religious discrimination.

Next, Plaintiffs argue that AFA representatives made "derogatory comments" about Plaintiffs and Plaintiffs' religious beliefs, evidencing discrimination. For example, on the morning Smith posted her comment, MEC president Peterson texted to a friend (an Alaska pilot) "I hate her," meaning Smith.[18] Peterson Decl., ¶ 70. In an email to several in AFA leadership, Peterson wrote, "Employees get to be bigots in their private lives and to express their bigoted and misinformed opinions while not at work—as horrifying as that may be. . . .I agree with you 100% [Smith's] post is reprehensible and there should be repercussions." Taub Decl., Ex. 114. He wrote several messages to AFA's Human Rights Committee head Tonnette Monroe, including that "the latest with lacey is indeed bullshit" and "management appears to be taking this seriously behind the scenes. Or at least the initial signs are encouraging"; and "Mngmt needs to send [Smith's] bigoted ass packing for a variety of reasons." Taub Decl., Ex. 115. In response to discovering Brown's post, Peterson wrote to Williams, "I wish fewer people would struggle so much with unifying their faith with inclusivity." Peterson Decl., Ex. 16. Terry Taylor, Seattle LEC president, wrote regarding Brown's post, "This is reprehensible, and it makes me furious." Taub Decl., Ex.

---

[18] While childish and unprofessional, Peterson's expression is not without context. Peterson was acquainted with Smith as a result of AFA's involvement in Smith's discipline over her BLM petition. *See* Peterson Decl., ¶ 65 (Smith "was a high-profile flight attendant based on her prior discipline for her BLM petition."). Peterson testifies that the petition—which garnered over 1,000 signatures before it was removed—had the potential for imposing a "massive burden" on AFA, and "created huge disruptions both for the flight attendants who supported it and for those who felt attacked by it." Peterson Decl., ¶¶ 49-53. In texting "I hate her," Peterson has testified, "I was not speaking literally. I don't hate Ms. Smith. I've never met her and don't know her. What I was expressing was extreme frustration that Ms. Smith had chosen to put her name front and center in a high-profile situation that could harm all sorts of flight attendants shortly after the disruption she had caused with her BLM petition, which had hurt many flight attendants represented by AFA." *Id*., ¶ 71. It is also notable that Peterson's text was not to anyone at AFA or in Alaska leadership, but to a personal friend, and of course makes no reference to Smith's religion. *Id*., ¶ 60.

144. In a Google chat to fellow AFA leadership, Taylor initially posted "Can we PLEASE get someone to shut down comments, or put Marli and Lacey in a burlap bag and drop them in a well," deleting the last phrase before anyone read it and replacing it with "This is horrible. The phone is now ringing with people who are appalled."  Taylor Decl., ¶¶ 44-45.

Many at AFA apparently shared an aversion to Brown and Smith's comments, and, like many at Alaska, perceived them as hostile towards LGBTQ equal rights, discriminatory, and harassing—in Peterson's crude word, "bigoted." Indeed, many of the AFA representatives' comments are coarse and unprofessional. None of those comments, however, raises an inference of discrimination *on the basis of religion*. This is in illustrative contrast to the facts in *Cordova*, for example—authority Plaintiffs cite for the proposition that "derogatory comments can create an inference of discriminatory motive"— which included the employer calling an employee a "dumb Mexican," and saying "that he was hired because he was a minority." 124 F.3d at 1149; *see also other authority on which Plaintiffs rely*, including *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) (reversing summary judgment dismissal of discrimination claim where employer had stated "women have no business in construction," and "women should only be in subservient positions."); *Chuang*, 225 F.3d at 1128 (member of decisionmaking committee stating "two Chinks" in the pharmacology department were "more than enough" was sufficient evidence to defeat summary judgment). Here, while some AFA officials were obviously offended by Plaintiffs' posts on Alaska's World, there is no evident nexus between Plaintiffs' protected class as Christians and AFA's comments.[19] Instead, as discussed at length above with regard to

---

[19] Of course, AFA representatives had a right to disagree with Plaintiffs' sentiments; nothing in Title VII or the caselaw grants employees a right to be represented by a union that agrees with their views or beliefs.

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
55

Alaska, several AFA representatives reasonably concluded that Plaintiffs' decision to broadcast their comments on a company-wide intranet side was a violation of Alaska's anti-harassment and anti-discrimination policies. In the absence of any evidence of religious discrimination, the Court will not substitute its own judgment for decisions by a private company, or its union, regarding what should and should not be expressed at work, particularly when those decisions are supported by laws prohibiting discrimination on the basis of sexual orientation or gender identity. *See Peterson*, 358 F.3d at 603 (approving "efforts to eradicate discrimination against homosexuals in its workplace [that] were entirely consistent with the goals and objectives of our civil rights statutes generally.").

