**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARLI BROWN; LACEY SMITH, | No. 24-3789 |
| *Plaintiffs - Appellants*, | D.C. No. 2:22-cv-00668-BJR |
| v. | |
| ALASKA AIRLINES, INC.; ASSOCIATION OF FLIGHT ATTENDANTS-CWA AFL-CIO, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Barbara J. Rothstein, District Judge, Presiding

Argued and Submitted August 22, 2025
San Francisco, California

Filed June 24, 2026

Before: Morgan Christen, Kenneth K. Lee, and Daniel A. Bress, Circuit Judges.

Opinion by Judge Bress;
Partial Concurrence and Partial Dissent by Judge Christen

2                    BROWN V. ALASKA AIRLINES, INC.

## SUMMARY[*]

### Employment Discrimination

The panel reversed the district court's summary judgment in favor of defendants Alaska Airlines, Inc., and Association of Flight Attendants-CWA AFL-CIO ("AFA") and remanded for further proceedings in an employment discrimination action brought by former flight attendants Marli Brown and Lacey Smith.

Brown and Smith claimed that Alaska fired them because of their religious beliefs, in violation of Title VII of the Civil Rights Act of 1964 and state anti-discrimination laws, and that their union, AFA, discriminated against them based on their religious beliefs during Alaska's internal investigation. The district court granted summary judgment for Alaska and AFA on plaintiffs' federal claims and further concluded that the Railway Labor Act preempted their state anti-discrimination claims against the union.

Plaintiffs were fired after they posted comments on Alaska's World, an internal intranet communications network, in response to the company's post announcing its support for the Equality Act, proposed federal legislation that would extend certain federal nondiscrimination requirements to cover discrimination involving sex, sexual orientation, and gender identity in various contexts. The panel held that, whether viewed through the lens of direct and circumstantial evidence or through the burden-shifting *McDonnell-Douglas* framework for Title VII cases,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

plaintiffs demonstrated a genuine dispute of material fact whether Alaska terminated them because of their religious beliefs, and the district court therefore erred in granting summary judgment on their Title VII and state law claims. Plaintiffs also demonstrated a genuine dispute of material fact whether AFA attempted to cause or acquiesced in their firing because of their religious beliefs.

Brown posted a facially religious statement that the Equality Act would endanger the Christian church, encourage suppression of religious freedom, and eliminate conscience protections, and Alaska and the union understood the religious basis for the post. Considering the facts in the light most favorable to Brown, there was a genuine dispute of material fact whether she was in fact fired for engaging in discrimination or harassment or whether Alaska instead used the cover of its employee policies to fire her because of her religious beliefs.

Smith's comment on Alaska's World, that "As a company, do you think it's possible to regulate morality?" was not explicitly grounded in religious belief, but Alaska considered Smith's situation in connection with Brown's, working them up together. The panel concluded that a reasonable jury could find that the company's stated neutral reasons for firing Smith were pretextual and that there was a genuine dispute of material fact whether AFA attempted to cause Smith's termination based on her religious beliefs or acquiesced in it.

Agreeing with the Second and Eighth Circuits, the panel held that the Railway Labor Act's duty of fair representation did not impliedly preempt plaintiffs' Oregon and Washington state law anti-discrimination claims against AFA.

4                BROWN V. ALASKA AIRLINES, INC.

Concurring in part and dissenting in part, Judge Christen concurred in the majority's conclusion that both plaintiffs demonstrated a genuine dispute of material fact that should have prevented entry of summary judgment regarding: (1) whether plaintiffs' union, the AFA, attempted to cause or acquiesced in the termination of their employment on the basis of their religious beliefs; and (2) whether Alaska Airlines terminated Brown on the basis of her religious beliefs. Judge Christen also agreed that the plaintiffs' state law claims were not preempted by the Railway Labor Act. Judge Christen dissented from the majority's decision to reverse the district court's entry of summary judgment on Smith's claims against Alaska because she did not agree that Smith demonstrated a genuine dispute of material fact about whether Alaska terminated her because of her religion.

### COUNSEL

Stephanie N. Taub (argued), David J. Hacker, and Jeffrey C. Mateer, First Liberty Institute, Plano, Texas; Rebecca R. Dummermuth and Tabitha M. Harrington, First Liberty Institute, Washington, D.C.; Andrew W. Gould, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix, Arizona; for Plaintiffs-Appellants.

Lauren P. Watts (argued), Joe Wonderly, and Joshua M. Goldberg, Seyfarth Shaw LLP, Seattle, Washington; Dawn R. Solowey and Lynn A. Kappelman, Seyfarth Shaw LLP, Boston, Massachusetts; Scott P. Mallery, Seyfarth Shaw LLP, Sacramento, California; Benjamin Berger (argued), Darin M. Dalmat, and Kathleen P. Barnard, Barnard Iglitzin

& Lavitt LLP, Seattle, Washington; for Defendants-Appellees.

Natalie C. Rhoads, Liberty University School of Law, Lynchburg, Virginia, for Amici Curiae Hindu American Coalition, Jewish Coalition for Religious Liberty, and Islam and Religious Freedom Action Team of the Religious Freedom Institute.

John A. Eidsmoe and Talmadge Butts, Foundation for Moral Law, Gallant, Alabama, for Amicus Curiae Foundation for Moral Law.

Katherine I. Hartley, Pacific Justice Institute, Coeur d'Alene, Idaho; Emily C. Mimnaugh, Pacific Justice Institute, Reno, Nevada, for Amicus Curiae Pacific Justice Institute.

John C. Sullivan, Jace R. Yarbrough, and H. Justin Pace, SL Law PLLC, Cedar Hill, Texas, for Amicus Curiae Airline Employees for Health Freedom.

Peter C. Breen and Michael G. McHale, Thomas More Society, Chicago, Illinois, for Amicus Curiae Thomas More Society.

Lauren A. Bone, Women's Liberation Front, Washington, D.C., for Amicus Curiae Women's Liberation Front.

Nathan Maxwell, Lambda Legal Defense and Education Fund Inc., Chicago, Illinois; Gregory R. Nevins, Lambda Legal Defense and Education Fund Inc., Decatur, Georgia; for Amicus Curiae Lambda Legal Defense and Education Fund, Inc.

## OPINION

BRESS, Circuit Judge:

Plaintiffs Marli Brown and Lacey Smith were flight attendants at Alaska Airlines. They claim that Alaska fired them because of their religious beliefs, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and state anti-discrimination laws. Brown and Smith also claim that their union, the Association of Flight Attendants-CWA AFL-CIO (AFA), discriminated against them based on their religious beliefs during Alaska's internal investigation. The district court granted summary judgment for Alaska and AFA on plaintiffs' federal claims. The court further concluded that the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, preempted plaintiffs' state law anti-discrimination claims against the union.

We hold that the plaintiffs have demonstrated a genuine dispute of material fact whether Alaska terminated them because of their religious beliefs and whether AFA attempted to cause or acquiesced in their firing on this unlawful basis. We further hold that the Railway Labor Act's duty of fair representation does not impliedly preempt plaintiffs' state law anti-discrimination claims against AFA. We reverse and remand for further proceedings.

### I.  Facts and Procedural History

In reviewing a grant of summary judgment, we recite the facts in the light most favorable to the plaintiffs as the non-moving parties. *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011).

### A. Alaska's World

Alaska is a large airline that employs approximately 26,000 people. It maintains an internal intranet communication network that it calls Alaska's World. Alaska's World is visible to all Alaska employees, with the company describing it as a "key vehicle for employee communications."

Alaska posts messages on Alaska's World, and employees are invited to reply and comment. Alaska explained to employees that the "[c]omments are here for us to openly and constructively share ideas, ask respectful questions, and understand one another and our company." According to Alaska's employee guidance on posting, "[w]e're a big team, inclusive of many people and perspectives," and "[o]ur differences make us better when we support and respect each other, allowing each of us to be who we are." The company has expressed its commitment to providing "a safe space culture where employees feel empowered to have open and critical dialogue with their peers and leaders."

Alaska maintains various rules for the Alaska's World comments section. Among other things, commenters must be "civil and respectful," "disagree respectfully," and use appropriate language. Alaska's typical practice is to remove any comment that violates its policies. If Alaska deletes three of an employee's comments, the employee is blocked from future commenting under a "three-strikes" policy (as discussed below, this rule has since changed). Separately from its commenting policy, Alaska maintains a zero-tolerance policy for "harassment or discrimination of any kind." The company's employee handbook provides that harassment includes offensive jokes, threats, intimidation,

8          BROWN V. ALASKA AIRLINES, INC.

ridicule or mockery, insults, offensive pictures, and interference with work performance. The handbook also forbids "[t]he use of discriminatory or hurtful language or slurs . . . regardless of the intent or the context."

Alaska's disciplinary process for employees generally entails several progressive steps. That process typically starts with a "confirmation of oral warning" and then proceeds to escalating discipline culminating in termination. But Alaska "doesn't always progressively travel up the steps of discipline" and there is "no middle ground for certain violations." In some contexts in which Alaska could terminate an employee, the company issues "last chance agreements" that allow the offending individual to remain employed under certain conditions.

### B.  Plaintiffs' Posts on Alaska's World

On February 25, 2021, Alaska posted on Alaska's World to announce the company's support for the Equality Act. The Equality Act is proposed federal legislation that would extend certain federal nondiscrimination requirements to cover discrimination involving sex, sexual orientation, and gender identity in various contexts. Internal company records show that Alaska "underst[ood] the issue touches on religious freedom concerns for some, and respect[ed] there are differing interpretations of the legislation on that point." As Tiffany Dehaan, Alaska's Managing Director for Culture, Learning & Inclusion, testified, "we knew that there was religious concerns that were continuing to come up." As was typical for Alaska's World posts, Alaska allowed its employees to comment on the company's Equality Act announcement.

Plaintiffs Marli Brown and Lacey Smith are Christians who worked as flight attendants at Alaska Airlines for eight

and six years, respectively.  Both were members of AFA, a flight attendants' union representing roughly 50,000 flight attendants at Alaska Airlines and other carriers nationwide.

Shortly after Alaska posted about the Equality Act on Alaska's World, Smith posted in response: "As a company, do you think it's possible to regulate morality?"  Smith's comment prompted responses on Alaska's World from other commenters, some of whom expressed disagreement.  Other employees voiced complaints about Smith's comment to AFA.