Finally, Plaintiffs claim that the Union treated other similarly situated members more favorably, providing five putative comparators whom they claim AFA represented more vigorously. For many of the reasons the Court has already reviewed with respect to comparators that Plaintiffs proffered in their claims against Alaska, the AFA comparators are also insufficiently similar to Plaintiffs to provide instructive comparison. None of the conduct the putative comparators were alleged to have committed was directed at more than one or two other employees, a particularly "material" consideration for AFA, which has an obligation to take into consideration the rights of its entire membership, including members who might have perceived Plaintiffs' comments as harassing. *See* Peterson Decl., ¶ 14 (referencing AFA's culture of "[u]niting all flight attendants across various backgrounds—including, for example, religion and sexual orientation."). Several comparator incidents involved procedurally different situations; in the case of "DT" and "IH," AFA sought, as it did with Plaintiffs, an LCA. But unlike with Plaintiffs, Alaska actually granted DT's and IH's LCA request, meaning AFA never had to decide

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
56

whether to represent them in arbitration. *See* Pls.' Rep. at 16. Two of the comparators went into their disciplinary proceedings with 15 and 22 years of service at Alaska, respectively, compared to Plaintiffs' respective six and eight—again, an aspect of noted materiality not just to the Union, presumptively scrupulous about its members' seniority rights, but to an arbitrator as well. *See* Adams Decl., ¶ 10 (observing that "arbitrators require" 15-20 years of service "before they will treat longevity as a mitigating factor"). Further, with each of the comparators, AFA was able to convincingly argue that the employee was contrite and would not reoffend. Plaintiffs' "accommodation" request signaled to Alaska that they did not view their actions as violating company policy, and in fact intended to continue their behavior.

The Court agrees with Plaintiffs that the conduct that some of the comparators were alleged to have committed was "much worse" than what Plaintiffs did. But the severity of the offense is only one of the "material respects" to be considered, and a true comparator must be "similarly situated" in "*all*." *See Moran*, 447 F.3d at 755. Simply put, none of the comparators is similar enough to Plaintiffs "in all material respects" to serve as evidence of discriminatory animus by AFA towards Plaintiffs or their religion.

### b. Whether AFA Violated Title VII by Failing to File Grievances

Plaintiffs put forth a distinct theory of AFA's liability, on which theory a "union may be liable under Title VII for intentionally failing to file grievances" concerning a hostile work environment. *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1200 (9th Cir. 1991). Plaintiffs include AFA's purported failure to vigorously advocate on Plaintiffs' behalf as evidence of religious discrimination, arguing also that Plaintiffs' AFA representatives should have encouraged and helped them in raising religious objections in their disciplinary proceedings. In pursuing liability

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
57

under this theory, Plaintiffs rely on *Goodman v. Lukens Steel* for the proposition that "Title VII [is] violated if a union passively sits by and does not affirmatively oppose the employer's . . . discriminatory employment practices." 482 U.S. 656, 665  (1987).

This authority does not support Plaintiffs' argument for several reasons. First, *Goodman* holds that a plaintiff may establish a claim under Title VII where it shows the union engaged  in a "policy or practice" of refusing, on unlawful grounds, to file discrimination claims against an employer. *See Goodman*, 482 U.S. at 667-69 (Violation of Title VII occurred where union "categorized racial grievances as unworthy of pursuit . . . while pursuing thousands of other legitimate grievances"; maintained a "practice" of "not including racial discrimination claims in grievances"; and "follow[ed] a policy of refusing to file grievable racial discrimination claims."). Here, however, Plaintiffs have not provided any evidence—apart from their own experience—that would support finding such a "policy or practice." And in fact, AFA has provided evidence to the contrary, demonstrating that AFA has represented Christian employees on religious matters. *See*, *e.g.*, Adams Decl., ¶¶ 43-54 (AFA defended Christian employees' right to pray during flight, "so long as doing so does not interfere with the flight attendant's job duties.").