Alaska management discussed Smith's post internally and with AFA.  Alaska did not initially remove Smith's post but instead decided to respond to it on Alaska's World. While drafting the company's response, Andy Schneider, Alaska's Senior Vice President of People, coordinated with AFA Master Executive Council President Jeffrey Peterson. The AFA Master Executive Council is the main governing body for AFA's membership at Alaska.  As Master Executive Council President, Peterson was the executive officer in charge of administering the collective bargaining agreement between Alaska and AFA.  Peterson had substantial communications with Alaska about plaintiffs' posts on Alaska's World as the company was contemplating its response and disciplinary actions against the plaintiffs.

Following internal company discussions and consultations with Peterson, Schneider posted the company's response to Smith's comment on Alaska's World. The response read:

> Supporting the Equality Act is not about regulating morality.  It's about supporting laws that allow our LGBTQ+ employees and

10                    BROWN V. ALASKA AIRLINES, INC.

> guests, no matter what state they live in or fly to, to be protected against discrimination. Our values are our guide, and we strongly believe that doing the right thing and being kind-hearted require us to support this act. As we said above, we aren't the kind of company that stands by and watches—we're going to use our voice and be a leader on these issues.
>
> We also expect our employees to live by these same values. Our differences are to be respected. As stated in our People Policies, harassment and discrimination will not be tolerated.

In internal Alaska emails discussing this draft, Taylor Ball of Alaska's legal department wrote, "Employees actually do not have the right to believe that LGBTQ rights are 'immoral,'" to which Carmen Williams, Alaska's Vice President of Inflight replied, "I 100% agree."

Peterson, the AFA Master Executive Council President, separately sent an email to his AFA colleagues expressing dismay about Smith's post. Referencing Smith, he wrote, "Employees get to be bigots in their private lives and to express their bigoted and misinformed opinions while not at work—as horrifying as that may be." He added that "the post is reprehensible and there should be repercussions." Peterson also told others at AFA that "this will be an ongoing and evolving conversation with management over the next couple weeks." Peterson separately texted "I hate her" (referring to Smith) to a friend who was an Alaska pilot. He also texted Toni Monroe, an Alaska employee, that Smith's post was "bullshit" and that "Mngmt needs to send [Smith's] bigoted ass packing for a variety of reasons." Still, Peterson

informed his AFA colleagues that the union would "represent [Smith] through the grievance process fairly, in good faith, and without discrimination."

Later that day, plaintiff Marli Brown independently saw Alaska's post and decided to read up on the Equality Act. After her research, Brown felt religiously compelled to post a response. Brown posted the following comment on Alaska's World:

> Does Alaska support: endangering the Church, encouraging suppression of religious freedom, obliterating women rights and parental rights? This act will Force every American to agree with controversial government-imposed ideology on or be treated as an outlaw. The Equality Act demolishes existing civil rights and constitutional freedoms which threatens constitutional freedoms by eliminating conscience protections from the Civil Rights Act. The Equality act would affect everything from girls' and women's showers and locker rooms to women's shelters and women's prisons, endangering safety and diminishing privacy. Giving people blanket permission to enter private spaces for the opposite sex enables sexual predators to exploit the rules and gain easy access to victims. This is Equality Act[.]

Brown later explained that her post contained information that she copied and pasted from elsewhere.

That same day, Peterson flagged Brown's comment to Alaska management in a text chain that included Alaska's Carmen Williams and Michaela Littman, the Managing Director of Flight Operations.  Peterson texted these Alaska executives to "[c]heck out Marli Brown's post on [Alaska's World] re: Equality Act.  Definitely lighting up social media tonight, as if Lacey [Smith] wasn't enough."  Peterson then lamented, "I wish fewer people would struggle so much with unifying their faith with inclusivity."  Peterson later confirmed that it was unusual for him to get involved with Alaska's internal response to disciplinary incidents.

Independently, AFA representative Terry Taylor posted in a Google chat with other union officials: "Can we PLEASE get someone to shut down comments, or put Marli and Lacey in a burlap bag and drop them in a well" (Taylor later revised that message), and also that Brown "needs to go!"  In an email to another flight attendant who had complained about the posts, Taylor called the posts "reprehensible."  Taylor would later serve as Brown's union representative in Alaska's disciplinary proceedings against Brown.  Union Grievance Chairperson Stephanie Adams privately described Brown's comments as "shitty," also telling Taylor that she expected Brown to receive "[a]t least a suspension," to which Taylor responded: "I certainly hope so!"  Adams in private texts also distinguished Brown from her own friends, who are "good women with good values and believe in equality."

That night, Alaska deleted Brown and Smith's comments on Alaska's World, shut down further comments, and began investigating both plaintiffs.  The company subsequently changed its commenting rules to remove the three-strikes policy.  It also revised its policy to state that comments on Alaska's World should not "express partisan or personal

(such as religious or political) opinions." Prior to that change, and referencing correspondence he received from a pilot who was concerned over Smith's and Brown's posts being taken down, Brad Tilden, the retiring CEO of Alaska, expressed concern to Alaska leadership "that we not [c]ensor people for having conservative Christian views."

### C. Alaska Investigates and Terminates Brown

Meanwhile, on March 4, 2021, Alaska investigators interviewed Brown with AFA representative Terry Taylor attending by video and AFA's Stephanie Adams appearing by phone. The investigators' "Fact Finding Report" noted that during the meeting, Brown identified herself as Christian. According to this company Report, Brown clarified that she "loves her [LGBTQ] co-workers and that the company support[s] equity as it relates to them," but that she posted to express concerns about the Equality Act's impact on religious people, women, and children. Alaska's internal report from the interview documents Brown's specific concern with how the Equality Act would be applied "to employees at Alaska Airlines who didn't identify as [LGBTQ], specifically employees with religious belief protection at work (employees connected to the Church)." According to the report, Brown expressed remorse for any offense caused and claimed she "had no intent to discriminate or create hostility." Instead, Brown maintained that her concerns with Alaska's announcement were religious in nature and requested an accommodation that would allow her to express her beliefs.

During the investigatory meeting in which Brown relayed her religious concerns, her AFA representative, Terry Taylor, privately texted AFA's Stephanie Adams, "[a]pparently [Brown] can't stop herself . . . I may hurl,"

with the text exchange culminating in Adams writing to Taylor: "Nice poker face . . . NOT." Brown's supervisor, meanwhile, believed that Brown's concerns were sincere and recommended that she be given a "record of discussion" but no discipline.

On March 19, 2021, Alaska determined that Brown's comments violated the company's anti-discrimination and anti-harassment policies and terminated her employment. Brown's Notice of Discharge stated that Brown's comment was "offensive, discriminatory, and did not align with Alaska Airline's values." In particular, "[y]our comment stating that providing equal rights to LGBTQ individuals threatens others and equating LGBTQ individuals to sexual predators is hateful and discriminatory" and "targets a group of individuals based on their legally protected characteristics." Alaska also explained that Brown's "misconduct cannot be excused by requesting a religious accommodation after the fact," because Alaska is "not required to provide an accommodation that permits actions that demean and degrade . . . other employees." Before Brown was terminated, she had no record of prior discipline.

AFA filed a grievance on Brown's behalf. According to Brown, she wanted to raise her concerns about Alaska's treatment of her religious beliefs in the grievance process, but AFA urged her not to. AFA did not otherwise raise religious discrimination at the grievance hearing. Instead, at the grievance meeting on March 30, 2021, Brown reiterated that she never intended to hurt her coworkers, with Taylor highlighting Brown's "unblemished" employment record at Alaska. Taylor also stated that Brown's comment was "unfortunate" and "offensive," but that in Taylor's opinion, Brown was not "beyond salvation."

Brown's grievance was denied on April 13, 2021, and Alaska refused to afford Brown a "last chance agreement" to be conditionally reinstated. AFA subsequently declined to arbitrate Brown's case, concluding that it was unlikely to succeed.

### D. Alaska Investigates and Terminates Smith

Alaska also investigated Smith for her post on Alaska's World. Alaska investigators met with Smith on March 11, 2021, a week after the investigatory meeting with Brown. Two AFA representatives attended the Smith meeting.

During Smith's investigatory interview, Smith did not tell Alaska that her comment on Alaska's World was based on her Christian faith. Instead, acting according to advice from her AFA representatives, Smith told investigators that her post was merely posing a "philosophical" question. She acknowledged there were things in the Equality Act that she disagreed with, but she clarified that she opposed discrimination and supported human rights and diversity. Smith claims she did not raise her religious beliefs during this meeting because she feared that Alaska would discriminate against her if she "used the word 'religion.'" Smith later described the meeting as "hostile" and recalled that during "repeated, aggressive questioning," she broke into tears.

Alaska terminated Smith's employment on March 19, 2021, the same day it terminated Brown. In Smith's Notice of Discharge, Alaska based its termination on Smith's violation of the company's anti-harassment and anti-discrimination policies. The Notice of Discharge stated that "[d]efining gender identity or sexual orientation as a moral issue, or questioning the company's support for the rights of all people regardless of their gender identity or sexual

16          BROWN V. ALASKA AIRLINES, INC.

orientation, is not a philosophical question, but a discriminatory statement." The Notice of Discharge found that Smith's post "was offensive, discriminatory, and did not align with Alaska Airline's values," and that "we cannot tolerate speech that is discriminatory in nature or targets a group of individuals based on their legally protected characteristics."

Unlike Brown, Smith had a prior disciplinary history, which Alaska referenced in its Notice of Discharge. Less than one year before Smith commented on the Equality Act initiative, she created an online petition entitled "Depoliticizing Alaska Airlines," which opposed Alaska's public support for the Black Lives Matter ("BLM") movement. Smith viewed the company's support for BLM as tantamount to promoting "a specific political party/ideology and creat[ing] bias." Alaska issued Smith a thirty-day suspension for posting the petition and instructed her to take the petition down. Alaska told Smith that any misconduct in the 18 months following her suspension could result in termination. Smith's post on Alaska's World fell within this window.

During Smith's grievance process, Smith argued for the first time that Alaska was discriminating against her based on her religious beliefs and asked for a religious accommodation. Her grievance was denied, as was her request for a last chance agreement. AFA elected not to arbitrate Smith's grievance based on its perception that her case was unlikely to succeed. During internal AFA deliberations over whether to arbitrate Smith's grievance, notes reflect Peterson stating that Smith "[c]an be a bigot at home but not at work."