Second, the evidence shows that AFA *did* "affirmatively oppose" Plaintiffs' treatment. It represented Plaintiffs in their investigatory meetings, filed grievances on their behalf after termination, and sought an LCA for both Plaintiffs after those grievances were denied. Plaintiffs argue that AFA's refusal to represent them in arbitration is evidence of religious discrimination. The evidence does not support this conclusory assertion. AFA has submitted evidence that it has a process for deciding whether to take a case to arbitration, and that it followed that process, without deviation or irregularity, in both Plaintiffs' cases, evidence that Plaintiffs have failed to

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
58

dispute. In short, AFA has limited resources and "must be selective in which cases to arbitrate on behalf of its members." Chaput Decl. ¶ 8. AFA representatives held a "pre-screening" meeting with each Plaintiff, evaluated the weaknesses in each case (*e.g.* that Smith was only six months into a 18-month probationary period during which even a minor infraction could be a terminable offense; and concerns about "Brown's performance as a witness," giving the impression she was "hostile or indifferent to her co-workers' concerns, not humble or apologetic," Chaput Decl. ¶ 83), determined they were "unwinnable," and voted not to advance Plaintiffs' claims. Maller Decl., ¶ 67.

Plaintiffs' proffered "comparators," as discussed above, are not similarly enough situated to suggest that AFA's actions were motivated by religious discrimination. The only specific allegation Plaintiffs have made regarding AFA's discriminatory motive in declining to arbitrate is that during the pre-screening process, AFA attorney Kimberley Chaput "rolled her eyes multiple times when Marli explained her religious beliefs." Pls.' Opp. AFA MSJ at 13 (citing Taub Decl., Ex. 1, ¶103). The probative value of this allegation is obviated by the fact that Chaput is the only member of the panel who voted in favor of taking Brown's claim to arbitration. Other than this, there is no evidence in the record that religion played any role in AFA's decision not to take Plaintiffs' claims to arbitration, while AFA has provided evidence to the contrary. *See, e.g.,* Maller Decl., ¶ 68 ("No one at the Screening Committee voted against taking her case to arbitration because Ms. Smith is a Christian or says her religious beliefs motivated her post."). Plaintiffs have therefore failed to demonstrate that AFA's stated reasons for declining to arbitrate Plaintiffs' claims were pretextual.

1        Third, as discussed above, Alaska was not in fact engaged in "discriminatory employment

2 practices" against Plaintiffs and did not maintain a "hostile work environment." *Supra*, § III.F. The

3 caselaw on which Plaintiffs rely in arguing that Title VII obligated AFA to vigorously oppose

4 Plaintiffs' discriminatory treatment all involve employers who were found to have engaged in

5 illegal discrimination. *See, e.g., Goodman*, 482 U.S. at 664 (affirming that "the company had

6 violated Title VII in several significant respects, including . . . the toleration of racial harassment

7 by employees"); *Beck v. United Food & Com. Workers Union, Loc. 99*, 506 F.3d 874, 884 (9th

8 Cir. 2007) (affirming district court's conclusion that employer "had violated the collective

9 bargaining agreement in terminating Beck without just cause"); *Woods*, 925 F.2d at 1199

10 (affirming district court finding "that the incidents of racial harassment had occurred" and "the

11 racial atmosphere in the plant was 'abysmal.'"). Plaintiffs have failed to demonstrate comparably

12 discriminatory circumstances here.

13        Moreover, to the extent Plaintiffs are arguing that AFA had an obligation under Title VII

14 to pursue a religious discrimination defense in Plaintiffs' disciplinary proceedings, they find no

15 support in the caselaw. AFA has an obligation to vigorously defend its members, but the law does

16 not dictate the strategy the Union should use, or require it to raise any specific theory in Plaintiffs'

17 defense. AFA representatives' strategic decisions in defending Plaintiffs were reasonable; and

18 there is no evidence in the record either that failing to raise religious discrimination claims as

19 alleged was motivated by discriminatory animus, or that doing so would have been more effective

20 than the path AFA chose. In the absence of evidence of unlawfully discriminatory policy or

21 practice, AFA's representation of Plaintiffs did not violate Title VII under *Goodman* and progeny.

22 Accordingly, Plaintiffs' religious discrimination claim against AFA is dismissed.

23 ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
24 60

25

# IV.   CONCLUSION

For the foregoing reasons:

1. Plaintiffs' Motion for Summary Judgment is DENIED;

2. Defendant Alaska Airlines' Motion for Summary Judgment is GRANTED;

3. Defendant AFA's Motion for Summary Judgment is GRANTED;

4. The Motions to Exclude Testimony, Dkt. Nos. 126, 128, 131, and 132 are STRICKEN as moot.

5. This matter is DISMISSED with prejudice.

DATED this 22nd day of May, 2024.

Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER RE: CROSS MOTIONS
FOR SUMMARY JUDGMENT
61