### E.  Procedural History

Brown and Smith later filed this lawsuit asserting Title VII and collateral state law claims against Alaska and AFA for discrimination on the basis of religious belief.  Brown brought her state law claims under the Washington Law Against Discrimination (WLAD), Wash. Rev. Code §§ 49.60.030, 49.60.180, 49.60.190.  Smith brought her state law claims under Oregon's Unlawful Discrimination in Employment law, Or. Rev. Stat. § 659A.030(1)(a), (c).  The parties agree that the plaintiffs' state law anti-discrimination claims turn on the same substantive standards as federal Title VII claims.  Our discussion of plaintiffs' Title VII claims thus encompasses the state law claims, except where specifically noted.

The district court concluded that the Railway Labor Act's federal duty of fair representation preempted plaintiffs' state law anti-discrimination claims against the union, dismissing these claims under Rule 12(b)(6).  After discovery, the district court granted summary judgment to Alaska and AFA on plaintiffs' Title VII and remaining state law claims.  In reasoning we will address below, the district court held that Brown and Smith failed to establish a genuine dispute of material fact that Alaska and AFA discriminated against them because of their religious beliefs.  Brown and Smith appealed.

## II.  Title VII and Collateral State Law Anti-Discrimination Claims

### A.  Legal Standards

We review the district court's grant of summary judgment de novo.  *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1136 (9th Cir. 2025).  Under Federal Rule

18                BROWN V. ALASKA AIRLINES, INC.

of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In reviewing the grant of summary judgment, we "view the facts and draw reasonable inferences" in favor of the nonmoving parties, here plaintiffs. *Scott v. Harris*, 550 U.S. 372, 378–379 (2007). "A factual issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Ochoa v. City of Mesa*, 26 F.4th 1050, 1055 (9th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In addition, Title VII prohibits labor organizations from "discriminat[ing] against" an individual, "adversely affect[ing] his status as an employee," or "caus[ing] or attempt[ing] to cause an employer to discriminate against an individual," "because of" religion, among other protected grounds. *Id.* § 2000e-2(c). As the EEOC has explained, unions may not "knowingly acquiesce in employment discrimination against their members, join or tolerate employers' discriminatory practices, or discriminatorily refuse to represent employees' interests." U.S. Equal Emp. Opportunity Comm'n, New Compliance Manual: Section 12 Religious Discrimination, § 12-I.B (2021) (EEOC Compliance Manual).

This case involves claimed discrimination on the basis of plaintiffs' religious beliefs.  Title VII defines "religion" to

"include[] all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Accordingly, "[d]iscrimination on the basis of religious beliefs is discrimination on the basis of religion for purposes of Title VII." *Damiano*, 140 F.4th at 1155 (citing *Groff v. DeJoy*, 600 U.S. 447, 458 (2023)). An employer firing an employee "because of" her religious beliefs is therefore unlawful, as is a union causing or attempting to cause an employer to fire an employee on this protected basis. 42 U.S.C. § 2000e-2(a), (c). "Title VII's 'because of' test incorporates the 'simple' and 'traditional' standard of but-for causation. That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020). In addition, Title VII also contains a "more forgiving standard," *id.* at 657, by which "an unlawful employment practice is established when the complaining party demonstrates that [a protected ground] was a motivating factor for any employment practice." 42 U.S.C. § 2000e-2(m); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772–73 (2015); *Hittle v. City of Stockton*, 101 F.4th 1000, 1012 (9th Cir. 2024).

A Title VII plaintiff may pursue her claim by producing "direct or circumstantial evidence" that her employer acted adversely because of an unlawful discriminatory reason. *Damiano*, 140 F.4th at 1154 (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)). Alternatively, the plaintiff may proceed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Damiano*, 140 F.4th at 1154. Under *McDonnell Douglas*, a plaintiff alleging discriminatory treatment must initially make out a prima facie case by showing: "(1) she is a member of a protected

20                BROWN V. ALASKA AIRLINES, INC.

class; (2) she was qualified for her position; (3) she experienced an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably *or* other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id.* at 1155. "At summary judgment, the degree of proof necessary to establish a prima facie case is 'minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Id.* (quoting *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002)). If the plaintiff makes out a prima facie case under *McDonnell Douglas*, "the defendant bears the burden of producing a[] neutral explanation for its action, after which the plaintiff may challenge that explanation as pretextual." *Id.* at 1154–55 (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am-Owned Media*, 589 U.S. 327, 340 (2020)).

At summary judgment, the plaintiff's obligation is not to show decisively that she will win, but that triable issues remain for a jury to resolve. Thus, "[w]e have repeatedly held that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015) (collecting cases). In particular, we have repeatedly said that "very little[] evidence is necessary to raise a genuine issue of fact regarding an employer's motive." *Opara v. Yellen*, 57 F.4th 709, 723–24 (9th Cir. 2023) (quoting *McGinest*, 360 F.3d at 1124) (alteration in original); *see also, e.g.*, *Damiano*, 140 F.4th at 1155; *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000).

In this case, Smith and Brown both established, at minimum, a genuine dispute as to the first three elements of their prima facie case. Smith and Brown claim they were

discriminated against based on their religious beliefs, a protected ground. *See Damiano*, 140 F.4th at 1154–55. The record supports the conclusion that both plaintiffs were qualified for their positions as flight attendants. Brown had been working as a flight attendant since 2013, with an unblemished employment record at Alaska prior to her termination. Despite a prior disciplinary issue relating to her BLM petition, Smith similarly received a substantial amount of positive customer feedback. Both plaintiffs had good working relationships with LGBTQ colleagues, with no history of negative interactions. Finally, because plaintiffs were terminated, they of course suffered an adverse employment action. *See, e.g.*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002).

Accordingly, whether viewed through the lens of direct and circumstantial evidence or through the *McDonnell-Douglas* framework, plaintiffs' Title VII claims boil down to the same question: construing the record in the light most favorable to Brown and Smith, does the record create a genuine dispute of material fact whether Alaska and AFA discriminated against them based on their religious beliefs? We answer that both plaintiffs have established a triable issue.

 B.  Brown Established a Genuine Dispute of Material Fact

Although Brown posted on Alaska's World after Smith, we begin with Brown because her case presents a more straightforward claim of religious discrimination and because understanding Brown's case helps to put Smith's case in context. We hold that Brown produced sufficient evidence to survive summary judgment on her Title VII and state law claims against Alaska and AFA.

22 BROWN V. ALASKA AIRLINES, INC.

### 1. Brown's Title VII Claim Against Alaska

i.

We start with the observation that Brown's post on Alaska's World on its face reflected the expression of religious belief. In the post, Brown contended that the Equality Act would "endanger[] the Church," "encourag[e] suppression of religious freedom," and "eliminat[e] conscience protections." During Alaska's investigation, and even though she claims AFA counseled her not to, Brown defended herself by maintaining that her post was grounded in her religious beliefs, specifically requesting a religious accommodation. Alaska's internal "Fact Finding Report" confirms that Alaska understood Brown to be offering, at least in part, a religious perspective on the Equality Act. As Alaska's Carmen Williams similarly testified, "if you read her comment . . . you can tell that she's talking about religious concerns that she may have." This same understanding was confirmed by Peterson's text to Alaska management, in which he specifically connected Brown's post to religion when saying: "I wish fewer people would struggle so much with unifying their faith with inclusivity." As Peterson later testified, it was "self-evident" that Brown's post was based on her religious convictions.

The fact that Brown was terminated after posting a facially religious statement, by a company (and cooperating union) that understood the religious basis for the post, provides the initial grounding for a genuine dispute of material fact regarding whether Alaska terminated Brown because of her religious beliefs. *See Hittle*, 101 F.4th at 1012 ("Under Title VII, the plaintiff need only demonstrate[] that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other

factors also motivated the [unlawful employment] practice." (quotations omitted)). The district court concluded that "the only reasonable inference that one can draw is that Alaska did not terminate Plaintiffs because of their religion, but because of the comments they posted." But because Brown's post was at least partially religious in nature and was understood that way by Alaska and AFA, the district court's conclusion does not resolve the issue. *See, e.g.*, *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1202 (9th Cir. 2016) ("We draw all justifiable factual inferences in favor of the nonmoving party, and we reverse an order granting summary judgment if any rational trier of fact could resolve a material factual issue in favor of the nonmoving party.").

The district court additionally determined that Brown's post was not "grounded in religious belief at all" because "Brown testified that her Christian faith taught her to speak up for the vulnerable," which the court described as not "anything other than a universal human precept." The court further discounted that Alaska discriminated on the basis of religion because Brown "was unable to point to any specific passage in the Bible, teaching of her religious leaders, or other religion-specific source," and because any view concerning the binary nature of human sexuality was "neither unique to, nor a particular tenet of, Christianity specifically or religion more broadly."

This reasoning was mistaken. The role of the courts in assessing a plaintiff's religious beliefs is limited to determining "whether the beliefs professed by the [plaintiff] are sincerely held and whether they are, in [her] own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 185 (1963); *see also Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018) ("It hardly requires

restating that government has no role in deciding or even suggesting whether the religious ground for Phillips' conscience-based objection is legitimate or illegitimate."); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993) ("Title VII protects more than . . . practices specifically mandated by an employee's religion."). It did not matter whether Brown could support her Alaska's World post with chapter and verse from an authoritative religious text. *See Damiano*, 140 F.4th at 1155 ("[I]t is well-established that an individual may sincerely hold a religious belief that is not reflected in a biblical passage or scripture."). Nor is the religious nature of Brown's post undermined by the fact that more than one religion may share in the same underlying views, or that the beliefs expressed could be regarded as non-religious human values. *See id.* ("Nor can the courts easily distinguish between beliefs springing from religious and secular origin." (quoting *Callahan v. Woods*, 658 F.2d 679, 687 (9th Cir. 1981))).

In this case, moreover, other circumstantial evidence beyond the evident religious grounding of Brown's post supports the inference that Alaska may have terminated Brown based on her religious beliefs. Internal Alaska emails showed the company discussing how "[e]mployees actually do not have the right to believe that LGBTQ rights are 'immoral.'" And the change in company policy that Brown's post engendered came only after the CEO expressed concern about "[c]ensor[ing] people for having conservative Christian views."

The communications involving AFA Master Executive Council President Jeffrey Peterson also support Brown's assertions of possible anti-religious bias. Despite AFA's role as Brown's union representative, it is apparent that AFA and Peterson in particular were heavily involved in Alaska's

investigation of Brown, perhaps to an unprecedented degree. Soon after Brown posted on Alaska's World, Peterson reported the matter to Alaska management and, critically, wrote to various Alaska executives by text: "I wish fewer people would struggle so much with unifying their faith with inclusivity." A reasonable jury could conclude that Peterson's comment specifically connected Brown's post to her religious faith, and that it did so in a disparaging way by suggesting an infirmity in Brown's religious beliefs. The same is true of Peterson calling Smith a "bigot" and "bigoted," terms that in the context of this case could be understood as pejorative references to religious beliefs.

The district court considered the comments of Peterson and others at AFA "coarse and unprofessional" but determined that none "raise[d] an inference of discrimination on the basis of religion." (Emphasis omitted). Construing the facts in the light most favorable to Brown, we conclude differently. Although some of the inappropriate statements from AFA personnel lacked a religious connotation, a reasonable jury could conclude that others did. In view of AFA's involvement in the investigatory and disciplinary process, the arguably disparaging statements that allude to a protected ground support an inference of discrimination. *See, e.g.*, *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) ("Where a decisionmaker makes a discriminatory remark against a member of the plaintiff's class, a reasonable factfinder may conclude that discriminatory animus played a role in the challenged decision."); *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) (observing that "isolated comments may constitute direct evidence of discrimination" if "causally related to the discharge decision making process").

26          BROWN V. ALASKA AIRLINES, INC.

In addition, the fact that Brown was terminated outright, rather than given any lesser punishment under Alaska's progressive discipline policy, contributes to the inference that she was terminated because of her religious beliefs. *See Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011) (explaining that a "triable issue of pretext" may be raised through evidence of an "employer's deviation from established policy or practice" (citing *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1214 (9th Cir. 2008))). That conclusion is made more plausible in this case by the fact that Brown was an employee with an otherwise unblemished disciplinary record who got along well with her LGBTQ coworkers, received positive customer feedback, and showed contrition at her internal investigatory meeting.

ii.

Alaska argues that it did not fire Brown for her religious beliefs but because it regarded her as having violated the company's anti-discrimination and harassment policies. This argument captures the genuine dispute in this case; it does not settle it. That is because for the reasons we have given, a reasonable jury could find Alaska's position pretextual. *See McGinest*, 360 F.3d at 1123 (explaining that evidence "that the defendant's explanation is unworthy of credence is [a] form of circumstantial evidence that is probative of intentional discrimination" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000))). The issue is not whether the company could have concluded that Brown violated a company policy, but whether its assertion that she did is worthy of credence, and whether that asserted finding was instead motivated by an improper discriminatory reason.

This genuine dispute is underscored, and not resolved, by the Notice of Discharge that Alaska issued to Brown, which sets forth Alaska's reasoning for firing Brown. That Notice referred to Brown as having engaged in "actions that demean and degrade, or are designed to demean or degrade, other employees." A reasonable juror could find that this was an overstated or even inaccurate accounting of Brown's post, which does not discuss Alaska employees. Similarly, the Notice of Discharge asserts that Brown's post was "hateful" and "equat[ed] LGBTQ individuals to sexual predators." The district court believed that Alaska's interpretation was "reasonable," but a reasonable jury could disagree and find this description overwrought or misleading. *Cf. Meriwether v. Hartop*, 992 F.3d 492, 514 (6th Cir. 2021) ("[T]he university derided him and equated his good-faith [religious] convictions with racism. An inference of religious hostility is plausible in these circumstances.").

The company's explanations in Brown's Notice of Discharge thus highlight the disputes of material fact and the issues of pretext that a jury must resolve. While Alaska claims it fired Brown for violating its anti-discrimination policies—which would be a "legitimate nondiscriminatory reason," *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 740 (9th Cir. 2004)—it is incorrect to say that, "viewing the record in the light most favorable to [Brown], any reasonable factfinder would find that [she] violated those policies," *Damiano*, 140 F.4th at 1156, or that this violation was necessarily the driving reason for her termination.

Alaska argues that by plaintiffs' logic, an employee could make discriminatory and harassing statements and escape discipline by claiming the comments were religiously motivated. That concern is misplaced. There is no dispute

that an employer can punish discrimination and harassment, even if it is religiously inspired. *See Bodett*, 366 F.3d at 740 (affirming summary judgment for employer in case of alleged religious discrimination where plaintiff "coerc[ed] and harass[ed] an openly gay subordinate" during numerous one-on-one interactions); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 602, 607 (9th Cir. 2004) (affirming summary judgment for employer in case of alleged religious discrimination where plaintiff made religious comments that he said he specifically "intended to be hurtful" to other employees, and where employee "intended to demean and harass his co-workers"). But adverse employment actions made on the basis of the religious beliefs themselves are improper. *See Damiano*, 140 F.4th at 1155. We of course do not sit as a super-personnel board. But nor may employers always avoid further inquiry into their employment decisions under Title VII whenever they hold up a facially neutral company policy as the reason for their decision, because an employee may demonstrate that the reason was pretextual or that unlawful discrimination otherwise motivated the decision. *See Bostock*, 590 U.S. at 645 ("[I]t is irrelevant what an employer might call its discriminatory practice, how others might label it, or what else may motivate it."); *Damiano*, 140 F.4th at 1154–55 (explaining that if an employer offers "a neutral explanation for its action, . . . the plaintiff may challenge that explanation as pretextual" (quotations omitted)).

Unlike the cases Alaska cites, moreover, this case does not involve direct employee-to-employee harassment. Rather, it concerns a post in response to Alaska's own invitation to share comments that reflect "[o]ur differences"—in this case, as to a piece of proposed federal legislation with which many people may disagree, including

on religious grounds.  *See Peterson*, 358 F.3d at 605 n.5 ("[A]n employee's opposition to a policy of his employer or his advocacy regarding a controversial public issue invokes different considerations than his expressive activity intended to demean or degrade co-workers.").  Indeed, Alaska was fully aware that some would object to the Equality Act for religious reasons.  That Alaska created a forum for employee discussion on controversial issues, then fired Brown after she made religious objections of the kind Alaska anticipated, provides a further reason for regarding this case as presenting a genuine dispute of fact on the reason for Brown's termination.  Alaska's World's openness as a forum is an important contextual feature of this case (and one that may not recur, given Alaska's updated rules for commenting on Alaska's World).

In sum, the issue is not whether Alaska can punish employees who engage in discrimination and harassment (it can).  The issue here is instead a factual one of whether Brown was in fact fired for engaging in discrimination or harassment, or whether Alaska instead used the cover of its employee policies to fire Brown because of her religious beliefs.  Construing the facts in the light most favorable to Brown, there is a genuine dispute of material fact on this point, and so summary judgment for Alaska was improper.

Our decision in this case is necessarily limited to its specific facts.  But we draw support from our recent decision in *Damiano*, 140 F.4th at 1117.  In that case, two school officials launched a campaign questioning the school district's policy requiring the use of preferred pronouns on school campuses.  *Id.* at 1129–31.  Both claimed that their campaign was based on "their philosophical and Christian religious beliefs, as well as their understandings of scientific evidence."  *Id.* at 1128.  Months later, and after an

30          BROWN V. ALASKA AIRLINES, INC.

independent investigation into the plaintiffs' campaign, the school board terminated plaintiffs and then reinstated them in less desirable positions.  *Id.* at 1135–36.

As relevant here, the plaintiffs brought Title VII claims against the school district alleging they were discriminated against based on their religious beliefs.  *Id.* at 1136.  The school district responded that it had terminated the plaintiffs for "legitimate, non-discriminatory reasons," namely, because after a lengthy investigation, it had concluded that the plaintiffs' campaign violated "multiple District policies," including a policy against disrupting the school environment.  *Id.* at 1132, 1156.  Even though (unlike here) there were no comments about the plaintiffs' religion that could be regarded as negative, *id.* at 1156 n.25, we still held that "there [was] a genuine issue of material fact regarding the credibility of the District's proffered reasons for terminating" the plaintiffs, *i.e.*, the District's assertedly honest belief that the plaintiffs had violated district policies.  *Id.* at 1156.

That conclusion applies with equal if not greater force here, where Brown's post on Alaska's World contained self-evidently religious objections, the record contains arguably negative comments about religious faith, Brown was fired outright in short order, and a jury could question the reasoning in the Notice of Discharge.[1]

---

[1] Although plaintiffs at times frame their case as one of religious accommodation, that theory is less apt for this case.  That theory generally applies when an employee has a religious practice or obligation that conflicts with an employment duty, and where he asks his employer for an accommodation.  *See Groff*, 600 U.S. at 456.  What we have here is an allegation that plaintiffs were fired because of their religious beliefs,

BROWN V. ALASKA AIRLINES, INC.                    31

### 2.   Brown's Title VII Claim Against AFA

Brown also established a genuine dispute of material fact over whether AFA "discriminated against" Brown, "adversely affected h[er] status as an employee," or "caused or attempted to cause" Alaska to discriminate against Brown "because of" her religious beliefs.  42 U.S.C. § 2000e-2(c); *see also* EEOC Compliance Manual.  Under our cases, a union under Title VII "has an affirmative obligation to oppose employment discrimination against its members," and if the union instead "acquiesce[s] or join[s] in the Company's discrimination practices, it too is liable to the injured employees." *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1200 (9th Cir. 1991) (quoting *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1304 (9th Cir. 1982)).

In this case, as we recounted above, AFA (through Peterson) became immediately engaged in Alaska's efforts to investigate Brown and Smith, even though it was "rare" for Peterson to get involved in discipline cases.  In the case of Brown (and also Smith), it appears that Peterson affirmatively reported Brown's post to Alaska leadership, which was also rare for him to do.  Peterson was otherwise intimately involved in communicating with Alaska about the company's response to the Smith and Brown posts.  And critically, it was Peterson who used the words "bigots" and "bigoted," and who had expressed exasperation to Alaska over plaintiffs' purported inability to "unify[] their faith with inclusivity."  It is true that Peterson informed his AFA colleagues that the union would "represent [Smith] through

---

which is more naturally regarded as a straightforward discrimination claim as opposed to a failure to accommodate. Still, Brown's request for a religious accommodation is relevant, as an evidentiary matter, to the reason why Alaska may have fired her.

32            BROWN V. ALASKA AIRLINES, INC.

the grievance process fairly, in good faith, and without discrimination," a comment that we assume could be fairly extended to Brown.   But a jury could find Peterson's representation unworthy of credence given his comments disparaging the plaintiffs and their views, including by arguable reference to their religion.

In addition, there is a genuine dispute whether AFA's representation of Brown reflected bias against her because of her religious beliefs.  Brown maintains that in the lead-up to her March 4, 2021 meeting with Alaska investigators, her AFA representative, Terry Taylor, was dismissive of Brown's understanding of the Equality Act and her request for a religious accommodation.   During that meeting, Brown maintains that "Terry said very little in my defense," and "[e]ven though [Brown] had told Terry that [Brown's] question came from [her] religious beliefs, [Terry] did not mention that."

The record raises factual questions about whether AFA's representation of Brown was colored by potential disagreement with her religious views.  As Brown was advocating a religious defense during her investigatory meeting, it was AFA's Taylor who privately texted "I may hurl" to her AFA colleague Stephanie Adams, who was also participating in the meeting.  As noted above, Adams had written to others that Brown was unlike her own friends, whom she described as "good women with good values and [who] believe in equality."  Taylor had also earlier written in private communications to other AFA colleagues that Brown "needs to go!," that the Smith and Brown posts on Alaska's World were "reprehensible," and that someone should "put Marli and Lacey in a burlap bag and drop them in a well." Although not all these comments had a clear religious valence considered in isolation, in the context of the rest of

the record as a whole, a jury could regard them as additional evidence that AFA personnel harbored general disagreement with Brown's religious beliefs, which may have affected their representation in the disciplinary process.

Going into the March 30, 2021 grievance hearing, Brown again claims that Taylor was dismissive of her religious concerns, with Taylor allegedly telling Brown that her post on Alaska's World was "wrong and hurtful" and that Brown "did not have religious protections because what [she] did was wrong."  Brown further claims that Taylor tried to dissuade her from raising religious discrimination and accommodation at the grievance hearing.  At the grievance hearing itself, moreover, Brown claims that "Terry never defended my comment as arising from my religious beliefs and concerns, nor did she raise my concern that I was being discriminated against on the basis of religion."  Taylor instead reportedly described Brown's comments as "unfortunate" and "offensive," while maintaining that Brown had a strong employment record and was not "beyond salvation."

For its part, AFA maintains that it adequately defended Brown and protected her interests, even if some AFA employees may have disagreed with Brown's position on the Equality Act as a policy matter.  AFA also points out that after the grievance hearing, Brown expressed that AFA had done a good job defending her.  AFA's account may ultimately carry the day with the jury.  But between the comments that could be interpreted as expressing a negative view of Brown's faith, Taylor's claimed unwillingness to defend Brown on religious discrimination grounds, and Taylor's efforts to dissuade Brown from raising this defense, it is genuinely disputed whether AFA attempted to cause Brown's termination based on her religious beliefs or

acquiesced in it.  *See* 42 U.S.C. § 2000e-2(c); *Woods*, 925 F.2d at 1200.

C.  Smith Established a Genuine Dispute of Material Fact

Turning now to Smith, we hold that Smith also produced sufficient evidence to survive summary judgment on her Title VII and state law claims against Alaska and AFA.

1.  Smith's Title VII Claim Against Alaska

Smith's situation is different than Brown's in several respects.  Smith, who posted on Alaska's World before Brown did, wrote only the following: "As a company, do you think it's possible to regulate morality?"  Smith was known to wear a cross necklace and therefore may have been regarded as Christian within the company, but Smith's comment on Alaska's World was not explicitly grounded in religious belief.  In her investigatory meeting, Smith also did not describe her post in religious terms, claiming she was raising a "philosophical" question.  Smith only expressly invoked her religious beliefs much later, after she had been terminated.  And unlike Brown, Smith had a prior disciplinary history based on the suspension she received in connection with her BLM petition.

But although Smith's post did not expressly invoke religion, "morality" is often associated with religious beliefs. *See* 29 C.F.R. § 1605.1 (EEOC guidelines defining "religious practices to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views").  "Moral" beliefs about the matters addressed in the Equality Act—which concern sexual identity and orientation—can likewise be understood to include religious beliefs.  Indeed, AFA's Peterson agreed that moral beliefs can be part of one's

religious beliefs.  And here, Alaska evaluated Smith's post after having already acknowledged internally that the company's support for the Equality Act "touches on religious freedom concerns for some," as "religious concerns . . . were continuing to come up."  Alaska thus could have reasonably understood that Smith was invoking beliefs about "morality" that are commonly tied to religion, that is, moral beliefs that are held because of religious convictions.  This context provides substantial grounding for discerning a genuine dispute of fact.

But we ultimately need not decide how we would have resolved Smith's Title VII claim against Alaska if the facts involved Smith alone.  The difficulty we have is that, as discussed above, there is a genuine dispute of material fact whether Alaska discriminated against Brown because of her religious beliefs.  And it is apparent that Alaska considered Smith's situation in connection with Brown's, working them up together.

When Smith first posted on Alaska's World, the airline did not immediately remove the post but instead posted its own reasoned response, taking Smith's post down only later in the day, after Brown had posted her separate, facially religious, comment.  AFA's Peterson also lumped both plaintiffs together in his comment that he "wish[ed] fewer people would struggle so much with unifying their faith with inclusivity."  As we discussed above, Peterson sent this text to Alaska executives Williams and Littman.  Further, Smith's investigatory meeting at Alaska took place after Brown's (which involved considerable airing of religious objections), and Alaska terminated both plaintiffs on the same day. Given the substantial overlap between Alaska's responses to Brown and Smith, and the fact that Alaska fully appreciated that there would be religious objections to the Equality Act,

36                BROWN V. ALASKA AIRLINES, INC.

we do not think it can be said, as the district court concluded, that "there is simply no evidence in the record that Alaska knew that Smith's comment was based on her religion when it decided to terminate her."

As was true for Brown, Alaska argues that it fired Smith for the neutral reason that she violated company anti-harassment and anti-discrimination policies. But perhaps even more so than in the case of Brown, a reasonable jury could find the company's stated reasons pretextual. *See Damiano*, 140 F.4th at 1156. After initially treating Smith's post as sufficiently legitimate to warrant a measured response from the company on Alaska's World, Smith's Notice of Discharge changed tunes and asserted that Smith's single-line comment, offered in the form of a question, was "offensive" and "discriminatory," going so far as to characterize it as speech "that targets a group of individuals based on their legally protected characteristics." Once again, a reasonable jury could conclude that these descriptions of Smith's post are overwrought or inaccurate, and thus pretextual, especially given that Smith made her comment in an open employee forum in which Alaska invited employees to explore "our differences."

Once again, our conclusions are necessarily limited to the facts of Smith's case, which are uniquely tied into Brown's. We hold that Smith created a triable dispute on her Title VII claim against Alaska.[2]

_____

[2] Our dissenting colleague thoughtfully disagrees on this one aspect of our decision and would affirm summary judgment for Alaska on Smith's Title VII claim (while otherwise agreeing that Smith can move forward with her claims against the union and that Brown can move forward on all her claims). But as to Smith's Title VII claim against Alaska, and

### 2. Smith's Title VII Claim Against AFA

For substantially the same reasons as Brown, we further hold that there is a genuine dispute of material fact whether AFA attempted to cause Smith's termination based on her religious beliefs or acquiesced in it. *See* 42 U.S.C. § 2000e-2(c); *Woods*, 925 F.2d at 1200.

As was true in the case of Brown, AFA's Peterson was heavily involved in Alaska's efforts to investigate and discipline Smith, even though this level of involvement was rare for him. Peterson's "struggle with faith" text extended to Smith as well as Brown, and he repeatedly referred to Smith as a "bigot" and "bigoted." As we noted above, Peterson did tell others at AFA that the union would "represent [Smith] through the grievance process fairly, in good faith, and without discrimination." But a reasonable jury could find that Peterson's explanation was not believable when, among other things, he was internally saying that "Mngmt needs to send [Smith's] bigoted ass packing for a variety of reasons."

Similarly, during the investigatory and grievance process, Smith claims she felt pressured not to raise her religious objections to the Equality Act, although it is not as clear from the record that this claimed pressure came from

---

especially given Alaska's coincident consideration of Smith's post with Brown's, we think a genuine dispute of fact remains, even as a jury may ultimately be persuaded by the dissent's reasoning. Nor, in our view, is it plausible that a failure to terminate Smith would have generated hostile work environment exposure for Alaska. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (observing that a hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (internal citations and quotations omitted)).

AFA.   However, during internal AFA deliberations over whether to arbitrate Smith's grievance, notes reflect Peterson stating that Smith "[c]an be a bigot at home but not at work." Ultimately, although there is less evidence that AFA attempted to dissuade Smith from raising a religious defense than in the case of Brown, the fact remains that the union was handling both cases at the same time, and the "bigot" comments were specifically directed to Smith.   Under these circumstances, we believe that a jury should consider the question of whether AFA violated Title VII in its handling of Smith's investigation and grievance.

### III.  Railway Labor Act Preemption

Having concluded that both Smith and Brown created a triable issue on their Title VII and collateral state law claims, we must address whether the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, preempts plaintiffs' state law anti-discrimination claims against the union.  *See* Wash. Rev. Code §§ 49.60.030, 49.60.190 (Brown); Or. Rev. Stat. § 659A.030(1)(c) (Smith).  We hold that the RLA's duty of fair representation does not preempt these claims.

### A.  Governing Legal Framework

We begin our analysis with Title VII itself.  Title VII expressly preserves state law anti-discrimination claims and does not preempt state law unless it "purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter," 42 U.S.C. § 2000e-7, *i.e.*, in cases of "actual[] conflict" with Title VII. *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987); *see also Rains v. Criterion Sys., Inc.*, 80 F.3d 339, 345 (9th Cir. 1996).  There is no such claimed conflict here. Instead, AFA's argument is that the RLA's federal duty of fair representation impliedly preempts employees' Title VII-

style state law claims against unions.  We therefore turn in depth to the RLA.

The RLA "authorizes employees in the railroad and airline industries to select a union to act as their exclusive representative for collective bargaining with their employer." *Beckington v. Am. Airlines, Inc.*, 926 F.3d 595, 597 (9th Cir. 2019).  The authority to act as the exclusive bargaining representative also "carries with it 'a correlative duty' . . . to 'represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective-bargaining agreements.'"  *Id.* at 600 (emphasis omitted) (quoting *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 46–47 (1979)).  This duty of fair representation requires unions "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.* (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 76 (1991)).  The unions' duty of fair representation is judicially implied from the RLA, as is the right to bring an unfair representation claim. *See Foust*, 442 U.S. at 47; *Beckington*, 926 F.3d at 598, 600; *Krakowski v. Allied Pilots Ass'n*, 973 F.3d 833, 839–40 (8th Cir. 2020); *see also Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998) ("When a labor organization has been selected as the exclusive representative of the employees in a bargaining unit, it has a duty, implied from its status under § 9(a) of the [National Labor Relations Act (NLRA)] as the exclusive representative of the employees in the unit, to represent all members fairly.").

Because of the similarities between the RLA and the Labor Management Relations Act (LMRA), which amended the NLRA, courts considering RLA preemption draw on LMRA case law.  *See Alaska Airlines Inc. v. Schurke*, 898

F.3d 904, 913 & n.1 (9th Cir. 2018) (en banc) (citing *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260 (1994)). And it is by now well-established that under the LMRA and RLA, the federal duty of fair union representation has preemptive force over some state laws. *See, e.g.*, *Vaca v. Sipes*, 386 U.S. 171, 180–82 (1967); *Adkins v. Mireles*, 526 F.3d 531, 539 (9th Cir. 2008); *Richardson v. United Steelworkers of Am.*, 864 F.2d 1162, 1165–67 (5th Cir. 1989); *Peterson v. Air Line Pilots Ass'n, Int'l*, 759 F.2d 1161, 1168, 1170–71 (4th Cir. 1985).[3]

Our principal decision in this area is *Adkins*, 526 F.3d 531, an LMRA case.  There, we held that "[t]he federal statutory duty which unions owe their members to represent them fairly also displaces state law that would impose duties upon unions by virtue of their status as the workers' exclusive collective bargaining representative." *Id.* at 539. To avoid preemption, we explained, "aggrieved workers must make a showing of *additional duties*, if they exist, beyond the normal incidents of the union-employee relationship." *Id.* (emphasis added).  These "duties must derive from sources other than the union's status as its members' exclusive collective bargaining representative,

---

[3] While there are different preemption doctrines stemming from the RLA and other labor statutes, we address only the strand of RLA preemption involving the union's duty of fair representation.  The separate RLA preemption doctrine that "preempt[s] a state-law claim whose resolution depends upon the meaning of a CBA" is not implicated here. *Adkins*, 526 F.3d at 539; *see also Alaska Airlines*, 898 F.3d at 913–14.  That doctrine involves claims that turn on the construction of CBAs. *Alaska Airlines*, 898 F.3d at 913–14.  In contrast, AFA in this case seeks preemption of plaintiffs' state law claims based on AFA's status (and corresponding duties) as plaintiffs' exclusive collective bargaining representative.

such as an express provision of the collective bargaining agreement or a collateral contract." *Id.* at 539–40.

*Adkins* involved former employees of a warehouse who sued their union. *Id.* at 536. The plaintiffs raised a breach of the federal duty of fair representation and various state law claims, including breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and intentional infliction of emotional distress. *Id.* at 536–37, 540. The theory of the case was that the union's secretary-treasurer "harbored animosity" toward the plaintiffs' warehouse after the employees burned their teamster jackets on national television. *Id.* at 537. The plaintiffs alleged that the secretary-treasurer "exacted revenge" nearly a decade later during a union-initiated negotiation with their employer over the terms of the CBA. *Id.* According to plaintiffs, the union materially misrepresented the terms of the CBA to them, colluded with the employer to induce employees to accept a less favorable CBA, and failed to represent the employees adequately in CBA negotiations. *Id.* at 537–38.

We held, as relevant here, that the LMRA's duty of fair representation impliedly preempted plaintiffs' state law claims. *Id.* at 540–42. Addressing each state law claim individually, we concluded that the employees "made no showing of additional duties beyond the normal incidents of the union-employee relationship." *Id.* at 540. Instead, federal law preempted the claims because each claim "implicates the duty of fair representation." *Id.* at 536. The plaintiffs' emotional distress claim, for example, was "inextricably linked to Appellee's performance of duties owed in their capacity as union representatives." *Id.* at 541. Thus, "[b]ecause the duty of fair representation occupies the field of regulation of union-member relations when a union

carries out its representational functions," the emotional distress claim was preempted. *Id.* at 541–42.

### B. Survey of Approaches in Other Circuits

The question in this case is whether Brown and Smith can maintain Title VII-style state law anti-discrimination claims against AFA. As the district court correctly recognized, "*Adkins* did not involve state-law antidiscrimination claims, and the Ninth Circuit has not expressly addressed whether the duty of fair representation preempts claims under a state's antidiscrimination statute." Following *Adkins*, district courts in our circuit have divided on the issue. *Compare Thompson v. Int'l Bricklayers & Allied Craftworkers Union*, 2013 WL 3865073, at *4 (W.D. Wash. July 24, 2013) (federal duty of fair representation preempts state law anti-discrimination claim against union), *Wright v. N. Am. Terrazo*, 2013 WL 441517, at *6 (W.D. Wash. Feb. 5, 2013) (same), *and Guidry v. Marine Engineers*, 2012 WL 646302, at *3–4 (N.D. Cal. Feb. 28, 2012) (same), *with Padilla v. Pac. Bell Tel. Co.*, 2015 WL 728695, at *4–5 (C.D. Cal. Feb. 19, 2015) (federal duty of fair representation does not preempt state law anti-discrimination claim against union), *Martinez v. Kaiser Found. Hosps.*, 2012 WL 2598165, at *7–8 (N.D. Cal. July 5, 2012) (same), *and Swain v. Dywidag-Sys. Int'l USA, Inc.*, 2009 WL 1578918, at *5–6 (N.D. Cal. June 4, 2009) (same).

The Second and Eighth Circuits have directly addressed this issue, however, and both courts held that unions' federal duty of fair representation does not preempt state anti-discrimination law. In *Figueroa v. Foster*, 864 F.3d 222 (2d Cir. 2017), the Second Circuit held that the duty of fair representation does not preempt the New York State Human Rights Law (NYSHRL) for claims of discrimination filed by

a union member against a labor organization, even when that organization engages in discrimination while "acting in its capacity as a collective bargaining agent." *Id.* at 224. In *Figueroa*, union members filed complaints against their union with the New York state agency responsible for administrative enforcement of the NYSHRL. *Id.* at 225. The employees alleged that the union had engaged in discrimination in violation of the NYSHRL, Title VII, and other federal non-discrimination laws in the course of serving as the employees' collective bargaining agent. *Id.* The union then sued the state agency in federal court seeking to stop the state agency from investigating it on the theory that federal law preempted the NYSHRL. *Id.* at 225–26.

The Second Circuit held that the federal duty of fair union representation did not preempt the NYSHRL. Using the rubric of conflict preemption, *Figueroa* concluded that upon examination of "the textual and structural relationships between the NLRA, Title VII, and the NYSHRL," "[t]here is no evidence that the NLRA's duty of fair representation was designed or intended to preempt state laws focused on combatting invidious discrimination, such as the NYSHRL." *Id.* at 233.

The Second Circuit began with the observation that unions are subject to both federal labor laws and federal anti-discrimination laws like Title VII, and that Title VII has an express anti-preemption provision, as we noted above. *Id.* (citing 42 U.S.C. § 2000e-7). Because the NYSHRL was a model for Title VII and "regulate[s] virtually the same discrimination" as Title VII, *Figueroa* concluded that Congress "sought to preserve[] the States' coordinate regulatory role" in protecting employees against discrimination. *Id.* (quotations omitted).

44            BROWN V. ALASKA AIRLINES, INC.

Nor did federal labor law conflict with this, as it was not impossible for unions to comply with both the federal duty of fair representation and state anti-discrimination laws. *Id.* at 234. State anti-discrimination law was likewise not an obstacle to the federal duty of fair representation because both prohibit discrimination against employees. *Id.* at 235. Indeed, as the Second Circuit observed, the Supreme Court has explained that the "statutory duty of fair representation was developed in the 1940s in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act." *Id.* (brackets omitted) (quoting *Vaca*, 386 U.S. at 177). Thus, the Second Circuit reasoned, federal labor law and state anti-discrimination law "work in tandem to protect union members from invidious discrimination in all of its forms." *Id.*

The Eighth Circuit reached substantially the same conclusion when examining whether the doctrine of complete preemption allowed for removal of state law claims to federal court. *See Markham v. Wertin*, 861 F.3d 748, 759 (8th Cir. 2017). In *Markham*, a union member claimed that his union discriminated against him based on his disability, in violation of Missouri law, when it failed to ensure he could remain in an on-the-job training program. *Id.* at 752. The Eighth Circuit held that the NLRA's implied duty of fair representation did not completely preempt the plaintiff's Missouri law claim. *Id.* at 758–59. The federal duty did not preempt the entire field, nor did the state anti-discrimination law "conflict with . . . or otherwise frustrate the federal scheme." *Id.* at 759.

The Tenth Circuit appears to have reached a different conclusion, *see Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1158 (10th Cir. 2000), although the case involved

somewhat different claims, its analysis was relatively abbreviated, and the decision pre-dated the Second and Eighth Circuit decisions by some years.  In *Thomas*, as relevant here, a federal postal service employee sued his union for allegedly agreeing with the Postal Service to discharge the employee because of his religious beliefs.  *Id.* at 1154, 1158.  The plaintiff sued his union under state law for wrongful discharge and civil conspiracy.  *Id.* at 1154.  As to wrongful discharge, he claimed that the union's actions violated "Kansas public policy protecting the free exercise of religion."  *Id.* at 1158.

The Tenth Circuit held that these claims "actually amount to a claim for breach of the duty of fair representation."  *Id.*  And it held that they were preempted because the federal duty of fair representation "encompass[es] the alleged actions of the Union" of coordinating with the Postal Service "to discriminate against plaintiff due to his religious belief."  *Id.*  We note, however, that unlike *Figueroa* and *Markham*, it does not appear that *Thomas* involved claims under state anti-discrimination statutes.

## C.  Application

Having surveyed the case law, we agree with the Second and Eighth Circuits and hold that the RLA's duty of fair representation does not preempt plaintiffs' Oregon and Washington anti-discrimination claims against their union. There is no conflict between these respective duties in federal and state law, nor does state anti-discrimination law stand as an obstacle to the federal duty.  *See Figueroa*, 864 F.3d at 234–35; *Markham*, 861 F.3d at 759.  Instead, "each serves to reinforce the anti-discriminatory purpose of the other," "work[ing] in tandem to protect union members from

invidious discrimination in all of its forms." *Figueroa*, 864 F.3d at 235.

We draw support for this conclusion from Title VII itself. As we have discussed, Title VII covers labor unions. *See* 42 U.S.C. § 2000e-2(c). And Title VII expressly preserves state law except in the limited circumstance when state law "purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." *Id.* § 2000e-7. It would be strange for a Congress that enacted a Title VII regime that covers unions and preserves state anti-discrimination laws to simultaneously, in the RLA, preempt these same state laws as to discrimination claims against unions. *See Figueroa*, 864 F.3d at 233–34 (relying on Title VII's preservation of state law). That is especially so when the genre of preemption at issue here is judicially implied rather than expressly set forth in the RLA. We have understandable reluctance in extending a court-implied doctrine of preemption arising from a court-imputed duty of fair representation in a way that would interfere with the directives of Title VII. *Cf. In re Volkswagen*, 959 F.3d 1201, 1206 (9th Cir. 2020) ("A high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." (quotations omitted)); *Env't Encapsulating Corp. v. City of New York*, 855 F.3d 48, 58 (2d Cir. 1988) ("[A] state's police powers are not displaced by federal law unless there is compelling evidence that this was the manifest aim of Congress. The burden of overcoming this presumption in favor of state law is heavy in those cases that rely on implied preemption, which rests in turn on inference." (citation omitted)).

The district court reached a contrary conclusion on the preemption question based on our decision in *Adkins*. While

other district courts have read *Adkins* differently and found no preemption of state anti-discrimination claims, *see, e.g.*, *Martinez*, 2012 WL 2598165, at \*8, some have read it as the district court here did, *see, e.g.*, *Wright*, 2013 WL 441517, at \*5–6.  Although *Adkins* contains some broader language that could be construed in the abstract to extend to state anti-discriminations claims, *Adkins* did not involve state law anti-discrimination claims, as the district court acknowledged.  We thus do not believe that *Adkins* should be read to resolve an issue that it did not consider.

And it bears noting that the claims in *Adkins* were different than those here, which gives context to the language in the opinion that some lower courts have perhaps understandably overread.  The state law claims in *Adkins* pertained specifically to the union's negotiation with the employer over a CBA and alleged misrepresentations to employees about the terms of the CBA.  *See* 526 F.3d at 537–38.  It was in that sense that the claims were "inextricably linked to Appellee's performance of duties owed in their *capacity* as union representatives," and sought to directly "impose duties upon unions by virtue of their *status* as the workers' exclusive collective bargaining representative."  *Id.* at 539 (emphasis added).

Compliance with state anti-discrimination laws, by contrast, seem to us the type of "additional duties" that *Adkins* contemplated as being outside the RLA's preemptive reach.  *Id.*  Those laws do not seek to replicate the "normal incidents of the union-employee relationship," which is more properly understood to refer to the classic work of the union as an exclusive bargaining agent, along the lines of the claims in *Adkins* itself.  *Id.*; *see also Martinez*, 2012 WL 2598165, at \*7 (explaining that *Adkins* does not direct the preemption of state discrimination claims because "[t]he

48                      BROWN V. ALASKA AIRLINES, INC.

duty not to discriminate arises from a source other than the Union's status as its members' exclusive collective bargaining representative—*i.e.*, the duty under [California anti-discrimination law]. While the duty of fair representation may also provide a remedy for the alleged discrimination, that does not mean that the right to obtain a remedy based on an independent source is thereby negated and displaced.").

We do not decide in this case the full reach of the "additional duties" that state law may impose upon unions consistent with the RLA. It suffices for present purposes that Title VII-style state anti-discrimination laws sufficiently fit that bill, especially when Title VII specifically covers unions and preserves state law absent an actual conflict. Finally, just as the Second Circuit in *Figueroa* caveated, "[t]his opinion addresses only [the union's] claim that the duty of fair representation" preempts Oregon and Washington anti-discrimination law in their "*entirety*" when applied to unions. 864 F.3d at 235. To the extent there could be other "potential conflict[s]" between more specific aspects of federal labor law and state anti-discrimination laws, we do not address them here. *Id.* We hold only that Washington and Oregon's anti-discrimination laws "present[] no potential conflict so incompatible with federal labor laws that all of [their] provisions must fail." *Id.*

*          *          *

For the foregoing reasons, we reverse the district court's grant of summary judgment to Alaska and AFA and its dismissal of plaintiffs' state law discrimination claims against AFA. We remand for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

Christen, J., concurring in part and dissenting in part:

I concur in the majority's conclusion that both plaintiffs demonstrated a genuine dispute of material fact that should have prevented entry of summary judgment regarding: (1) whether plaintiffs' union, the AFA,[1] attempted to cause or acquiesced in the termination of their employment on the basis of their religious beliefs; and (2) whether Alaska Airlines terminated Marli Brown on the basis of her religious beliefs. I also agree that the plaintiffs' state-law claims are not preempted by the Railway Labor Act, 45 U.S.C. § 151 *et seq*. But I dissent from my colleagues' decision to reverse the district court's entry of summary judgment on Lacey Smith's claims against Alaska because I do not agree that Smith demonstrated a genuine dispute of material fact about whether Alaska terminated her because of her religion.

The fatal defects in Smith's prima facie case obligated the district court to grant summary judgment in Alaska's favor.   Most notably, Alaska would have had to be clairvoyant to know that Smith considered the statement she posted on the company's internal website to be an expression of her faith because the statement itself gave no hint that it was religiously motivated and Smith did not claim that it was an expression of her religion when Alaska interviewed her during its investigation.

Smith did not argue that Alaska's termination decision constituted religious discrimination until a month after she was fired. *See Williams v. Legacy Health*, 174 F.4th 1201, 1205 (9th Cir. 2026) (explaining that to establish a Title VII religious discrimination claim "[t]he employer must have been informed of the [religious] belief" (citation modified)).

---

[1] Association of Flight Attendants-CWA AFL-CIO.

And as our precedent makes clear, Alaska had ample reason to terminate Smith even after she gave notice that she considered the statement to be religiously motivated because an employee may not rely on her religious beliefs as a shield if her conduct or actions otherwise constitute harassment of other employees in the workplace. *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607–08 (9th Cir. 2004) (holding that employers "need not accept the burdens that would result from allowing actions that demean or degrade, or are designed to demean or degrade, members of its workforce").

The majority suggests a jury could decide that Alaska's decision to fire Smith was motivated by hostility toward her faith. In part, it reaches this conclusion by drawing an adverse inference from the fact that Alaska responded to Smith's online comment before terminating her for violating its anti-discrimination and anti-harassment policies. But given Smith's coworkers' reactions, it was appropriate for Alaska to promptly reiterate its commitment to a workplace free of discrimination and harassment, and refrain from taking disciplinary measures until it completed its investigation and considered Smith's explanation. No adverse inference may be fairly drawn from Alaska's decision to take down Smith's post because her comment exposed Alaska to claims that it tolerated a hostile work environment. *See Matthews v. Walmart,* 417 F. App'x 552, 554 (7th Cir. 2011). This is especially true considering Smith's persistent history of noncompliance with Alaska's anti-discrimination and anti-harassment policies.

I would affirm the district court's order granting summary judgment in Alaska's favor on Smith's Title VII claim and the entry of summary judgment on the corresponding state-law anti-discrimination claims. Accordingly, I respectfully dissent from the majority's

reversal of the district court's summary judgment ruling on Smith's intentional discrimination claims against Alaska.

## I.

The order in which the events unfolded here matters, as does the unique environment in which Alaska's in-flight employees work.  Alaska explained that its in-flight employees function as a team to navigate emergency situations while in the air and far from outside help.  To ensure passenger and employee safety, flight attendants must trust that they will have each other's back when the time comes to handle an emergency situation.  In keeping with this goal, Alaska has a "zero-tolerance" policy for harassment and discrimination.

In August 2020, Alaska Airlines announced a series of racial justice commitments, including a statement in support of the Black Lives Matter movement.  In response, Lacey Smith, a flight attendant for Alaska, emailed Alaska's CEO as well as her supervisor with concerns that Alaska was taking a political stance.  Alaska's CEO responded that Alaska was "trying to stay out of the political aspect of this," and Smith's supervisor hand-delivered a flyer to Smith explaining that Alaska was not supporting an "anti-police-officer" stance or staking a political position, but was supporting an "international human rights movement" acknowledging the "discrimination Black people face every day."  Smith's supervisor encouraged her to reach out if she had any questions or remaining concerns.  Smith did not discuss her concerns further with her supervisor.

A few days after receiving these responses, Smith wrote and circulated a petition titled "Depoliticizing Alaska Airlines."  Smith's petition described the Black Lives Matter

organization as having "political ties into Marxist communism through its self-proclaimed Marxist leaders." The petition included the statement that "[b]y supporting [the Black Lives Matter movement] the company automatically places itself in direct support of a specific political party/ideology and creates bias." The petition accused Alaska of hostility toward the police and military and stated that Alaska approved "rioting and upheaval." Smith posted the petition on a social media website, circulated it among her coworkers, and encouraged them to share it with others. After an investigation, Alaska concluded that Smith's campaign constituted harassment and other Alaska employees reported concerns about their ability to "work[] safely" with her. In a Notice of Discipline, Alaska further explained that Smith ignored "clear guidance from the Company that its support of Black Lives Matter relates entirely to the human rights movement and not the political organization" and instead published a petition that "mischaracterize[d]" Alaska's support of the movement. The Notice explained that Smith failed to correct her knowing mischaracterization of Alaska's position and that her petition was still active. Smith did not claim that her Black Lives Matter petition was religiously motivated.

Alaska suspended Smith for thirty days, the longest suspension that the AFA union had witnessed for an Alaska employee, and placed her on probation for eighteen months. Alaska expressly told Smith that any misconduct in the ensuing eighteen months could result in termination.

Just six months later, Alaska posted an article on its company website that expressed the company's support for the Equality Act. The article described the Equality Act as seeking to "amend existing civil rights laws protecting individuals from discrimination based on race, color,

national origin, sex, disability and religion" and to "add clear, consistent protections to prohibit discrimination on the basis of sexual orientation and gender identity." Minutes later, Smith commented, "As a company, do you think it's possible to regulate morality?" The internal company website where this exchange occurred is accessible by 26,000 Alaska employees and retirees. Alaska posted a response to Smith's comment, also visible to all of its employees, within a few hours:

> Supporting the Equality Act is not about regulating morality. It's about supporting laws that allow our LGBTQ+ employees and guests, no matter what state they live in or fly to, to be protected against discrimination. Our values are our guide, and we strongly believe that doing the right thing and being kind-hearted require us to support this act. As we said above, we aren't the kind of company that stands by and watches—we're going to use our voice and be a leader on these issues.

> We also expect our employees to live by these same values. Our differences are to be respected. As stated in our People Policies, harassment and discrimination will not be tolerated.

Throughout the day, Alaska received feedback confirming that other employees were alarmed by Smith's comment. AFA specifically received feedback from multiple flight attendants concerning Smith's comment, some of whom "questioned how they could safely fly with her." AFA relayed to Alaska that it was receiving similar comments.

Marci Brown, also an Alaska flight attendant, posted a
comment to Alaska's Equality Act post more than eleven
hours later.  Unlike Smith's, Brown's comment expressly
invoked her religious beliefs.    More comments from
coworkers negatively responding to Brown's comment
followed, and Alaska decided to delete both flight
attendants' posts.

At the time Smith made her online comment, she was
still on probationary status as a result of the Black Lives
Matter petition she had circulated.  Rather than immediately
terminating Smith, Alaska opened a second investigation
and interviewed Smith about her Equality Act post.  Smith
said nothing to suggest that her comment was an expression
of religion.    Instead, she characterized the post as a
"philosophical question."    Alaska terminated Smith on
March 19, 2021.  In its notice of termination, Alaska stated:

> This was not the first time [Smith] engaged
> in conduct that was contrary to [Alaska's]
> Company values and had a significant
> negative impact on other employees. . . . Like
> [Smith's] conduct in August 2020, [Smith's]
> comment here created a negative impact on
> other employees, was made in a public
> forum, promulgated divisiveness, and
> undermined the Company's efforts to create
> an inclusive work environment free of
> harassment and discrimination.

The notice went on to explain that Smith "failed to learn
from the August 2020 incident," and concluded that Smith's
post was discriminatory and did not align with Alaska's
values.  More than a month after her termination, Smith

claimed for the first time that her online statement reflected her religious beliefs.

## II.

### A.

Title VII precludes employers from discharging employees on account of their "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "Religion" is defined as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate" a "religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). To establish a Title VII violation, a plaintiff may either "produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer" or "rely on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1154 (9th Cir. 2025) (citation modified). The majority concludes that Smith defeats summary judgment under either theory. In my view, this decision cannot be squared with the facts of this case or with controlling precedent.

### B.

Smith did not provide direct or circumstantial evidence demonstrating that her religion was more likely than not a motivating factor in Alaska's decision to terminate her. As the majority acknowledges, the question she posed on Alaska's internal website did not make any mention of religion at all. In its entirety, Smith's comment read: "As a company, do you think it's possible to regulate morality?" During Alaska's investigation, Smith insisted that she was

merely posing a philosophical question rather than asserting to the investigators that her Christian beliefs caused her to conclude that the Equality Act was immoral. The majority posits that "'morality' is often associated with religious beliefs," but references to morality are not inherently religious. Maj. Op. at 34. People of many faiths, including those with no religious affiliation, make moral judgments. There is no record evidence that Alaska knew or even suspected Smith's comment was religiously motivated; when Alaska interviewed her, Smith did not mention religion.[2]

The majority suggests that because Smith sometimes wore a cross, Alaska could have inferred that she is Christian. Fair enough, but the question is whether there is evidence of discrimination, i.e., whether Alaska fired Smith *because of* her religion. *See Bostock v. Clayton Cty.*, 590 U.S. 644, 656–57 (2020). It is blackletter law that this requires more than merely demonstrating the employer's knowledge of the employee's protected classification. *Hittle v. City of Stockton*, 101 F.4th 1000, 1014 (9th Cir. 2024). Even if Smith had showed that the decision-maker at Alaska knew she was Christian (she did not), knowledge of Smith's faith does not warrant the inference that her religious beliefs prompted her online comment regarding the Equality Act, or that Alaska's decision to terminate her had anything to do with religion. To be sure, Smith's online comment allowed

---

[2] During the pendency of this litigation, Smith explained that she did not volunteer that her comment stemmed from her religious beliefs because she feared religious discrimination. This explanation might be relevant to a hostile work environment claim, but it does not change Smith's obligation to raise an issue of fact about what Alaska knew when it decided to fire her. On appeal, Smith waived her retaliation, disparate impact, and hostile work environment claims.

an inference that she was hostile toward the company's support of the Equality Act, but it gave no hint that Smith's disapproval of Alaska's stance was a reflection of her religious views. *Cf. Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) ("An employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race."); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 (2003) ("If [the decision-maker] were truly unaware that such a disability existed, it would be impossible for her hiring decision to have been based, even in part, on respondent's disability."). As the district court recognized, some Christians support LGBTQ rights, and some do not.

The majority decides Smith established a prima facie disparate treatment case by conjoining her termination with Brown's because the two were fired on the same day. From this temporal proximity, my colleagues curiously conclude that Smith's case was "uniquely tied into Brown's." Maj. Op. at 36. This is wrong for several reasons. First, Brown's statement was overtly religious in nature, unlike Smith's. Second, Smith posted her comment more than eleven hours before Brown posted hers, so there can be no suggestion that Smith's statement would have been understood as chiming in with the religious views that Brown expressed. Third, during Brown's pre-termination interview, Brown explicitly articulated that her online post was an expression of her religious beliefs and, as explained, Smith said nothing comparable. Fourth, though I agree that the extremely disparaging statements by some of the union's representatives cannot be excused, neither may they be attributed to Alaska's decision-maker, and nothing in the record supports the suggestion that the union made the decision to terminate Smith. *See Cornwell v. Electra Cent.*

58          BROWN V. ALASKA AIRLINES, INC.

*Credit Union*, 439 F.3d 1018, 1030 (9th Cir. 2006) (explaining that a plaintiff must put forth "specific" and "substantial" circumstantial evidence to create a triable issue with respect to whether the employer intended to discriminate on the basis of a protected classification). Finally, and perhaps most glaringly, Smith was still on probation for the Black Lives Matter petition she circulated, and that episode culminated in Alaska's express warning that another violation of the company's anti-harassment policy could result in her termination. Smith disregarded the express warning Alaska gave her after that incident, repeating the type of comment that concerned her coworkers in 2020. For these reasons, the backdrop to which Smith's termination was "uniquely tied" was not Brown's termination, it was Smith's own probationary status for violating Alaska's anti-harassment policy just six months earlier. In light of the sequence in which these facts unfolded and the concerns expressed by Smith's coworkers, it is not surprising that Alaska decided to end Smith's employment rather than continue to accept the risk that her conduct would prompt other employees to claim that Alaska tolerated a hostile work environment.

Even if Smith had established a prima facie case under *McDonnell Douglas*, Alaska articulated legitimate, nondiscriminatory reasons for terminating her. The law does not require more. To rebut the presumption of discrimination that arises when a plaintiff establishes a prima facie case, "the defendant must clearly set forth . . . the reasons" for terminating the plaintiff, and the explanation "must be legally sufficient to justify a judgment for the defendant." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981).

Alaska terminated Smith because her comment, which was posted in view of Alaska's entire workforce, "undermine[d] Alaska's stance" and "question[ed] the Company's support for the rights of all people," which Alaska considered a company value. Alaska reasonably deemed the comment to violate its anti-discrimination and anti-harassment policies as well as the terms of Smith's probation. It is settled law that Title VII allows employers to discipline employees for discriminatory conduct, even where such conduct is religiously motivated; indeed, Title VII's prohibition on workplace discrimination requires employers to take corrective action in some circumstances. *See Peterson*, 358 F.3d at 601–02, 607 (considering a case in which an employee referred to gay individuals as "evil" and explaining that "an employer need not accommodate an employee's religious beliefs if doing so would result in discrimination against his coworkers or deprive them of contractual or other statutory rights"); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 740–41, 746 (9th Cir. 2004) (affirming summary judgment against a plaintiff who claimed she was religiously discriminated against after she was terminated for telling an LGBTQ coworker that "homosexuality is wrong" and "a sin").

Alaska's decision to terminate Smith was especially reasonable given the unique circumstances in which its in-flight employees work. Alaska's flight attendants operate as a team to navigate stressful and potentially life-threatening circumstances in tight quarters, far from help. This type of work setting requires that Alaska's employees trust each other and back-up their coworkers. The ability to work together in stressful or dangerous circumstances starts with mutual respect. Alaska made clear that it would take very

60          BROWN V. ALASKA AIRLINES, INC.

seriously employee conduct that causes other staff to question whether they can work safely with their coworkers.

Once an employer offers "a neutral explanation for its action, . . . the plaintiff may challenge that explanation as pretextual." *Damiano*, 140 F.4th at 1154–55 (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 340 (2020)) (citation modified). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253.

The majority concludes that a reasonable juror could find Alaska's stated reasons for terminating Smith pretextual because Alaska seemingly viewed Smith's post as sufficiently legitimate to warrant a response, but later characterized the comment as "discriminatory." Maj. Op. at 36. In the majority's view, Alaska's response was potentially "overwrought or inaccurate." Maj. Op. at 36. But as even the majority recognizes, our court does not "sit as a super-personnel department that reexamines . . . the propriety of" employers' business decisions. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). And here, the record unambiguously shows that Smith's comment was broadcast to all 26,000 current and former Alaska employees. The day after Smith posted her comment, Alaska continued to receive feedback from other employees that raised concerns about workplace harassment, and the union reported that it received comments from multiple flight attendants who "questioned how they could safely fly with her." It was reasonable for Alaska to reiterate its mission and values in a message visible to the employees who received Smith's comment and then, after receiving still more expressions of concern from employees, to delete Smith's comment and commence an investigation. After taking time to interview

Smith, Alaska concluded that Smith's comment and her explanation for it warranted corrective action. *Cf. Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 918 (9th Cir. 1997) (holding that even the presence of "shifting" justifications for an adverse action is not sufficient to defeat summary judgment when the justifications "are not incompatible").

The majority's disagreement with Alaska's characterization of Smith's comment is insufficient to defeat summary judgment. Maj. Op. at 36; *see Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (noting that in considering an employer's proffered reason for an adverse employment action, "courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless" (citation modified)). Pursuant to Alaska's "zero-tolerance" anti-harassment policy, the airline could have gone straight to termination for the Black Lives Matter incident in 2020. The fact that Alaska chose to issue Smith a lesser punishment in the form of suspension is compelling support for the conclusion that its final decision to terminate her employment sixth months later, for similar misconduct, was not a pretext for religious discrimination but rather a decision prompted by Smith's failure to abide by Alaska's directive to comply with its anti-discrimination and anti-harassment policies. *See Staunch v. Continental Airlines,* 511 F.3d 625, 632 (6th Cir. 2008) (explaining the fact that an employer gave a termination warning "is strong evidence that its final decision to terminate [plaintiff's] employment" after another violation of company policy was not pretextual).

### III.

For the reasons explained, I would affirm the district court's order granting Alaska's motion for summary judgment as to Smith's Title VII and corresponding state-law anti-discrimination claims. Accordingly, I respectfully dissent from the court's reversal of the district court's summary judgment ruling on Smith's intentional discrimination claims against Alaska.